Alexander B. Ritchie, Attorney General
Arizona Bar No. 019579
Justine R. Jimmie
Arizona Bar No. 019148
Chase A. Velasquez
New Mexico Bar No. 148293 (*pro hac vice* pending)
SAN CARLOS APACHE TRIBE
P.O. Box 40
San Carlos, AZ 85550
Tel.  (928) 475-3344
Fax: (928) 475-3348
E-M: alex.ritchie@scat-nsn.gov
justine.jimmie@scat-nsn.gov
chase.velasquez@scat-nsn.gov

Attorneys for Plaintiff San Carlos Apache Tribe

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA
### PHOENIX DIVISION

| | |
|---|---|
| San Carlos Apache Tribe, a federally recognized Tribe,<br><br>    Plaintiff,<br> vs.<br><br>United States Forest Service, an agency in the U.S. Department of Agriculture; Neil Bosworth,  Supervisor of the Tonto National Forest; Tom Torres, Acting Forest Supervisor of the Tonto National Forest<br><br>    Defendant. | No. _____<br><br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br><br><br>Jury Trial Demanded |

## INTRODUCTION

1.  This is a complaint for declaratory and injunctive relief. The San Carlos

Apache Tribe ("Tribe") brings this action in connection with federal conduct, actions and

inactions relating to a proposed copper mining operation known as the Resolution Copper Mine ("Mine").  The Mine and the associated facilities necessary for its operation is a mining project proposed by Resolution Copper Mining, LLC ("Resolution"), located near the town of Superior, approximately 40 miles east of Phoenix, Arizona.  Resolution is a limited liability company owned 55% by the Resolution Copper Company, a Rio Tinto PLC subsidiary, and 45% by BHP Copper Inc., a BHP PLC subsidiary.  Resolution seeks to mine an ore body located beneath U.S. Forest Service ("Forest Service") lands in the Tonto National Forest ("TNF").

2.      Resolution's project includes the mine site itself, as well as associated infrastructure and facilities, including but not limited to, large power transmission lines, numerous high capacity groundwater wells, transportation corridors, pipelines, ore processing facilities, service roads, rights of way and a tailings waste storage facility. The Mine and its associated infrastructure will cover over 45,000 acres of federal, state and private land.

3.      The Tribe, a federally recognized American Indian tribe, brings this case because defendant Forest Service has taken actions in violation of federal statutes. The Mine and its associated infrastructure are located on the aboriginal lands of the Western Apache,[1] and other Indian tribes with significant traditional and religious connections to the land. As acknowledged by defendant Forest Service, this mining operation will

---

[1] The term "Western Apache" refers to tribes of Apaches that live in east central Arizona, including the San Carlos Apache Tribe, the White Mountain Apache Tribe, Tonto Apache Tribe, Yavapai-Apache Nation, and the Fort McDowell Yavapai Nation.  This term was developed after 1934, and does not describe the Apache tribes, bands or clans or aboriginal territories that were prevalent prior to the Apache Treaty of 1852 to 1934.

permanently damage, destroy, and irreparably harm sites of profound religious, cultural, and historic significance to the San Carlos Apache Tribe and other Indian tribes, nations, and communities in Arizona.

4.     For ten years or more, Rio Tinto sought to obtain a Congressional legislative land exchange to obtain legal title to the lands where the subsurface ore body is located.  Importantly, the subsurface ore body lies beneath land, known as Oak Flat, where the Tribe and its members have and continue to hold as a religious, holy site. Oak Flat was listed by the U.S. National Park Service as a Traditional Historic Cultural Property on the National Register of Historic Places. Through the efforts of a coalition of Indian tribes, environmental organizations, religious organizations, outdoor recreational groups and others, all of Rio Tinto's congressional attempts to advance the land exchange were rejected.  Consequently, Rio Tinto/Resolution obtained legislators' assistance to append "The Southeast Arizona Land Exchange and Conservation" to a "must pass" national defense appropriations bill.

5.     Section 3003 of the Fiscal Year 2015 National Defense Authorization Act ("NDAA") requires the Forest Service to exchange certain federal lands, including the lands overlying the subsurface copper ore body, to Resolution after certain conditions are fulfilled.   Resolution intends to mine that ore body by a mining method, known as block cave mining.[2] This method will destroy the land above the ore body and leave a massive

---

[2] Block cave mining is defined as "an underground hard rock mining method that involves undermining an ore body, allowing it to progressively collapse under its own weight," where "a large section of rock is undercut, creating an artificial cavern that fills with its own rubble as it collapses," and then the "broken ore falls into a pre-constructed

crater, in which polluted, toxic water will accumulate.  The federal lands to be exchanged with Resolution include lands that currently prohibit any type of mining. These same federal lands are lands which are of historic, cultural and religious significance and importance to the Tribe, and are recognized as the aboriginal lands of Western Apaches before title devolved to the federal government.

6.     Section 3003 of the NDAA, however, required that the Defendant Forest Service fully comply with the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, ("NEPA") and all other applicable public land laws.  A Final Environmental Impact Statement ("FEIS") is a federal action that is subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*.  In the normal sequence of events, the agency would approve a project reviewed in an FEIS via a Record of Decision ("ROD"), which may also be judicially examined under the APA.  In this case, however, Section 3003 of the NDAA mandates that within sixty days after the publication of the FEIS, and predicted upon other requirements (such as the approval of legally-compliant appraisals of the lands to be exchanged), the Forest Service shall consummate the Exchange and convey the federal lands to Resolution.  As detailed herein, these lands are of critical and irreplaceable cultural and religious significance and importance to the Tribe.

---

series of funnels and access tunnels underneath the broken ore mass."
Geoengineering.org, "Block caving: A new mining method arises," Jul. 25, 2018,
https://www.geoengineer.org/news/block-caving-a-new-mining-method-arises.

7.      Section 3003 of the NDAA did not alter the procedures for compliance with the National Historic Preservation Act ("NHPA") or other federal laws which may apply to the Forest Service's environmental examination and analysis contained in the FEIS.

