Alexander B. Ritchie, Attorney General
Arizona Bar No. 019579
Justine R. Jimmie
Arizona Bar No. 019148
Chase A. Velasquez
New Mexico Bar No. 148293 (*pro hac vice*)
SAN CARLOS APACHE TRIBE
P.O. Box 40
San Carlos, AZ 85550
Tel.  (928) 475-3344
Fax: (928) 475-3348
E-M: alex.ritchie@scat-nsn.gov
justine.jimmie@scat-nsn.gov
chase.velasquez@scat-nsn.gov

Attorneys for Plaintiff San Carlos Apache Tribe

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## PHOENIX DIVISION

| | |
|---|---|
| San Carlos Apache Tribe, a federally recognized Tribe, <br><br>                  Plaintiff, <br>    vs. <br><br> United States Forest Service, *et al.*, <br><br>                 Defendants. | No. CV-21-0068-PHX-DWL <br><br><br> Oral Argument Requested |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
## PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ............................................................................................................1

FACTS .........................................................................................................................2

LEGAL STANDARD FOR PRELIMINARY INJUNCTION .....................................................9

ARGUMENT ...............................................................................................................10

I.     The Requirements of NDAA Section 3003 Have Not Been Performed And Therefore Plaintiff is Entitled to a Preliminary Injunction .......................................10

A.     Irreparable Harm ................................................................................12

B.     Likelihood of Success on the Merits ....................................................13

C.     A Preliminary Injunction is in the Public Interest.................................16

D.     The Balance of Equities Tips in the Tribe's Favor ...............................17

# TABLE OF AUTHORITIES

***Federal Caselaw***

Alliance for the Wild Rockies v. Cottrell,
632 F.3d 1127 (9th Cir. 2011) .....................................................................10

Boise Cascade Corp. v. U.S. E.P.A.,
942 F.2d 1427 (9th Cir. 1991).....................................................................11

Se. Alaska Conservation Council v. U.S. Army Corps of Engineers,
472 F.3d 1097 (9th Cir. 2006) .....................................................................10

Sierra Club v. Bosworth,
510 F.3d 1016 (9th Cir. 2007) .....................................................................16

Sierra On-Line, Inc. v. Phoenix Software, Inc.,
739 F.2d 1415 (9th Cir. 1984).....................................................................11

Silver Sage Partners, Ltd. v. City of Desert Hot Springs,
251 F.3d 814 (9th Cir. 2001).......................................................................11

United States v. Lewis,
67 F.3d 225 (9th Cir. 1995).........................................................................12

United States v. Neal,
776 F.3d 645 (9th Cir. 2015)........................................................................11

United States v. Ron Pair Enters., Inc.,
489 U.S. 235 (1989) .....................................................................................11

Winter v. Natural Resources Defense Council,
555 U.S. 7 (2008) ......................................................................................9, 10

***Federal Statutes***

Administrative Procedure Act,
5 U.S.C. §§ 704, 706(2) .................................................................................5

American Indian Religious Freedom Act,
42 U.S.C. § 1996, *et. seq*.,.............................................................................4

Indian Reorganization Act of June 18, 1934
 (42 Stat. 984)..................................................................................................10

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ......................................................................*passim*

National Historic Preservation Act ("NHPA"),
16 U.S.C. §§ 470 *et seq.* ........................................................................*passim*

Section 3003 of the National Defense Authorization Act for Fiscal Year 2015
("NDAA"), Pub. L. 113-291 ...............................................................*passim*

### *Federal Regulations*

Executive Order 13007, Indian Sacred Sites
61 Fed. Reg. 26771 (May 24, 1996) ..............................................................4

36 CFR § 800.6(b)(1)(i-iv).........................................................................14

**INTRODUCTION**

Plaintiff, the San Carlos Apache Tribe ("Tribe"), respectfully submits this motion for preliminary injunction and memorandum in support. The Tribe asks this Court to enjoin and stay the Defendants, U.S. Forest Service, *et al.*, from effectuating a land exchange of public lands at and around an area known as Oak Flat.