8.      The block cave mining method that Resolution intends to utilize to extract copper ore from the subsurface ore body will create an enormous crater. In the process of extracting ore, the block cave mining method would swallow, damage and destroy Apache sites of sincere historic, religious, and cultural significance to the Tribe and its members at Oak Flat and its immediate environs. The physical destruction, which the Mine and its operation will cause at Oak Flat and its immediate location, will prevent the full and free exercise of the Apache traditional religion, prevent the harvesting of cultural foods and medicines, and forever foreclose access to sites that have been an integral part of Apache life for time immemorial.  The destruction of this land will prevent the Tribe and its members from being able to physically practice and celebrate traditional religious and spiritual ceremonies, comprising of ceremonies, gatherings, celebrations, rituals, and songs, in the location where those ceremonies have been practiced for generations predating the arrival of European contact and the establishment of the United States republic.

9.      The Forest Service has failed to take certain actions in compliance with federal statutes in its review of the Exchange and Mine project, including its construction and operation.  These statutes include, but are not limited to, Section 3003 of the NDAA, the NHPA, the NEPA, and their implementing regulations.

10.     The Forest Service has acted with a haste that compromises the full, independent analyses of impacts caused by the Exchange and the Mine and its associated facilities and operations.  The Forest Service also will not take actions it is required to take to comply with federal statutes authorizing the Mine, its construction and operation.

11.     The Tribe brings this action because the FEIS and related agency actions violate Section 3003 of the NDAA, the NHPA, and the NEPA, among other requirements detailed herein.  Furthermore, the authorization of the land exchange for the mine will violate the free exercise clause of the First Amendment of the U.S. Constitution, as guaranteed by the Apache Treaty of 1852, and the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb, *et. seq.*, as amended.

12.     The Tribe seeks a declaration that the Forest Service violated Section 3003 of the NDAA, environmental, mining, public land, and historic preservation laws.  The Tribe seeks an injunction preventing the Forest Service from issuing a FEIS for the Project.  The Tribe further seeks a declaration that the Forest Service has failed to comply with § 106 of the NHPA and an order requiring full compliance with Section 3003, § 106 of the NHPA and NEPA. The Tribe seeks a further order enjoining any activities or orders advancing the approval of mining operations until Defendants comply with all applicable federal law.   Finally, the Tribe further seeks a declaration that the Forest Service's actions and the Resolution Mine itself violate the free exercise clause of the First Amendment of the U.S. Constitution and the RFRA, and thus are unconstitutional, as well as violations of certain of the Tribe's treaty rights.  Because of these violations,

the Tribe seeks vacatur of the FEIS, appraisals, and any related agency decision or action related to the Exchange or Mine.

## JURISDICTION AND VENUE

13.     Jurisdiction arises under 28 U.S.C. § 1362 ("district courts shall have original jurisdiction of all civil actions, brought by any Indian Tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States"); § 2201 (declaratory relief); and, § 2202 (injunctive relief). This action involves the United States as a defendant and arises under the laws of the United States. An actual, justiciable controversy exists between Plaintiff and Defendants.  Jurisdiction is also conferred by 28 U.S.C. § 1331 (federal question).

14.     Venue in this district is appropriate under 28 U.S.C. § 1391(e) because it is the district in which "a substantial part of the events or omissions giving rise to the claim occurred."

## PARTIES

15.     The Tribe is a federally recognized Indian tribe, organized pursuant to Section 16 of the Indian Reorganization Act of 1934 (48 Stat. 984), with a governing body recognized by the Secretary of the Interior.

16.     The San Carlos Apache Reservation ("Reservation") is situated in three counties in eastern Arizona – Gila, Pinal and Graham. The Reservation is a much smaller portion of the larger aboriginal and ancestral homelands of the Tribe and Western Apaches. The Tribe has a strong religious, historical and cultural connection to the lands

where the Mine, its associated facilities and connected activities are to be located and operated.

17.     Long before Anglo-Europeans appeared in the western hemisphere, the Tribe's and its members' ancestors lived on the land where the Mine and its associated facilities will be located and operated. The Mine, its associated facilities and connected activities include lands of great historical, religious and cultural significance to the Tribe. The Mine, its associated facilities and connected activities, specifically through the block-cave mining method, will intrude upon and destroy waters and lands of cultural, religious, economic and ecological significance to the Tribe and its members. Furthermore, the Mine, its associated facilities and connected activities will despoil, defile and permanently damage unique sacred lands where traditional Apache religious beliefs and practices have been conducted by the Tribe's members and other Indians and Western Apaches long before Anglo-Europeans appeared in the western hemisphere. The Tribe and its members have been and are being harmed by the Forest Service's failure to comply with environmental, historic preservation and other laws which are legally binding on the Forest Service and require Forest Service compliance. The Tribe is suing in its own capacity and as *parens patriae* on behalf of its members.

18.     The Forest Service is a federal agency of the U.S. Department of Agriculture. Defendant Forest Service is, by law, responsible for the management policies and actions undertaken with respect to the public lands at issue here.  By statutory authority, and the agency's own regulations and policies, Defendant Forest Service is also responsible for implementing the NHPA, NEPA, and other land

management laws and regulations pertaining to actions and decisions about lands administered by Defendant.  The Forest Service has an obligation to consult and coordinate with the San Carlos Apache Tribe and other governmental units when making findings and determinations under Section 106 of the NHPA regarding the effects of Forest Service-approved projects on cultural resources.  The Forest Service also has a fiduciary duty under the federal trust responsibility to consult and coordinate with the Tribe and protect the Tribe's properties, including traditional cultural properties and sacred sites, when approving and assessing the effects of projects.

19.    Defendants Neil Bosworth and Tom Torres are sued in their official capacities as the Forest Supervisor and Acting Forest Supervisor for the Tonto National Forest. Bosworth and Torres took and/or authorized the actions alleged herein.  Bosworth and Torres are the responsible officials who oversee, regulate and approve mining activities located in the Tonto National Forest. Bosworth and Torres are named as Defendants only in their official capacities.

20.    By filing this action, the Tribe does not waive its sovereign immunity and does not consent to suit as to any claim, demand, offset, or cause of action of the United States, its agencies, officers, agents, or any other person or entity in this or any other court.

## STATUTORY AND REGULATORY BACKGROUND

### I. SECTION 3003 OF THE FISCAL YEAR 2015 NATIONAL DEFENSE AUTHORIZATION ACT

21.     On December 19, 2014, President Obama signed into law the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act ("NDAA") for Fiscal Year 2015.  Section 3003 of the NDAA authorized the exchange of land between the United States and Resolution. Under the terms of Section 3003, Resolution will obtain title to approximately 2,422 acres of Forest Service lands located in the TNF, including 760 acres of land in an area known as the Oak Flat Withdrawal Area. In exchange, Resolution is required to transfer title to non-federal lands to the Secretaries of Agriculture and Interior.