Section 3003 of the of the Fiscal Year 2015 National Defense Authorization Act, Pub. L. 113-291 ("NDAA" or "Section 3003"), directed the exchange of certain federal lands controlled by the Forest Service to Resolution Copper Mining, LLC ("Resolution"). Section 3003 expressly required the Forest Service to comply with a number of prerequisites, *inter alia*, the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, ("NEPA"). Section 3003 did not relieve the Forest Service from complying with the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 *et seq.*, or other federal laws applicable to Section 3003. The Forest Service failed to comply with Section 3003. Until the Forest Service complies with the Section 3003 directives, the issuance of a Final Environmental Impact Statement ("FEIS") is premature and the current FEIS is invalid. Plaintiff has a strong likelihood of success on the merits, will suffer irreparable injury without an injunction, and an injunction will not markedly injure others while furthering the public interest. This Court should, therefore, grant Plaintiff's request for a preliminary injunction requiring the Forest Service comply with all of the provisions of Section 3003.

# FACTS[1]

Resolution proposes a massive copper mining operation known as the Resolution Copper Mine ("Mine"). FAC ¶ 1. Resolution is a limited liability company owned 55% by Resolution Copper Company, a Rio Tinto PLC subsidiary, and 45% by BHP Copper Inc., a BHP PLC subsidiary. FAC ¶ 1. Resolution seeks to mine an ore body located deep beneath Forest Service lands in the Tonto National Forest ("TNF"). FAC ¶ 1.

Resolution intends to mine the subsurface ore body by a mining method, known as block cave mining. FAC ¶ 5. Block cave mining is "an underground hard rock mining method that involves undermining an ore body, allowing it to progressively collapse under its own weight," where "a large section of rock is undercut, creating an artificial cavern that fills with its own rubble as it collapses," and then the "broken ore falls into a pre-constructed series of funnels and access tunnels underneath the broken ore mass." FAC ¶ 5, fn. 2. The broken ore mass is then hauled away by underground conveyance. This mining method will permanently destroy the land above the ore body and leave a massive crater, in which polluted, toxic water will accumulate. FAC ¶ 5.

The ore body which Resolution craves lies beneath land, known as Oak Flat, which the Tribe and its members have held and continue to hold as a religious, holy site. FAC ¶ 4. Oak Flat currently is listed by the U.S. National Park Service as a Traditional Historic Cultural Property on the National Register of Historic Places. FAC ¶ 4.

---

[1] The facts are sourced, in part, from the verified First Amended Complaint filed by the San Carlos Apache Tribe ("Tribe"). The Tribe's First Amended Complaint is referenced as "FAC" followed by the paragraph and number of the cited paragraph "FAC ¶ __".

Resolution's proposed project includes the mine site, as well as associated facilities and infrastructure, including but not limited to, large power transmission lines, numerous high capacity groundwater wells, transportation corridors, pipelines, ore processing facilities, service roads, rights of way and a tailings waste storage facility. FAC ¶ 2. The Mine and its associated infrastructure will cover over 45,000 acres of federal, state and private land. FAC ¶ 2.

For ten years or more, Rio Tinto tried to get a Congressional legislative land exchange to gain legal title to land overlying the ore body. FAC ¶ 4. A coalition of Indian tribes, environmental organizations, religious organizations, outdoor recreational groups and others, halted all of Rio Tinto's attempts to advance the land exchange. FAC ¶ 4.

Consequently, Rio Tinto/Resolution obtained legislators' assistance to append "The Southeast Arizona Land Exchange and Conservation" to a "must pass" national defense appropriations bill. FAC ¶ 4. Section 3003 of the NDAA requires the Forest Service to exchange 2,400 acres of certain federal lands, including the lands overlying the copper ore body to Resolution. FAC ¶ 5. These lands include Oak Flat. FAC ¶ 5.