22.     NDAA Section 3003(c)(9)(A) requires the Secretary of Agriculture to "carry out the land exchange in accordance with the requirements of the [NEPA]".  Prior to conveying any federal land, the Secretary is required to  "prepare a single environmental impact statement under the [NEPA] which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." *Id*. § 3003(c)(9)(B).

23.     The Secretary was required to "engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange." *Id*. § 3003(c)(3)(A).  Following consultation

with the Indian tribes, the Secretary was required to consult with Resolution "and seek to find mutually acceptable measures to -- (i) address the concerns of the affected Indian tribes; and (ii) minimize the adverse effects on the affected Indian tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper under this section." *Id*. § 3003(c)(3)(B).

24.     Before any land exchange may occur, the Secretary of Agriculture is required to have obtained appraisals of the land to be exchanged. *Id*. § 3003(c)(4).  Also, before the land exchange, the Secretary is required to make the appraisals of the land to be exchanged (or a summary thereof) available for public review. *Id.* § 3003(c)(4)(B)(iv). Based on the appraisals, the value of the land exchanged by the Forest Service and the value of the land exchanged by Resolution is required to be equalized.  *Id*. § 3003(c)(5)(A).  The appraisals or summaries of the appraisals have not been made available to the public for review.

25.     The NDAA directs that "Not later than 60 days after the publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper." *Id*. § 3003(c)(10).  The land exchange conveyances cannot occur, however, until the legally-compliant appraisals for all properties to be exchanged have been authorized by the Secretaries of Agriculture and the Interior and provided for public review.

26.     The Forest Service has informed the Arizona Mining Reform Coalition that the Final EIS will be published on January 15, 2021; however, the Tribe has not received

any formal notice to this effect, leaving the Tribe guessing whether the publication will be issued.

27.     Despite requests from the public and the Tribe to allow public review of the appraisals, no information on the appraisals has been provided.

28.     Although Congress directed the Forest Service to exchange the federal parcels at and around Oak Flat described in the NDAA, it also required the Forest Service to otherwise comply with the NDAA, NEPA, and all applicable federal law. Nothing in the NDAA excused the Forest Service from compliance with NEPA, NHPA and all other applicable federal laws and regulations.

29.     The Forest Service cannot defer or postpone review of any portion of the land exchange or any aspect of the mine project because Congress mandated that a single EIS be used as a basis "for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations . . ." *Id*. § 3003(c)(9).

30.     The Forest Service has advised the Tribe that the appraisals of the Federal and Non-Federal Lands will not be completed prior to the publication of the FEIS. Because the Land Exchange for Oak Flat can occur immediately after the publication of the FEIS and submittal of the legally-compliant appraisals to the public, the Tribe and its members will be irreparably damaged and harmed by the issuance of the FEIS, appraisals, and Exchange.  Even if any appraisal information is contained in the FEIS, the Tribe and its members will be irreparably damaged and harmed because they will not have had the opportunity to review and comment upon the appraisals before the FEIS is issued and the Exchange for Oak Flat is consummated. Importantly, it would be pointless

to comment on any appraisal after the Exchange and FEIS because the property would be private property once the transfer occurs.

31.     The Forest Service, the Interior Department and Resolution all interpreted and understood that Section 3003 of the NDAA requires the completion of the appraisals prior to entering into an exchange agreement.  "It is understood that upon approval of the appraisals required by the Act, the parties may enter into an exchange agreement." "Agreement to Initiate" https://www.resolutionmineeis.us/sites/default/files/project-files/usfs-tonto-agreement-initiate-land-exchange-20171215.pdf, page 2, ¶ 3.

## II. THE NATIONAL HISTORIC PRESERVATION ACT

32.     Congress enacted the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101 *et seq.*, in 1966, with the expressed intent that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people."

33.     Section 106 of the NHPA requires that, prior to issuance of a federal permit or license, federal agencies shall take into consideration the effects of an "undertaking" on historic properties." 54 U.S.C. § 306108. Agencies "must complete the section 106 process prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." 36 C.F.R. § 800.1(c).  The NHPA established the Advisory Council on Historic Preservation ("ACHP"), an independent federal agency with the primary mission to encourage historic preservation in the government and across the nation.

34.     The NHPA defines undertaking as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including – (1) those carried out by or on behalf of the Federal agency; (2) those carried out with Federal financial assistance; (3) those requiring a Federal permit, license, or approval; and (4) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency." 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y).

35.     Early in the NHPA process, an agency must determine the area of potential effects ("APE") of a federal undertaking. 36 C.F.R. § 800.4(a)(1). The APE is defined by regulation to include the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties. … The [APE] is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *Id*. § 800.16(d).

36.     The NHPA Section 106 process requires federal agencies involved in undertakings to make a reasonable and good faith effort to identify and disclose historic properties within affected areas, evaluate the potential adverse effects of the federal undertaking to the historic properties, and seek ways to avoid, minimize, or mitigate any adverse effects to the historic properties.  36 C.F.R. §§ 800.4-800.6.

37.     The Section 106 process requires consultation with Indian Tribes on federal undertakings that potentially affect sites that are culturally significant to Indian Tribes. 36 C.F.R. § 800.2(c)(2); 54 U.S.C. § 302707 (properties "of traditional religious and cultural importance to" a Tribe may be included on the National Register, and federal agencies "shall consult with any Indian Tribe…that attaches religious or cultural significance" to

such properties). Consultation must occur regarding sites with "religious and cultural significance" even if they occur on ancestral or ceded land outside of a Tribe's reservation boundaries.  36 C.F.R. § 800.2(c)(2)(ii)(D).

38.     Federal agencies are required to consult with Indian tribes such as Plaintiff on a government-to-government basis pursuant to Executive Orders, Presidential memoranda, and other authorities.  Section 800.2(c)(2)(ii)(B) of the ACHP's regulations remind federal agencies that "the Federal Government has a unique legal relationship with Indian tribes set forth in the Constitution of the United States, treaties, statutes, and court decisions.  Consultation with Indian tribes should be conducted in a sensitive manner respectful of tribal sovereignty.  Nothing in this part alters, amends, repeals, interprets or modifies tribal sovereignty, any treaty rights, or other rights of an Indian tribe, or preempts, modifies or limits the exercise of such rights." *Id.*

39.     Section 800.2(c)(2)(ii)(C) of the ACHP's regulations further states "consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes.  The agency official shall consult with representatives designated or identified by the tribal government."