The federal lands to be exchanged include lands that currently prohibit any type of mining. FAC ¶ 5. These lands are recognized as the aboriginal lands of Western Apaches before title devolved to the federal government. FAC ¶ 5. Resolution's mining operations will permanently damage, destroy, and irreparably harm sites of profound religious, cultural, and historic significance to the Tribe and other Indian tribes, nations, and communities in Arizona. FAC ¶ 3. Oak Flat will be permanently and irreparably damaged. FAC ¶ 5.

The significance and importance of Oak Flat is undisputed by Defendants and Resolution. For centuries, the area has held profound religious and cultural significance for the Tribe, its members, and other Indian tribes. Known in Apache as "*Chich'il Bildagoteel,*" or "a Flat with Acorn Trees", the area stands within the Tribe's aboriginal territory. *See, e.g.*, Exhibit 6, FEIS at 837-848 (describing importance of Oak Flat and destruction of the sacred site); Exhibit 8 Declaration of Vernelda Grant (SCAT002710-SCAT002735).

Because of its importance to the Tribe, its members and other tribes, Oak Flat is recognized in the National Register of Historic Places as a Traditional Cultural Property ("TCP") under Section 106 of the NHPA, and is identified as a "sacred site" within the meaning of Executive Order 13007, Indian Sacred Sites, May 24, 1996, 61 Fed. Reg. 26771 ("E.O. 13007"), the American Indian Religious Freedom Act ("AIRFA"), 42 U.S.C. § 1996, *et. seq*., and related laws, regulations and policies. In effect, the Mine will transform Oak Flat into a crater, one that swallows and destroys all of the sacred, Apache traditional sites.

Section 3003 of the NDAA expressly requires that the Forest Service comply with NEPA. FAC ¶ 6. Section 3003 of the NDAA did not release the Forest Service from complying with the NHPA. FAC ¶ 7. Also, Section 3003 did not exclude the application of other pertinent federal laws. FAC ¶ 7.

On January 15, 2021, with only five days left in the Trump Administration, the Forest Service issued its FEIS of the "Resolution Copper Project and Land Exchange", and related proposed approvals of pipelines, roads, electrical transmission lines and other

uses of the federal lands associated with the Mine. The FEIS is a federal action that is subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*. FAC ¶ 6. In the normal sequence of events, a federal agency would approve a project reviewed in an FEIS via a Record of Decision ("ROD"), which would be judicially reviewed under the APA. FAC ¶ 6. In this case, however, Section 3003 of the NDAA mandates that within sixty days after the publication of the FEIS, the Forest Service shall consummate the land exchange and convey federal lands to Resolution, thereby privatizing such lands. FAC ¶ 6.

Under Section 3003 of the NDAA, the Forest Service was required to prepare a single FEIS. The Forest Service's preparation, issuance, and reliance upon an inadequate FEIS as part of its review of the Land Exchange and the Resolution Project, and its failure to comply with the public and agency review requirements under NEPA, contravene the NDAA and stand in excess of the Forest Service's statutory jurisdiction, authority, or limitations.

The Advisory Council on Historic Preservation ("ACHP"), the Arizona State Land Department and the Environmental Protection Agency ("EPA") have each objected to the FEIS process for the "Resolution Copper Project and Land Exchange".

The ACHP recently terminated consultation with the Forest Service. On January 26, 2021, the Forest Service forwarded the final Programmatic Agreement ("PA") to ACHP for execution.  Exhibit 1. The execution of the final PA by ACHP "would document the [Forest Service's] compliance with Section 106 of the National Historic Preservation Act (NHPA) and its implementing regulations . . ." *Id*. ACHP found "the

proposed undertaking would destroy significant historic properties, including the highly significant Oak Flat, and the measures in the PA are not sufficient to adequately resolve those adverse effects." *Id*. The ACHP determined that further consultation would be unproductive and therefore terminated the consultation process. *Id*.