40.     Section 302706(b) of the NHPA (54 U.S. Code) specifically requires that "in carrying out its responsibilities under [Section 106], a Federal agency shall consult with any Indian tribe . . . that attaches religious and cultural significance to [historic properties that may be affected by the undertaking]."

41.     The NHPA and its implementing regulations further and specifically provide that "[c]onsultation [with Indian tribes] should commence early in the planning

process, in order to identify and discuss relevant preservation issues . . ." (36 C.F.R. § 800.2(c)(2)(ii)(A)), and that federal agencies provide the tribe with "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id.* § 800.5(c)(2)(ii)(A). The agency must evaluate the historic significance of such sites and determine whether they are potentially eligible for listing under the National Register. *Id*. § 800.4(c).

42.     Under the consultation regulations, an agency official must "ensure" that the process provides Tribes with "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties . . . articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  *Id*. § 800.2(c)(ii)(A). This requirement imposes on agencies a "reasonable and good faith effort" by agencies to consult with Tribes in a "manner respectful of tribal sovereignty." *Id*. § 800.2(c)(2)(ii)(B).

43.     Acting "in consultation with … any Indian tribe … that might attach religious and cultural significance to properties within the area of potential effects, the agency official shall take steps necessary to identify historic properties within the area of potential effects." *Id*. §800.4(b).

44.     If the agency determines that no historic properties will be affected by the undertaking, it must provide notice of such finding to the state and tribal historic preservation offices, and the ACHP, which administers the NHPA.  *Id*. § 800.4(d). The

regulations give those parties the opportunity to object to such a finding, which elevates the consultation process further. *Id*.

45.     If the agency finds that historic properties are affected, it must provide notification to all consulting parties, and invite their views to assess adverse effects. *Id*. Any adverse effects to historic properties must be resolved, involving all consulting parties and the public. *Id*. § 800.6. If adverse effects cannot be resolved, the process is elevated again to the ACHP and the head of the agency undertaking the action. *Id*. §800.7. Until this process is complete, the action in question cannot go forward.

46.     The ACHP authorizes agencies to adopt their own regulations for implementing its § 106 obligations. Such regulations must be reviewed and approved by the ACHP in order to be valid. *Id*. § 800.14. The Forest Service has adopted procedures intended to satisfy its § 106 obligations.

47.     Section 106 regulations provide a compliance mechanism under which agencies can negotiate a "programmatic agreement" with the ACHP to resolve "complex project situations or multiple undertakings." 36 C.F.R. § 800.14(b). Such agreements are suitable for "when effects on historic properties are similar and repetitive or are multi-State or regional in scope;" "when effects on historic properties cannot be fully determined prior to approval of an undertaking;" or when "nonfederal parties are delegated major decision-making responsibilities," among other situations. *Id*. § 800.14(b)(1). Programmatic agreements require consultation with Tribes, as well as public participation and public comment.

### III. THE NATIONAL ENVIRONMENTAL POLICY ACT

48.     NEPA, 42 U.S.C. §§ 4321–4370f, is the "basic national charter for
protection of the environment." 40 C.F.R. § 1500.1(a). It makes environmental protection
a part of the mandate of every federal agency. 42 U.S.C. § 4332(1).

49.     NEPA seeks to ensure that federal agencies take a "hard look" at
environmental concerns. One of NEPA's primary purposes is to ensure that an agency,
"'in reaching its decision, will have available, and will carefully consider, detailed
information concerning significant environmental impacts.'" *Robertson v. Methow Valley
Citizens Council*, 490 U.S. 332, 349 (1989). NEPA also "guarantees that the relevant
information [concerning environmental impacts] will be made available to the larger
audience," including the public, "that may also play a role in the decision-making process
and the implementation of the decision." *Id*.

50.     NEPA requires agencies to fully disclose all of the potential adverse
environmental impacts of its decisions before deciding to proceed. 42 U.S.C. § 4332(C).
NEPA also requires agencies to use high quality, accurate scientific information and to
ensure the scientific integrity of the analysis. 40 C.F.R. §§ 1500.1(b) and 1502.24.

51.     If an agency action has adverse effects that are "significant," they need to
be analyzed in an environmental impact statement ("EIS"). 40 C.F.R. § 1501.4.

52.     NEPA's governing regulations define what "range of actions, alternatives,
and impacts [must] be considered in an environmental impact statement." 40 C.F.R. §
1508.25. This is in part what is known as the "scope" of the EIS. The EIS must consider
direct and indirect effects. The direct effects of an action are those effects "which are

caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). The

indirect effects of an action are those effects "which are caused by the action and are later

in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. §

1508.8(b).

53.     An agency must also analyze and address the cumulative impacts of a

proposed project. 40 C.F.R. § 1508.25(c)(3). Cumulative impacts are the result of any

past, present, or future actions that are reasonably certain to occur. Such effects "can

result from individually minor but collectively significant actions taking place over a

period of time." 40 C.F.R. § 1508.7.

54.     The Tribe has learned from third parties that TNF has announced that it will

publish the FEIS for the Resolution Copper Project and Land Exchange on January 15,

2021.

IV.     RELIGIOUS FREEDOM RESTORATION ACT AND FIRST AMENDMENT

55.     Under the Religious Freedom Restoration Act ("RFRA"), "the government

shall not substantially burden a person's exercise of religion even if the burden results

from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). The government may

burden a person's exercise of religion, however, if the government action "is in

furtherance of a compelling governmental interest [and] is the least restrictive means of

furthering that compelling governmental interest." *Id.* § 2000bb-1(b). In passing RFRA,

Congress found and affirmed that the free exercise of religion is "unalienable right." *Id.* §

2000bb(a)(1).

56.     RFRA applies to all Federal law, whether statutory or otherwise, and to actions taken by the government thereunder, and whether or not adopted before or after November 16, 1993. 42 U.S.C. § 2000bb-3(a). RFRA defines the term "government" to include, "a branch, department, agency, instrumentality, and official . . . of the United States, or a covered entity." 42 U.S.C. § 2000bb-2 (1).