Thus, the Forest Service failed to comply with the most fundamental goals of Section 3003 of the NDAA. First, the NDAA required the Forest Service consult with and work with tribes to analyze and minimize impacts on cultural and archeological resources. NDAA § 3003(c)(9)(C). ACHP's correspondence to Mr. Torres is a clear statement that this requirement had not occurred. Second, the NDAA's requirement of a single EIS means the NHPA compliance has not been met. NDAA § 3003(c)(9)(B). The termination of consultation by the ACHP with the Forest Service clearly shows that the Forest Service failed to comply with NDAA Section 3003. Furthermore, the ACHP will not sign off on the Forest Service's efforts. The ACHP will provide its final remarks on or about March 15, 2021. Exhibit 2.

The Arizona State Land Department ("ASLD") filed comments on the Draft EIS on December 7, 2019. Exhibit 3. ASLD's wide ranging comments covered the Skunk Camp TSF, water impacts on ASLD lands, cultural impacts of the Skunk Camp site, and grazing fee losses. *Id*.

ASLD's comments on the cultural impacts noted that of the five alternative tailing sites, the Skunk Camp location "will directly impact significantly more cultural resources . . ." *Id*. Recognizing that the cultural resource inventories had not been completed for the alternative tailings sites, ASLD, nevertheless, noted that the Skunk Camp alternative

6

"will directly impact significantly more cultural resources than any of the other alternatives." *Id*. (Table omitted). Depending on the slurry pipeline location at Skunk Camp, ASLD estimated that 2.8 to 5.4 more cultural resources would be impacted than any of the other alternative tailings locations. *Id*.

The Forest Service's response did not address any of ASLD's comments on cultural resources. Exhibit 4. Instead, it simply recited it had "taken the steps necessary to complete a reasonable and good faith effort to identify the historic properties. . ." *Id*. The fact that the Skunk Camp alternative impacted literally hundreds more cultural resources than any other alternatives tailings location was of no concern to the Forest Service.

As a matter of political necessity, ASLD is a signatory to the PA. ASLD's comments bolster ACHP's refusal to be a signatory to the PA. Its signatory status does not diminish the ACHP's rejection of the PA.

In response to the extensive comments received in response to the DEIS, the Forest Service commissioned dozens of new technical and scientific reports comprising thousands of pages.  The public never saw those reports prior to the publication of the FEIS. The EPA made recommendations to the Forest Service for additional reports and information prior to the finalization of the FEIS. The EPA's list of necessary additional reports is representative of the new technical and scientific reports which were never viewed by the public.

The EPA participated in the Forest Service's "Water Resources Working Group". On August 7, 2020, EPA submitted a report to the Water Resources Working Group. Exhibit 5. The EPA report addressed gaps in information that needed to be addressed by

the Forest Service prior to the completion of the FEIS. *Id.* EPA's report called for over a

dozen clarifications or recommendations that the Forest Service should have made or

addressed. *Id.* The Forest Service did not provide the EPA's recommendations or its

response to EPA to the public.

A partial list of reports which the public never saw includes:

1) KCB Consultants, November 2019, Skunk Camp Site Investigation, documenting geophysical surveys, test pits, a geotechnical drilling program, a hydrogeological drilling program and hydraulic testing. Together with its appendices, this report contains more than 2,700 pages of technical documentation relevant to Skunk Camp as the preferred alternative for the TSF.

2) KCB Consultants, January 2020, Letter Report: Skunk Camp TSF Stability Implications Post Site Investigation.

3) Montgomery and Associates, November 7, 2019, Aquifer Testing Results for Skunk Camp Hydrogeologic Investigation.

4) Lettis Consultants International, January 6, 2020, Site-Specific Seismic Hazard Analyses and Development of Time Histories for Tailings Storage Facility, Southern Arizona.

5) Montgomery & Associates, April 24, 2020, Skunk Camp Area Data Submittal, Summary and Data for Water Quality and Water Level Database for Skunk Camp and Gila River.

6) KCB Consultants, June 2020, Skunk Camp TSF Seepage Assessment.

7) Montgomery & Associates, July 17, 2020, Numerical Groundwater Flow Model for the Skunk Camp Tailings Storage Facility.