57.     A person whose religious exercise has been burdened…may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. 42 U.S.C. § 2000bb-1(c).

58.     The Apache Treaty of 1852 (10 Stat. 979) guaranteed that the Tribe and its members "are lawfully and exclusively under the laws, jurisdiction and government of the United States . . ."  The Tribe's members are descendants of the beneficiaries of the Apache Treaty of 1852.

59.     In 1852, Apaches were guaranteed the rights, protections and benefits of the First Amendment to the United States Constitution.

60.     As descendants of the beneficiaries of the Apache Treaty of 1852, the Tribe and its members are the successors to the benefits, advantages, merits and protections of the RFRA.

FACTUAL ALLEGATIONS

I.     INTERESTS OF THE SAN CARLOS APACHE TRIBE

61.     Since time immemorial, the Tribe's ancestors have used and occupied a broad area throughout States of Arizona and New Mexico, as well as the State of Sonora and Chihuahua of the United Mexican States.  The entire area of the Resolution mining

operation including, but not limited to, large power transmission lines, numerous high capacity groundwater wells, transportation corridors, pipelines, ore processing facilities, service roads and a tailings waste storage facility, are located on Western Apache aboriginal lands.  The Western Apache and other Indian tribes have identified their ancestral roots to this area.  Within the area of the planned copper mining operations is a landscape filled with cultural and historical significance central to the Tribe's identity, as well as to the traditional Apache religion. Within this landscape is Oak Flat, a site of religious significance to the Tribe and its members, where members of the Tribe have and continue to practice Apache culture, tradition and religion, comprising of ceremonies, songs, rituals, gatherings, and celebrations. Throughout this entire land exchange proposal and process, the sincerity of these beliefs have not been questioned nor disputed by defendant Forest Service.

62.     The Tribe's traditional and ancestral territory extends well beyond the current Reservation's exterior boundaries, encompassing lands that are the subject of this action. The TNF has repeatedly acknowledged these lands as Apache traditional homelands and has acknowledged the lands within and around the proposed copper mining operations as the aboriginal lands used by the Tribe's ancestors.

63.     The Tribe's cultural resources are historically and traditionally interrelated with the Tribe's land and aboriginal territory.  The vast majority of this land is outside the exterior boundaries of the Reservation. Protection of the Tribe's heritage, including the practice of Apache tradition and religion, is of significant importance to the Tribe and its members, including Apache medicine people, practitioners, and elders. Destruction or

damage to cultural or religious resources or sites destroys the Tribe's culture, history, and Apache religion.  Destruction or damage to the Tribe's cultural and Apache religious resources causes immediate, permanent, and irreparable injury to the Tribe and its members, as well as Apache traditional religion itself.

64.     Cultural and religious resources of significance to the Tribe are located on the lands that are the subject of this action including all of the lands which Resolution will utilize for its vast operation, in particular Oak Flat. The lands within the Area of Potential Effects for the Mine and its associated facilities are historically, culturally and spiritually significant to the Tribe and its members.

65.     The Tribe and its members also have a historical, cultural and religious interest in preserving the quality of the land, water, air, fauna, and flora within the Tribe's traditional and aboriginal territory, within and outside of the Reservation.

II.     THE FOREST SERVICE'S ISSUANCE OF A FINAL ENVIRONMENTAL IMPACT STATEMENT

66.     The Forest Service will publish a Final Environmental Impact Statement on January 15, 2021.  On January 10, 2021, Acting Forest Supervisor Torres corresponded to the Tribe's Chairman, Terry Rambler, responding to the Tribe's December 22, 2020 correspondence. Acting Forest Supervisor Torres made clear that the TNF would not issue a Supplemental Draft Environmental Statement for public or professional comment, despite the Tribe raising issues that justified a supplement. On the subject of new data and information collected and analyzed by the TNF after the publication of the DEIS and not shared with the general public, Mr. Torres wrote:

For NEPA projects involving a Forest Service decision, we rely on the Council on Environmental Quality Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act (40 CFR 1500-1508) and agency-specific guidance. Generally, an EIS is prepared in two stages (draft and final). They *may* be supplemented if warranted. An agency may supplement either draft or final EISs if there are substantial changes in the proposed action; or there are significant (sic) new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts (40 CFR 1502.9).

\* \* \*

We have concluded that the information gathered between draft and final stages of EIS preparation, while voluminous in content, results in only minor changes to the analysis conclusions and is qualitatively within the spectrum of the alternatives and impacts discussed in the DEIS. Much of the information collected after the DEIS fills data gaps or addresses analysis uncertainty and responds directly to public comments. Some of the data have informed new protective measures or revisions to alternative components resulting in fewer environmental impacts. These outcomes are all part of the modest changes to be disclosed in the FEIS. Thus, we have determined that the additional information received between draft and final statements are not significant and therefore do not require a supplement.

Correspondence, Torres to Rambler, January 10, 2021, pp. 2-3 (emphasis supplied).

67.     However, Acting Supervisor Torres misstated the terms of 40 CFR 1502.9(b), which provides that "Agencies *SHALL* prepare supplements. . . ." (Emphasis supplied). The Forest Service must publish a supplemental DEIS for public review. Chairman Rambler's Correspondence explained that both reports of BGC, TNF's third-party contractor, and the Tribe's expert, Dr. James Wells, presented "significant new circumstances or information. . ." Therefore, the Forest Service must stop publication of the FEIS and undertake a supplemental draft EIS for public review and comment. Failure to do so will result in irreparable harm to the Tribe because the land exchange will be ripe for transfer.

68.     Mr. Torres also wrote that the Council on Environmental Quality regulations in effect for the NEPA analysis at issue identified the need for scientific integrity and that "[a] critical part of the role of the third-party contractor is to provide the Forest Service access to objective professionals with specific technical expertise, in order to evaluate data and analysis provided by the proponent and ensure the scientific integrity of that work." *Id*. p. 4.

69.     Chairman Rambler's December 22, 2020 correspondence transmitted the report of the Tribe's geo-hydrologic expert, Dr. James Wells, and supporting documentation, which opined that a Supplemental Draft Environmental Impact Statement was required for further public review and comment.

70.     Mr. Torres' January 10, 2021 correspondence readily acknowledged that several studies and reports were prepared and received after the publication of the DEIS: "We also have evaluated the information that became available after the DEIS was published, including several studies and reports that we identified in the DEIS as necessary for evaluation and inclusion with the FEIS and several reports and data requested for further consideration as a follow-up to comments received on the DEIS." According to Mr. Torres: "These are normal agency actions taken to fulfill our NEPA obligations between draft and final stages of document preparation."