8) Montgomery & Associates, July 3, 2020, Summary of Results for 2020 Site Investigations at the Skunk Camp Storage Facility Site.

9) Montgomery & Associates, June 29, 2020, Conceptual Hydrogeologic Model: Skunk Camp Tailings Storage Facility Alternative.

This list does not include the additional reports and data which the EPA recommended be provided. Absent these reports and the EPA report, the public was not adequately informed of the potential impacts of the Skunk Camp site on Dripping Springs Wash, the Gila River, the underlying groundwater or the impacts of pumping from the Desert Wellfield.

There were voluminous new studies of the Skunk Camp TSF and new groundwater modeling work on the East Salt River Valley groundwater basin (site of the proposed Desert Wellfield where much of the water required for the mine would be pumped). These new studies clearly indicate that significant new information developed *after* publication of the Draft EIS relevant to environmental concerns and bearing on the proposed action and its impacts, including new groundwater modeling for Resolution's proposed Desert Wellfield in the East Salt River Valley, new studies of water quality impacts at the Skunk Camp TSF and a new assessment of possible surface water discharges from mine operations into Queen Creek. Nor were alternatives analyzed using consistent methodology, leading to problems with analysis. *See* Affidavit of James Wells, Exhibit 7.

## LEGAL STANDARD FOR PRELIMINARY INJUNCTION

Courts apply the preliminary injunction standard set forth by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief "is an extraordinary remedy never awarded as a matter of right." *Winter*, 555 U.S at 24. To obtain a preliminary injunction the plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

In *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011), the Ninth Circuit clarified that its "serious questions" approach to preliminary injunctions survives *Winter* when applied as part of a four-part *Winter* test. A "plaintiff [must] make a showing on all four prongs" to obtain a preliminary injunction. *Alliance*, 632 F.3d at 1135. Thus, once a plaintiff has shown a likelihood of irreparable injury and that the injunction is in the public interest, an injunction is warranted if the plaintiff further shows there are "'serious questions going to the merits' and the balance of hardships tips sharply towards the plaintiff." *Id.*

The Tribe, a federally recognized American Indian tribe organized pursuant to the provisions of Section 16 of the Indian Reorganization Act of June 18, 1934 (42 Stat. 984), brings this case because the Forest Service has taken actions in violation of federal statutes. Plaintiff's complaint is for declaratory and injunctive relief. The Forest Service has failed to take actions to comply with federal statutes, in its review of the land exchange and the Mine Project and in fact violated federal law. These laws include Section 3003 of the NDAA, the NHPA, the NEPA, and applicable federal regulations.

## ARGUMENT

### THE REQUIREMENTS OF NDAA SECTION 3003 HAVE NOT BEEN PERFORMED AND THEREFORE PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION

The purpose of Section 3003 of the NDAA was "to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States." *See*

NDAA Section 3003(a). In order to accomplish this purpose, the Forest Service was directed to prepare a single FEIS. NDAA Section 3003(c)(9)(B). The Forest Service has not prepared a single FEIS, and instead the Forest Service seeks to classify various integral mining facilities under a special use permit procedure in defiance of Congress' mandate.

Preliminary injunctions are provisional remedies issued before final disposition of litigation. "A preliminary injunction, of course, is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

The proper interpretation of a federal statute is a question of law. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). When interpreting a statute, courts are guided by the fundamental canons of statutory construction and begin with the statutory text. *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015). Statutory terms are interpreted in conformity with their ordinary meaning, "unless the statute clearly expresses an intention to the contrary." *Id*. (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989)). Courts must "interpret [the] statut[e] as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Id*. (quoting *Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991)). "Particular phrases must be construed in light of the overall

purpose and structure of the whole statutory scheme." *Id*. (quoting *United States v. Lewis*, 67 F.3d 225, 228–29 (9th Cir. 1995)).