71.     SWCA's Chris Garrett prepared a "white paper" for the Groundwater Modeling Workgroup "to propose a path forward" to respond to the "numerous comments – criticisms to be more specific – on the groundwater modeling analysis and results used in the Draft EIS."  Mr. Garrett's white paper is an extensive document (134

pages) that recommends a process to respond to 15 categories of comments on or criticisms of the DEIS groundwater modeling analysis and results. The white paper's intent was "to make very clear the conclusion the NEPA team arrived at internally and the direction they intend to follow, for sharing with the Workgroup." The white paper executive summary acknowledges the need for new text in the FEIS, the addition of data to the project record and even revised analysis for specific topics. Despite acknowledging the need for additional data and revised analysis, the white paper never intended for the additional data or revised analysis to be subjected to public or professional review. The term "supplemental DEIS" never appears in the white paper.

72.     The predetermined path set forth in the white paper that a supplemental DEIS would not be prepared violates NEPA and the Forest Service Handbook, FSH 1909.15 – National Environmental Policy Act Handbook, 25 - Requirements Specific To A Final Environmental Impact Statement, and calls the objectivity and scientific integrity of the EIS into question.

73.     Section 3003 of the NDAA provides that the Secretary of Agriculture will "convey all right, title and interest" to federal lands to Resolution within sixty days of the publication of the FEIS. Section 3003(c)(10). After public issuance of legally-complaint appraisals for all properties to be exchanged, the NDAA authorizes the USFS to convey federal lands to Resolution following the publication of the FEIS.

74.     The Forest Service by the TNF has specified that it will publish the FEIS on January 15, 2021. The TNF has made clear that it will not delay the publication of the FEIS.

### III.   FACTS RELATED TO THE FOREST SERVICE'S ISSUANCE OF A PROGRAMMATIC AGREEMENT REGARDING COMPLIANCE WITH THE NATIONAL HISTORIC PRESERVATION ACT

75.   Section 106 of the NHPA requires that, prior to issuance of a federal permit or license, federal agencies take into consideration the effects of an "undertaking" on historic properties. 54 U.S.C. § 306108.

77.   Section 3003 of the NDAA requires the preparation of a single EIS to be used as a basis for all decisions under federal law related to the proposed Mine, the mine plan of operations and any related federal actions affecting the quality of the human environment.  Section 3003(c)(9)(B).

78.   The preparation of the EIS mandated by Section 3003 of the NDAA requires consideration of the impacts on cultural and archeological resources and identify measures to minimize potential adverse impacts on such resources.  Section 3003(c)(9)(C).  The NHPA Section 106 process conducted by the USFS did not comply with this requirement.

79.   Section 3003 of the NDAA did not modify any provision of the NHPA as applied to the Exchange or Mine, or any associated mining facilities or mining operation.

80.   On March 4, 2016, the U.S. National Park Service listed the Chi'chil Bildagoteel Historic District Traditional Cultural Property (Oak Flat) on the National Register of Historic Places.[3]

---

[3] Chi'chil Bildagoteel is an Apache word that means Oak Flat in English.

81.    The Forest Service was and remains aware of the sacred, cultural and archeological sites within the Chi'chil Bildagoteel Historic District Traditional Cultural Property ("TCP")

82.    The Forest Service was also aware that the Resolution General Plan of Operations ("GPO") called for mining operations on federal lands in and beyond the Chi'chil Bildagoteel TCP.

83.    The Forest Service did not consult with the Tribe in compliance with the NHPA, Section 3003 of the NDAA or the NEPA.  Indeed, the Forest Service classified activities it undertook as consultation which were actions that pre-dated Resolution's filing of its GPO with the Forest Service.

84.    The Forest Service undertook a flawed process to consider the impacts of the Resolution mine Project on historic and culturally significant sites that was flawed.

85.    The Forest Service's attempts at § 106 consultation failed to examine the full range of the Mine's operations and its associated facilities.  The Forest Service's consultations efforts focused on only portions of the entire mining Project. The consultation process suffered from inadequate and late field work and delays in processing and reporting.

86.    The TNF claims it has finalized a Programmatic Agreement ("PA") regarding the federal undertaking covering the Mine and the Land Exchange. The TNF has represented that the 9th version of the PA is final.  The TNF has not presented an executed 9th version of the PA.

87.     According to the 9th version of the PA "the land exchange authorized by the Southeast Arizona Land Exchange and Conservation Act and the authorization of the use of Federal land that is not included in the exchange constitute a Federal undertaking" requiring compliance with Section 106 of the NHPA and Section 3003(c)(9)(C) of the NDAA.

88.     According to the TNF, the 9th version of the PA purports to comply with the NHPA and with Section 3003 of the NDAA. The Tribe has objected to this version as not in compliance with the NHPA or Section 3003 of the NDAA and has made these objections known in writing to TNF, since the beginning of version 1.

89.     On December 15, 2020, Director Reid Nelson, of the ACHP's Office of Federal Agency Program, wrote to the Acting Forest Supervisor of the TNF setting forth the ACHP's observations that the TNF's "communications with consulting parties remain inconsistent and at times lack transparency . . ." and that it was not clear how the TNF was "managing its consultation responsibilities."  Director Nelson's correspondence continued by providing "observations and recommendations to assist TNF in moving the Section 106 review for this undertaking to closure."

90.     The TNF's Acting Forest Supervisor Tom Torres spurned Director Nelson's recommendations, advised the ACHP that it had developed a final PA and the TNF would proceed with the execution of the final PA.

91.     The final PA being circulated by the TNF for execution does not comply with the Section 106 consultation and review process mandated by the NHPA or applicable federal regulations.

92.     The final PA being circulated by the TNF for execution does not comply with Section 3003 of the NDAA or the December 15, 2020 recommendations of the ACHP's Office of Federal Agency Program.

93.     The development of the entire Mine and associated facilities will destroy historic or culturally significant sites within the Project's Area of Potential Effects ("APE") that are already known but unevaluated historic sites within the Project's APE. In other words, sites that may be eligible for protection under the NHPA and which should be documented in the final PA.

94.     Consultation with the Tribe on the Project, on ancestral land with great historic, cultural and religious importance to the Tribe and its members, has been inadequate.