Congress directed the Forest Service to exchange certain federal land at and around Oak Flat. The substantive directions given to the Forest Service to accomplish this purpose are contained in Section 3003. When Section 3003 is read as a whole, the prerequisites for the land exchange have not occurred. The Forest Service has admitted the Tribe will suffer irreparable harm if the land exchange goes forward. Moreover, the Tribe is likely to succeed on the merits because the Forest Service has failed to comply with Section 3003 of the NDAA. Because of this non-compliance, the balance of equities tips in the Tribe's favor and a preliminary injunction maintaining the *status quo* would be in the public interest.

**A. Irreparable Harm.**

Pursuant to § 3003, the publication of the FEIS by the Forest Service will result in irreparable harm to the Tribe. The land exchange can be fully executed by March 16, 2021, or sooner. "Title Transfer – Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper." NDAA, § 3003(c)(10). The FEIS was published on January 15, 2021. After the exchange, the Tribe will no longer have recourse to the courts and the Tribe will be permanently and irreparably harmed.

The Forest Service has admitted that the Tribe will suffer irreparable harm. Exhibit 6. No provision of NDAA Section 3003 eliminates the harm. Under the

"Miscellaneous Provisions", NDAA Section 3003(i)(3), the Tribe and its members will

be denied access to the cultural and sacred religious sites in and around Oak Flat. Section

3003(i)(3) provides after the exchange access to everyone will be restricted to the 50

acres of the Oak Flat Campground.

> As a condition of conveyance of the Federal land, Resolution Copper
> shall agree to provide access to the surface of the Oak Flat Campground to
> members of the public, including Indian tribes, to the maximum extent
> practicable, consistent with health and safety requirements, until such time
> as the operation of the mine precludes continued public access for safety
> reasons, as determined by Resolution Copper.

The most immediate, irreparable harm will be to the inability of members of the

Tribe to practice their religion, as detailed in affidavits and declarations by Rose Belvado,

Carol Sneezy, and Ramon Riley. Plaintiffs' affidavits and declarations note that their

religious practice has been passed down for generations. *See* Declaration of Vernelda

Grant Exhibit 8; Affidavit of Ramon Riley Exhibit 9; Affidavit of Rose Belvado Exhibit

10; Affidavit of Carol Sneezy Exhibit 11; Declaration of Chairman Terry Rambler

Exhibit 12.

## B. Likelihood of Success on the Merits.

There is high likelihood that the Tribe will succeed on the merits of its claim. The

evidence is undisputed that the Forest Service has not complied with Section 3003 of the

NDAA. The Forest Service has not completed a Programmatic Agreement for the

treatment of historic and cultural properties. Indeed, the Advisory Council on Historic

Preservation terminated consultation with the Forest Service because "the measures in the

PA are not sufficient to resolve . . . adverse effects" and "further consultation in this case would be unproductive. . ." Exhibit 1.

As part of the environmental compliance requirement for NDAA Section 3003, the Forest Service was required to assess and identify mitigation measures of the impacts of "mining and related activities on the Federal land conveyed to Resolution Copper" on cultural and archeological resources. NDAA § 3003(c)(9)(C). If an undertaking will or may adversely affect historic properties (any prehistoric or historic district, site, building, structure, or object included in or eligible for inclusion in the National Register of Historic Places), the Section 106 regulations at 36 CFR § 800.6(b)(1)(i-iv) require the federal agency to consult with the State and/or Tribal Historic Preservation Officer (SHPO, THPO) and other parties to negotiate and execute a Section 106 agreement document that sets out the measures the federal agency will implement to resolve those adverse effects through avoidance, minimization, or mitigation. The ACHP letter to Acting Forest Supervisor Torres makes clear that a legally compliant PA has not been finalized. The FEIS does not include a finalized, legally compliant PA. The requirement to comply with NEPA as a prerequisite to the land exchange is an express part of the NDAA.