95.     On numerous occasions, the Chairman of the Tribe expressed to the Forest Service personnel concerns about historical, cultural and religious impacts, and sought to engage the Forest Service in a good-faith consultation process as required by the NHPA and § 106 regulations.

96.     The Forest Service was well aware of the Tribe's concerns about historical, cultural and religious impacts as a consequence of prior litigation regarding a portion of the Resolution mining Project. *See generally* No. 16-cv-03115-PHX-DGC (2017).  The Forest Service was also aware that the Tribe's concerns about historical, cultural and religious impacts extended well beyond the limited area at issue in the prior litigation.

97.     The Forest Service's efforts to comply with its § 106 obligations were intermittent, sporadic and interrupted by long periods of inactivity and no

communications with the Tribe.  The Forest Service received criticism from ACHP regarding its consultation efforts.  In the Fall of 2019, ACHP laid out a number of criticisms of the Forest Service's compliance with § 106 and made recommendations for additional steps that the Forest Service could take.

98.     Shortly, after it received this criticism from ACHP regarding its consultation efforts, the Forest Service barred the general public from further participation in the § 106 consultation process.

99.     Several of the Forest Service's consultation efforts were limited to federal agencies, state agencies and Resolution.  The general public and the Tribe were unaware of these consultation efforts. Even when TNF attempted to have consultation sessions, the appropriate TNF official was not present to answer questions or provide updates.

100.    On December 23, 2019, the Tribe submitted extensive comments on the Draft EIS, highlighting both the flaws in the § 106 consultation process as well as the significant historic, cultural religious resources that could be harmed by the Project.

101.    The Forest Service's § 106 compliance is flawed because of the Forest Service's failure to properly define the undertaking and area of potential effects; inadequate Tribal consultation and incomplete identification efforts; exclusion of the general public from participation in the § 106 and other procedural flaws.

102.    The 9th and final version of the PA is flawed because the Forest Service has not complied with its § 106 consultation obligations.

103     On January 7, 2021, Terry Rambler, Chairman of the Tribe, wrote ACHP Director Nelson, objecting to the 9th version of the ACHP as unacceptable and in violation of the NHPA.

104.    When the Final EIS is published by the Forest Service on January 15, 2021, it will have been published prior to the execution of the final version of the PA.

IV.     FACTS RELATED TO NATIONAL ENVIROMENTAL PROTECTION ACT COMPLIANCE

105.    The Forest Service has specified that the Final EIS will be published on January 15, 2021.

106.    If the Final EIS is published on January 15, 2021, it will be published prior to its completion according to Section 3003 of the NDAA, the finalization of the § 106 NHPA process, the completion of a legally compliant FEIS and the Agreement to Initiate between the Forest Service, BLM and Resolution.

CLAIMS FOR RELIEF

Claim 1

VIOLATION OF SECTION 3003 OF THE NDAA

107.    Plaintiff incorporates the allegations in all preceding paragraphs.

108.    The Forest Service's actions and decisions in the preparation, issuance, and reliance upon the inadequate FEIS as part of its review and approval of the Land Exchange and the Resolution Project, including the failure to take the required "hard look" at the Exchange and the Resolution Project and comply with the public and agency review requirements under NEPA and Section 3003 of the NDAA, were arbitrary,

-31-

capricious, an abuse of discretion, contrary to the NDAA and NEPA, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations.

109.    The Forest Service's actions, inactions and decisions in the preparation, issuance and presentation of the appraisals to be conducted on the Federal land and non-Federal land after the consummation of the land exchange were arbitrary, capricious, an abuse of discretion, contrary to the NDAA, not in accordance with the law, and without observance of procedures required by law and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the NDAA Section 3003(c)(4)(B)(iv) and the APA Section 706 *et seq.*

110.    Absent injunctive and declaratory relief, the Tribe's members have been and will continue to be harmed.

### Claim 2
### FAILURE TO CONSULT UNDER § 106 OF THE NHPA; VIOLATION OF SECTION 3003 OF THE NDAA

111.    Plaintiff incorporates the allegations in all preceding paragraphs.

112.     Issuance of any permit for the construction or operation of the Resolution mining Project is an "undertaking" as defined in the NHPA. As such, § 106 consultation is required to determine the effect of such undertaking on historic or culturally significant properties.

113.    Section 3003(c)(9)(C) of the NDAA requires that the single EIS prepared under Section 3003 assess the effects of the mining and related activities on the Federal

land on the cultural and archeological resources that may be located on the Federal land; and  identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources.

114.   The § 106 determination of the effect of the Resolution mining activities Land Exchange on historic or culturally significant properties does not adequately assess the effects of the mining and related activities on the cultural and archeological resources that may be located on the Federal land, particularly the Tribe and its members hold as central to Apache tradition and religion ; nor does the § 106 determination adequately identify measures that may be taken to minimize potential adverse impacts on the cultural and archeological resources.

115.   The § 106 determination of the effect of the Resolution mining activities and land exchange on historic or culturally significant properties has not been completed and will not be completed prior to January 15, 2021, the date the FEIS will be published, which is not consistent with Section 3003 of the NDAA.  Any properties identified for the land exchange in the final EIS will not have the benefits of any protection or mitigation of adverse impacts on the cultural and archeological resources which may have been provided in the final PA.

116.   The § 106 determination of the effect of the Resolution mining activities Land Exchange on historic or culturally significant properties does not adequately address mitigation of adverse impacts on the cultural and archeological resources.

117.    The Forest Service will have failed to consider the impacts of the Resolution mining activities and operations or Land Exchange on historic or culturally significant properties, before a Final EIS will be published on January 15, 2021.

118.    Absent injunctive and declaratory relief, the Tribe's members have been and will continue to be harmed.  The Forest Service's actions, inactions and decisions in the preparation, issuance and presentation of the appraisals to be conducted on the Federal land and non-Federal land after the consummation of the land exchange were arbitrary, capricious, an abuse of discretion, contrary to the NDAA, not in accordance with the law, and without observance of procedures required by law and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the NDAA Section 3003(c)(4)(B)(iv) and the APA Section 706 *et seq.*

## Claim 3

### SECTION 3003 OF THE NDAA AS APPLIED VIOLATES THE RELIGIOUS FREEDOM RESTORATION ACT

119.    Plaintiff incorporates the allegations in all preceding paragraphs.

120.    The Religious Freedom Restoration Act of 1993 applies to Section 3003 of the NDAA and applies to defendant Forest Service as a federal agency.