Issuance of any permit for the licensing, construction or operation of the Resolution mining Project is an "undertaking" as defined in the NHPA and as such, § 106 consultation was required to determine the effect of such undertaking on historic or culturally significant properties. Section 3003(c)(9)(C) of the NDAA required that the

single EIS prepared under Section 3003 assess the effects of the mining and related activities on the cultural and archeological resources on the Federal land to be exchanged and identify measures that may be taken, to the extent practicable, to minimize adverse impacts on those resources. Much of the 45,000 acres that this mine will impact will not have been identified for protection or mitigation of adverse impacts on the historic, cultural and archeological resources which should have been provided in the final PA.

The § 106 determination of the effect of the Resolution mining activities and the land exchange on historic or culturally significant properties failed to adequately assess the effects of the mining and related activities on the properties the Tribe and its members hold as central to Apache tradition and religion. Nor did the § 106 determination adequately identify measures that could be taken to minimize and mitigate adverse impacts on the historic or culturally significant properties.

Because the § 106 determination of the effect of the Resolution mining activities and land exchange on historic or culturally significant properties has not been completed, Section 3003 of the NDAA has been violated by the Forest Service.

The NDAA also required the appraisal (or a summary) of the land to be exchanged _prior_ to the exchange. NDAA § 3003(c)(4)(B)(iv)("Before consummating the land exchange under this section, the Secretary [of Agriculture] shall make the appraisals of the land to be exchanged (or a summary thereof) available for public review."). The NDAA requires that all actions associated with the land exchange and mine operations be fully analyzed and subject to full public review in one, single EIS. NDAA § 3003(c)(9)(B). The FEIS clearly does not contain any information regarding the

appraisals. Indeed, the Forest Service has made clear that appraisal information will not be available until March 21, 2021. The Forest Service has failed to provide any appraisal information to date including as part of the FEIS.

Thus, contrary to Section 3003 of the NDAA, the Forest Service's actions, inactions and decisions in the preparation, issuance and presentation of appraisals to be conducted on the Federal land and non-Federal land after the publication of the FEIS is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, within the meaning of the NDAA Section 3003(c)(4)(B)(iv).

**C.  A Preliminary Injunction is in the Public Interest.**

Until the Forest Service has complied with Section 3003, a preliminary injunction maintaining the *status quo* is in the public interest.  "The public interest strongly favors preventing environmental harm. Although the public has an economic interest in the mine, there is no reason to believe that the delay in construction activities caused by the court's injunction will reduce significantly any future economic benefit that may result from the mine's operation." *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1101 (9th Cir. 2006). The public interest in favor of a preliminary injunction is especially acute when faced with violations of environmental laws such as NEPA. "The preservation of our environment, as required by NEPA . . . is clearly in the public interest."  *Sierra Club. v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007). The public also has a strong interest in ensuring that federal agencies comply with laws designed to protect the public waters and lands, and public participation.

**D. The Balance of Equities Tips in the Tribe's Favor.**

A limited preliminary injunction in this case balances the equities in favor of the Tribe. The Tribe only seeks that the *status quo* be maintained until judicial review is completed. Whether the federal lands to be exchanged remains titled to the Forest Service while this matter is litigated, and maintaining the *status quo* will result in no harm to the Forest Service or Resolution. Mining operations are many years in the making. The fact that Resolution may not immediately pursue development of private lands does not diminish the immediate impacts of privatization of the federal parcels. For these reasons, the Tribe's request for a preliminary injunction is appropriate and necessary.

Respectfully submitted this 20th day of February, 2021.

/s/ Alexander B. Ritchie
Alexander B. Ritchie (AZBN 019579)
Attorney General
E-m: Alex.ritchie@scat-nsn.gov

/s/ Justine R. Jimmie
Justine Jimmie (AZBN 019148)
Deputy Attorney General
E-m: Justine.jimmie@scat-nsn.gov

/s/ Chase A. Velasquez
Chase A. Velasquez (NMBN 148294)
(*pro hac vice* )
Assistant Attorney General
E-m: chase.velasquez@scat-nsn.gov

San Carlos Apache Tribe
Department of Justice
Post Office Box 40
San Carlos, Arizona 85550

*Attorneys for Plaintiff*