121.    The transfer of the land exchange, pursuant to Section 3003 of the NDAA, will authorize block-cave mining on lands, which the Tribe's members hold as cultural and religious, and will result in being irreparably damaged and destroyed. Accordingly, Section 3003 of the NDAA and its application by the government have placed a

substantial burden on the Tribe's members' free exercise of their sincerely held religious beliefs.

122.    Section 3003 of the NDAA and its application discriminate against the Tribe's members and create a government imposed coercive pressure on the Tribe's members to change or violate their religious beliefs.

123.    Section 3003 of the NDAA and its application chill the Tribe's members' religious exercise.

124.    Section 3003 of the NDAA does not identify any compelling government interest, nor has the government identified any such interest in the application of Section 3003.

125.    The United States through its agency the Forest Service is not furthering or advancing a compelling government interest.

126.    Any government interest which may exist has not been shown by the United States through its agency, the Forest Service, as either compelling or being advance by the least restrictive means of furthering that interest.

127.    Section 3003 of the NDAA and its threatened enforcement by Defendants violates the Tribe's members' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.* The Forest Service's actions, inactions and decisions in the preparation, issuance and presentation of the appraisals to be conducted on the Federal land and non-Federal land after the consummation of the land exchange were arbitrary, capricious, an abuse of discretion, contrary to the NDAA, not in

accordance with the law, and without observance of procedures required by law and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the NDAA Section 3003(c)(4)(B)(iv) and the APA Section 706 *et seq.*

128.    Absent injunctive and declaratory relief, the Tribe's members have been and will continue to be harmed.

### Claim 4

#### SECTION 3003 OF THE NDAA PROHIBITS THE TRIBE'S MEMBERS' TREATY RIGHT TO THE FREE EXERCISE OF THEIR RELIGIOUS BELIEFS

129.    Plaintiff incorporates the allegations in all preceding paragraphs.

130.    The Apache Treaty of 1852 (10 Stat. 979) guaranteed that the Tribe and its members "are lawfully and exclusively under the laws, jurisdiction and government of the United States . . ." *Id.*  The Tribe's members are descendants of the beneficiaries of the Apache Treaty of 1852.

131.    In 1852, Apaches were guaranteed the rights, protections and benefits of the First Amendment to the United States Constitution.

132.    The Tribe's members' right to the free exercise of their religious beliefs was guaranteed by the Treaty.

133.     Section 3003 of the NDAA is a law enacted by the Congress of the United States which denies the Tribe's members and other Apaches the free exercise of their religion of choice.

134.    The enforcement of Section 3003 of the NDAA which will demolish the Tribe's and its members' sacred grounds in and around Oak Flat amounts to a case of

aggression against and maltreatment of the Tribe's and its members in violation of the Apache Treaty.

135.   The United States and its agency have not established that Section 3003 of the NDAA is justified by a compelling government interest.

136.   Section 3003 of the NDAA targets Apache traditional religious adherents in violation of the First Amendment of the United States Constitution and the Apache Treaty. The Forest Service's actions, inactions and decisions in the preparation, issuance and presentation of the appraisals to be conducted on the Federal land and non-Federal land after the consummation of the land exchange were arbitrary, capricious, an abuse of discretion, contrary to the NDAA, not in accordance with the law, and without observance of procedures required by law and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the NDAA Section 3003(c)(4)(B)(iv) and the APA Section 706 *et seq.*

137.   Absent injunctive and declaratory relief, the Tribe's members have been and will continue to be harmed.

## **REQUEST FOR RELIEF**

For the foregoing reasons, Plaintiff respectfully request that this court:

A.   Declare that the United States through the Forest Service have violated Section 3003 of the NDAA, the NHPA, the Apache Treaty, RFRA and the 1st Amendment to the United States Constitution and the implementing regulations and policies of these laws;

B.   Enjoin the Forest Service from issuing the FEIS and taking any actions or

decisions based on the FEIS;

C.      Enjoin the Forest Service from allowing, authorizing, or approving the

Land Exchange or any aspect of the Resolution Project in reliance on the FEIS

until the Forest Service has complied with Section 3003 of the NDAA, the NHPA,

the RFRA, the NEPA, and, the other laws noted herein, and the implementing

regulations and policies of these laws;

D.      Vacate and Set Aside the FEIS, appraisals, and all agency actions

challenged herein under the APA;

E.      Award Plaintiff its reasonable fees, costs, expenses, and disbursements,

including attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412,

and any other applicable federal law; and

F.      Grant such additional relief as this court deems equitable, just, and proper.

Respectfully submitted this 14th day of January, 2021

/s/ Alexander B. Ritchie
Alexander B. Ritchie (AZBN 019579)
Attorney General
E-m: Alex.ritchie@scat-nsn.gov

/s/ Justine R. Jimmie
Justine Jimmie (AZBN 019148)
Deputy Attorney General
E-m: Justine.jimmie@scat-nsn.gov

/s/ Chase A. Velasquez
Chase A. Velasquez (NMBN 148294)

(*pro hac vice* pending)
Assistant Attorney General
E-m: chase.velasquez@scat-nsn.gov


San Carlos Apache Tribe
Department of Justice
Post Office Box 40
San Carlos, Arizona 85550
Tel. (928) 475-3344
Fax. (928) 475-3348

*Attorneys for Plaintiff*


VERIFICATION OF COMPLANT ACCORDING TO 28 U.S.C. 1746

I declare under penalty of perjury that the foregoing complaint is true and correct

to the best of my knowledge.

Executed on January 14, 2021.


_____
Terry Rambler,
Chairman, San Carlos Apache Tribe
*I certify that I have signed the original*
*of this document, which is available for*
*inspection at any time by the Court or a*
*party to this action.*

VERIFICATION OF COMPLANT ACCORDING TO 28 U.S.C. 1746

I declare under penalty of perjury that the foregoing complaint is true and correct

to the best of my knowledge.

Executed on January 14, 2021.

/s/ Vernelda Grant
Vernelda Grant
Director/Tribal Archaeologist/THPO
Historic Preservation & Archaeology
Department
San Carlos Apache Tribe
*I certify that I have signed the original
of this document, which is available for
inspection at any time by the Court or a
party to this action.*