**SAN CARLOS APACHE TRIBE**
**DEPARTMENT OF JUSTICE**
Alexander B. Ritchie, AZ Bar No. 019579
Justine Jimmie, AZ Bar No. 019148
Laurel Herrmann, AZ Bar No. 025623
Jana Sutton, AZ Bar No. 032040
Bernardo M. Velasco, AZ Bar No. 033746
P.O. Box 40
San Carlos, Arizona 85550
Tel. (928) 475-3344
alex.ritchie@scat-nsn.gov
justine.jimmie@scat-nsn.gov
laurel.herrmann@scat-nsn.gov
jana.sutton@scat-nsn.gov
bern.velasco@scat-nsn.gov
*Attorneys for the San Carlos Apache Tribe*

**THE SPARKS LAW FIRM, P.C.**
Joe P. Sparks, AZ Bar No. 002383
7503 First Street
Scottsdale, Arizona 85251
Tel. (480) 949-1339
joesparks@sparkslawaz.com
*Attorney for the San Carlos Apache Tribe*

**TITLA & PARSI, PLLC**
Steve Titla, AZ Bar No. 009325
245 S. Hill Street
P.O. Box 1143
Globe, Arizona 85502
Tel. (928) 812-7714
steve@titlaparsi.com
*Attorney for the San Carlos Apache Tribe*
*(of counsel)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

|  |  |
|---|---|
| San Carlos Apache Tribe, a federally recognized Indian tribe, | No. CV-21-0068-PHX-DWL |
| *Plaintiff* | (Hon. Dominic W. Lanza) |
| v. | **MOTION FOR PRELIMINARY INJUCTION TO ENJOIN CONVEYANCE OF OAK FLAT** |
| United States Department of Agriculture; Brooke L. Rollins, United States Secretary of Agriculture; United States Forest Service, an agency of the U.S. Department of Agriculture; United States Forest Service, an agency in the U.S. Department of Agriculture; Neil Bosworth, Supervisor of the Tonto National Forest; Tom Torres, Acting Forest Supervisor of the Tonto National Forest, |  |
| *Defendants* |  |
| v. |  |
| Resolution Copper Mining LLC, |  |
| *Intervenor-Defendant* |  |

Oak Flat is a deeply sacred place to the San Carlos Apache Tribe ("Tribe") and its members who practice traditional Apache religion. Despite Oak Flat's cultural and religious importance, the Southeastern Arizona Land Exchange and Conservation Act of

2015 ("SALECA")[1] directs the federal government to convey Oak Flat to Resolution Copper Mining LLC ("Resolution"), who will mine it into oblivion. Before the government can do so, however, it must first prepare a comprehensive environmental impact statement ("EIS") that considers every aspect of the planned mine and all related infrastructure ("Project") to such a degree that it "shall be used as the basis for all decisions under Federal law." 16 U.S.C. § 539p(c)(9)(B). Further, the EIS must also "assess the effects of the mining and related activities . . . on the cultural and archeological resources" located within Oak Flat and "identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources." 16 U.S.C. § 539p(c)(9)(C). Until the government prepares such an EIS, it lacks the authority to convey Oak Flat to Resolution.

On June 20, 2025, the United States Forest Service ("Forest Service") published an EIS concerning the Resolution Mine ("2025 FEIS"; Exh. 23, 24, 25, 26, 27, 28).[2] The 2025 FEIS, however, fails to analyze critical aspects of the Project such that it cannot form a reasonable, informed basis for all future decisions under federal law. These include primarily decisions related to tailing storage facilities, pipelines, groundwater impacts, and historic properties. The FEIS fails to "assess the effects of mining and related activities" on the cultural resources of the Tribe and how to minimize adverse impacts upon them. Additionally, where the 2025 FEIS attempts to shore up glaring deficiencies in the now-withdrawn EIS that the Forest Service published in 2021 ("2021 FEIS"), the added content is so voluminous and substantive that the Forest Service should have first published a supplemental draft so that the public could review and comment on the new content. *See* Exh. 33 (Wells July 2025 Declaration, ¶¶ 5-7); 40 CFR

---

[1] SALECA is synonymous and used interchangeably with Section 3003 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 ("NDAA").

[2] Exhibits are continuous of inclusive with previously disclosed exhibits in the Tribe's 2021 and May 2025 motions for preliminary injunction and replies thereto.

1502.9(d)(1).

Because the 2025 FEIS fails to satisfy SALECA's statutory condition precedent for a single, comprehensive EIS that will be the basis for all decisions under federal law, Federal Defendants lack authority to convey Oak Flat to Resolution and this Court should enter an injunction to maintain the *status quo* by prohibiting Oak Flat's transfer during the pendency of this action.

## I.    FACTUAL & PROCEDURAL BACKGROUND

Oak Flat, known to the Western Apache as *Chí'chil Biłdagoteel* ("a broad flat of Emory oak trees" in Apache), is included on the National Register of Historic Places,[3] lies within Tonto National Forest, and encompasses 6.7 square-miles of plains, oak groves, rocky cliffs, and natural springs.[4]  (Second Amended Complaint ("SAC") ¶ 4).  In traditional Apache religion, Oak Flat and its several seeps and streams are home to *Diyin* (most holy beings) and *Ga'an* (powerful mountain spirits), who are creators, saints, and saviors who bless the Apache people.[5]  Oak Flat has been a center of Apache ceremonial activity for over a thousand years,[6] and, to this day, the members of the Tribe visit Oak Flat for spiritual, religious, and cultural activities, including traditional Apache

---

[3]*See* National Park Service, *National Register of Historic Places*, available at: https://www.nps.gov/subjects/nationalregister/database-research.htm#table (last visited May 10, 2025).

[4]*See* Resolution Copper Project Map, available at https://www. resolutionmineeis.us/sites/default/files/feis/resolution-final-eis-map-package.pdf.

[5]Testimony of T.J. Ferguson *et al.*, *Oak Flat is an Important Cultural Site for Nine Tribes – The Resolution Copper Mine Will Impact Hundreds of Tribal Traditional Cultural Properties*, before the U.S. House of Representatives Natural Resources Committee, Subcommittee on Indigenous Peoples of the United States, April 13, 2021, available at: https://docs.house.gov/meetings/II/II24/20210413/111424/HHRG-117-II24-20210413-SD013.pdf.

[6]Hopkins, Maren P., Colwell, Chip, Ferguson, T. J., & Hedquist, Saul L., *Ethnographic and Ethnohistoric Study of the Superior Area, Arizona* (2015).

ceremonies that can only take place there.[7]   (Exh. 11 ¶¶ 12-13, 26).[8]  Those who practice traditional Apache religion commune with the *Diyin* and *Ga'an* through ceremonies that are integral to their identity as Apaches,[9] including the traditional Apache Sunrise and Holy Ground ceremonies.[10]  Destroying Oak Flat will end those practices there forever. (*Id.* ¶¶ 21-23).

In 1955, President Eisenhower protected Oak Flat from mining and brought it within the Tonto National Forest.  *See* Public Land Order 1229, 20 FR 7336 (Oct. 1, 1955).  Forty years later, however, a copper deposit was found beneath Oak Flat.  (SAC ¶ 4).  From 2005 to 2013, Resolution's congressional supporters introduced at least twelve stand-alone bills to transfer Oak Flat to Resolution; but each failed in committee. (SAC ¶ 4).  In 2014, then Senator Jeff Flake, (a former Rio Tinto lobbyist) and the late Senator John McCain attached SALECA as a non-germane policy rider amendment at the

---

[7]Tisa Wenger, *Fighting for Oak Flat: Western Apaches and American Religious Freedom*, J. L. and Religion, 2 (2024) ("For centuries, Apaches have maintained close ties to [Oak Flat] as a place to collect traditional foods and medicines, a place of ancestral origins, a place where holy beings reside, and the only place where certain prayers, offerings, and ceremonies can be conducted.").

[8]Exhibits numbers are continuous with the Tribe's 2021 Motion for Preliminary Injunction (Docs. 29, 30).

[9]Rylan Bourke, *et al.*, *Conserving Sacred Natural Sites of Cibecue,* in Landscape: Sacred Sites; Sources of Biocultural Diversity 2:11 (Bas Verschurren *et al.* eds 2012), 31-32; Michael D. McNally, *Native American Religious Freedom as a Collective Right*, BYU L. Rev. 205, 224-26 (2019); *also* Michael D. McNally, *The Sacred and the Profaned: Protection of Native American Sacred Places that Have Been Desecrated*, Cal. L. Rev. 111:395, 405 (2023) ("what makes certain places sacred is the relationship between a community and their place").

[10]Testimony of Naelyn Pike before House Natural Resources Committee, https://www.youtube.com/watch?v=ZKmwsq0k-YY; Testimony of Terry Rambler, Chairman, San Carlos Apache Tribe before the Senate Committee on Energy and Natural Resources Subcommittee on Public Lands, Forests, and Mining, Legislative Hearing on S.339, Southeast Arizona Land Exchange and Conservation Act of 2013, Nov. 20, 2013, https://www.energy.senate.gov/services/files/bd432593-9e7c-4f18-8a61-4e74bc6edb34.

11th hour to the must-pass 2015 National Defense Authorization Act ("NDAA"),[11] without committee review or consideration by Congress.  (SAC ¶ 4).  For Resolution, the land transfer is essential because Oak Flat will lose the federal protections that prevent its destruction once it becomes Resolution's private property.

Before Federal Defendants can transfer Oak Flat, however, SALECA requires a condition precedent: the Secretary of the Agriculture ("Secretary") must first "prepare a single environmental impact statement under the National Environmental Policy Act of 1969 ["NEPA"], which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations."  *See* 16 U.S.C. 539p(9)(c).  This comprehensive EIS must consider "*any* major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities."  *Id.* (emphasis supplied).  The EIS must also "assess the effects of the mining and related activities . . . on the cultural and archaeological resources."  *Id.*  This includes the entirety of the Project, including the mine site, associated facilities and infrastructure, large power transmission lines, high-capacity groundwater wells, transportation corridors, pipelines, ore processing facilities, service roads, rights of way, and a tailings storage facility.  *Id.* The 2025 FEIS does not meet these requirements.

Before the Forest Service published an FEIS on behalf of the Secretary, the Tribe provided numerous comments on the draft EIS ("DEIS").[12]  On December 23, 2019, Chairman Rambler commented on effects that will result outside the Oak Flat subsidence area as the Resolution mine depletes the surrounding region's groundwater that neither

---

[11]Grayson, Rep. Alan, *Did the GOP Just Give Away $130 Billion of Public Property?*, The Nation, Feb. 13, 2015, https://www.thenation.com/article/archive/did-gop-just-give-away-130-billion-public-property/.

[12]In January and March 2021, the Forest Service published and then withdrew an earlier FEIS ("2021 FEIS").  The Tribe's comments also predate the 2021 FEIS.

the DEIS nor the 2025 FEIS analyze.  (Exh. 12, pp. 39-45, Exh. 13).  This subsidence will cause a vertical collapse of the surrounding mountain units, potentially altering wind rose and precipitation patterns on the San Carlos Reservation ("Reservation") and the Superstition and Pinal Mountains, whose runoff recharges the Reservation's and the region's most important sources of drinking water.  (*Id.; see also* SAC*,* Exh. E.)  Such losses would threaten the Tribe's vested rights to surface and groundwater, which are held in trust for the Tribe by the United States and devastate the region's water supplies.  (*Id.*)   Further, the comment notes that the mine will deplete the Apache Tuff Aquifer, the source of drinking water for the Town of Superior and the area surrounding Queen Creek, and highlights how the DEIS failed to analyze likely impacts on other important water sources, such as the Black and Salt Rivers.  (*Id.*)

Similarly, the Advisory Council on Historic Preservation ("ACHP"), the Arizona State Land Department ("ASLD"), and the Environmental Protection Agency ("EPA") each objected to the Forest Service's EIS process, with ACHP terminating its consultation and refusing to certify the Forest Service's "compliance with Section 106" of the National Historic Preservation Act ("NHPA").  (Exh. 1, 29, 30, 31.)  ACHP asserted that the measures in the draft programmatic agreement ("PA") were "not sufficient to adequately resolve those adverse effects," which include the total physical destruction of Oak Flat.  (*Id.*)

Likewise, ASLD commented on the DEIS on December 7, 2019, addressing cultural impacts associated with the Skunk Camp site for the proposed tailings storage facility and water impacts on ASLD lands.  (Exh. 3).  ASLD noted that this location "will directly impact significantly more cultural resources" than other alternatives and noted that cultural resource inventories had not been completed for alternative sites.  (*Id.*) Rather than substantively address ASLD's comments, the Forest Service simply recited that it "had taken the steps necessary to complete a reasonable and good faith effort to identify the historic properties."  (*Id.*)

EPA recommended the Forest Service prepare additional reports and information to address over a dozen issues.  (Exh. 5).  Although numerous reports were prepared by and on behalf of the Forest Service, they were never presented for public comment.[13]  To this day, the public has not been able to comment on these reports.  Pursuant to NEPA and its attendant regulations, the Forest Service must receive and respond to public comment on these reports as a matter of ensuring public input and transparency by addressing the potential impacts on Skunk Camp, Dripping Springs Wash, the Gila River, and the Desert Wellfield.  *See* 42 U.S.C. § 4332; *also* 40 CFR part 1503.  The Forest Service, however, has not done so.  These studies demonstrate that the Forest Service developed significant new information after it published the DEIS and that another round of public comment is required.  *See* 40 C.F.R. § 1502.9(d)(1).

On January 14, 2021, after the Forest Service first gave notice that it would publish the 2021 FEIS, the Tribe filed this action challenging the 2021 FEIS under SALECA, NEPA, NHPA, the Religious Freedom Restoration Act ("RFRA"), Apache Treaty of 1852, and Free Exercise Clause of the United States Constitution. (Doc. 1, 14). On January 15, 2021, the Forest Service published the 2021 FEIS.

---

[13]These include, but are not limited to: (1) KCB Consultants, November 2019, Skunk Camp Site Investigation, documenting geophysical surveys, test pits, a geotechnical drilling program, a hydrogeological drilling program and hydraulic testing; (2) KCB Consultants, January 2020, Letter Report: Skunk Camp TSF Stability Implications Post Site Investigation; (3) Montgomery and Associates, November 7, 2019, Aquifer Testing Results for Skunk Camp Hydrogeologic Investigation. (4) Lettis Consultants International, January 6, 2020, Site-Specific Seismic Hazard Analyses and Development of Time Histories for Tailings Storage Facility, Southern Arizona; (5) Montgomery & Associates, April 24, 2020, Skunk Camp Area Data Submittal, Summary and Data for Water Quality and Water Level Database for Skunk Camp and Gila River; (6) KCB Consultants, June 2020, Skunk Camp TSF Seepage Assessment; (7) Montgomery & Associates, July 17, 2020, Numerical Groundwater Flow Model for the Skunk Camp Tailings Storage Facility; (8) Montgomery & Associates, July 3, 2020, Summary of Results for 2020 Site Investigations at the Skunk Camp Storage Facility Site; and (9) Montgomery & Associates, June 29, 2020, Conceptual Hydrogeologic Model: Skunk Camp Tailings Storage Facility Alternative.

Shortly before the Forest Service published the 2021 FEIS, then-acting Forest Supervisor, Tom Torres of Tonto National Forest ("TNF") wrote to Chairman Rambler stating that although the information gathered between the DEIS and 2021 FEIS— summarized above—was "voluminous in content," the Forest Service would not publish a supplemental DEIS, notwithstanding its legal obligation to do so.  (SAC ¶ 119); *see* 40 CFR 1502.9(d)(1).  Even with its substantive revisions, the 2021 FEIS materially failed to address the issues raised by the Tribe as discussed above.

On February 20, 2021, the Tribe filed a Motion for Preliminary Injunction asking the Court to enjoin Federal Defendants from conveying Oak Flat to Resolution.  (Doc. 29-1).  On March 1, 2021, the Forest Service withdrew the 2021 FEIS and Federal Defendants filed a Notice of Superseding Agency Action stating the proposed land exchange would not occur as scheduled because the Forest Service needed additional time "to reinitiate consultation with Tribes and ensure impacts have been fully analyzed." (Doc. 36).  The Forest Service, however, failed to substantively consult with the Tribe in the intervening four years.[14]

Nevertheless, on June 20, 2025, the Forest Service published the 2025 FEIS.  The 2025 FEIS fails to analyze critical aspects of the Project such that it could not form a reasonable, informed basis for all future decisions under federal law.  These include decisions related to tailing storage facilities, rights of way for pipelines, groundwater models, and cultural resources.  (Exhs. 32, 33, Emerman July 2025 declaration ¶¶, 4-8; Wells July 2025 declaration, ¶¶ 4-18).  The FEIS also fails to "assess the effects of

---

[14] See Executive Order No. 13175 (65 FR 67249, Nov. 6, 2000), which provides that any federal "actions that have substantial direct effects on one or more Indian tribes" in light of the "unique relationship with Indian tribal governments as set forth in the Constitution of the United States, treaties, statutes, Executive Orders, and court decision," requires the Federal Government to "grant Indian tribal governments the maximum administrative discretion possible" and "defer to Indian tribes to establish standards" and that each agency "shall have an accountable process to ensure meaningful and timely input by tribal officials."

mining and related activities" on the cultural resources of the Tribe and consider how to minimize adverse impacts upon them. Additionally, where the 2025 FEIS attempts to shore up glaring deficiencies in the now-withdrawn 2021 FEIS, the added content is so voluminous and substantive that the Forest Service should have first published a supplemental draft so that the public could review and comment on the new content. *See* 40 C.F.R. § 1502.9(d)(1).

Moreover, had the 2025 FEIS adequately considered numerous important aspects of the Project, including a breach analysis of the preferred Skunk Camp tailings storage facility, it likely would have preferred a different alternative. By failing to perform this minimal investigation, the decision to prefer this action alternative is arbitrary and capricious.

Further, Federal Defendants and Resolution admit that the mine will destroy Oak Flat when a massive subsidence crater at least two miles wide and 1,100 feet deep swallows it whole. Once destroyed, Oak Flat and its sacred springs, seeps, and streams will be lost forever, permanently ending important Apache ceremonies. Coextensively, the Project will deplete the Tribe and region's water supplies and permanently impair their hydrology. *See* fn 10 *supra*. These adverse effects and Oak Flat's fate will be sealed once Federal Defendants convey Oak Flat to Resolution.

## II.    THE TRIBE HAS STANDING UNDER THE APA AND ARTICLE III

Before evaluating the preliminary injunction factors, it is necessary to address two issues the Court raised in its June 9, 2025 Order ("Order"). (*See* Doc. 99). These include whether (1) the FEIS is a "final agency action" under the Administrative Procedures Act ("APA"), and (2) the Tribe has Article III standing to challenge Oak Flat's transfer. (*See* Doc. 99, n.3, 20:8-17).

Under controlling Ninth Circuit precedent, the FEIS is a "final agency action," meaning the Tribe has standing under the APA. Further, because (1) the 2025 FEIS has

injured the Tribe and its members; (2) Oak Flat's transfer will further and imminently injure the Tribe and its members; and (3) preliminary and final relief from this Court will redress those injuries, the Tribe has Article III standing.

**A.    The FEIS is a "Final Agency Action" Under the APA and Controlling Ninth Circuit Precedent.**

Under the APA, "the person claiming a right to sue must identify some 'agency action' that affects him in the specified fashion'" and that action must be a "final agency action." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990); 5 U.S.C. § 704. "An agency action is 'final' when (1) the agency reaches the 'consummation' of its decisionmaking *[sic]* process and (2) the action determines the 'rights and obligations' of the parties or is one from which 'legal consequence will flow.'" *Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d 1095, 1103 (9th Cir. 2007) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

The Ninth Circuit has "repeatedly held that final NEPA documents are final agency actions." *Envt'l Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 868 (9th Cir. 2022) (collecting cases); *Oregon Nat. Desert Ass'n v. Bureau of Land Management*, 625 F.3d 1092, 1118-19 (9th Cir. 2010). In *Environmental Defense Center*, the Ninth Circuit determined an EIS and record of decision constituted a "final agency action" under the APA "because they culminate the agencies' environmental review process." *Id.* Moreover, because SALECA requires the transfer of Oak Flat within 60 days after publication of an EIS and because Federal Defendants intend to convey Oak Flat at the earliest opportunity, legal consequences unquestionably flow from publication of the 2025 FEIS. *See Rattlesnake Coalition*, 509 F.3d at 1103.

Likewise, *Oregon Natural Desert Association* not only recognizes that an EIS is a final agency action, but also that "the Supreme Court has strongly signaled that any agency's decision to issue . . . an environmental impact statement is a 'final agency action' permitting immediate judicial review under NEPA." 625 F.3d 1118-19 (quoting

*Sierra Club v. U.S. Army Corp of Eng'rs*, 446 F.3d 808, 815 (8th Cir. 2006)).  Similarly, in *Ohio Forestry Association, Inc. v. Sierra Club*, the Supreme Court expressly stated that an EIS must be reviewable because "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper."  523 U.S. 726, 737 (1998) (emphasis added) (NEPA "guarantees a particular procedure").

A further question raised in the Court's Order is whether the Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497 (2025), calls this Ninth Circuit precedent into question.  Here, *Seven County Infrastructure Coalition* does no such thing because the Ninth Circuit requires a high standard before determining an intervening decision has abrogated its existing precedent; namely, the authorities must be "clearly irreconcilable."  *Tingley v. Ferguson*, 47 F.4th 1055, 1074 (9th Cir. 2022).  This requires more than "some tension" between the authorities that "'cast[s] doubt' on [the Ninth Circuit]'s prior authority."  *Id.* at 1074-75.  So long as a district court "can apply prior circuit precedent 'consistently with' or 'without running afoul' of the intervening authority, [it] must do so."  *Id.* at 1075.

In *Tingley*, the Ninth Circuit considered whether the Supreme Court's decision in *National Institute of Family & Life Advocates v. Becerra* ("NIFLA") abrogated its prior decision in *Pickup v. Brown*.  In *Pickup*, the Ninth Circuit upheld a California law banning licensed medical providers from performing conversion therapy on minors under its professional speech doctrine.  740 F.3d 1208 (9th Cir. 2014).  In *NIFLA*, however, the Supreme Court rejected that doctrine but nevertheless recognized that states could "regulate professional conduct, even though that conduct incidentally involves speech."  585 U.S. 755 (2018); *Tingley*, 47 F.4th at 1074.  Accordingly, the Ninth Circuit concluded that *Pickup*'s ultimate holding remained valid as a regulation of professional conduct that incidentally burdened speech.  *Tingley*, 47 F.4th at 1075.

Here, *Seven County Infrastructure Coalition* is not "clearly irreconcilable" with

*Oregon Natural Desert Association* because the recent Supreme Court case does not address whether an EIS constitutes a final agency action. Instead, in *Seven County Infrastructure Coalition*, the Court reviewed whether a subsequent action taken on an allegedly defective EIS was arbitrary and capricious. In other words, the plaintiff's claim in *Seven County Infrastructure Coalition* challenged a subsequent action taken in reliance of an EIS; it did not consider whether publication of the EIS itself was arbitrary and capricious. *See* 2025 WL 1520964, at *6, *9 (plaintiff argued an "agency action was arbitrary and capricious due to a deficiency in an EIS" and the "ultimate question" was whether the EIS "reasonably explained" the subsequent action).

By contrast, Federal Defendants' arbitrary and capricious final agency action here occurred when the Forest Service published a deficient EIS that does not comply with SALECA, NEPA, and NHPA. Because *Seven County Infrastructure Coalition* does not address whether publishing an EIS is a "final agency action" that confers standing under the APA, it cannot be "clearly irreconcilable" with established Ninth Circuit precedent. In fact, *Seven County Infrastructure Coalition* does not even mention the words "standing," "Article III," or "final agency action." As such, *Oregon Natural Desert Association* still binds this Court, and it must conclude that publishing the 2025 FEIS is a final agency action that supports standing under the APA.

Even assuming *Seven County Infrastructure Coalition* somehow stood for the proposition that an EIS is not a final agency action under the APA and NEPA, despite never mentioning the question, the Tribe would still have standing to challenge the 2025 FEIS as a final agency action under NHPA. *See Tohono O'odham Nation v. United Stated Dep't of Interior*, 138 F.4th 1189, 1200 (9th Cir. 2025) (analyzing final agency action for alleged NHPA violation under *Oregon Nat. Desert Ass'n*). In *Tohono O'odham Nation*, the Court determined that two limited notices to proceed authorizing construction of transmission towers were final agency actions because they (1) "marked the consummation" of the agency's decision-making process under NHPA; and (2) legal

rights, obligations, or consequences flowed from them.  *Id.*  Whereas an ordinary NEPA challenge considers whether an EIS is "reasonable and reasonably explain[s]" a subsequent decision, a NHPA challenge is broader, evaluating whether the agency gave due consideration to identifying and protecting historic properties.  *Compare Seven County Infrastructure Coalition*, 145 S. Ct. at 1511; *with Tohono O'odham Nation*, 158 F.4th at 1193-94; 54 U.S.C. § 306108.

In an effort to defeat standing and avoid judicial review, Federal Defendants and Resolution reduce the Tribe's challenges to one contesting Oak Flat's transfer, which they assert is not a "decision" within the meaning of the APA because Congress gave them no discretion.  The Tribe, however, does not challenge the decision to convey Oak Flat as arbitrary and capricious.  Instead, the Tribe asserts that the Forest Service's decision to publish the 2025 FEIS, as well as the decisions in it related to various action alternatives are arbitrary and capricious.  Further, by publishing the 2025 FEIS, Federal Defendants injure the Tribe  and its members. Moreover, until Federal Defendants fulfill SALECA's condition precedent by publishing an EIS that meets SALECA's requirements, they lack authority to convey Oak Flat to Resolution.  Indeed, to the extent Federal Defendants and Resolution would argue that a challenge to an EIS can only be framed as a challenge to a subsequent decision(s), they would remove challenges brought directly under NEPA from the APA and render all such claims as derivative of a subsequent action without a textual basis creating such a scheme.[15]

As it stands, *Oregon Natural Desert Association* remains controlling precedent, and publishing the 2025 FEIS is a "final agency action" under the APA.  Because the Forest Service has published a deficient EIS that does not address the subjects required

---

[15]Contrary to Ninth Circuit precedent discussed above, such a scheme would also abrogate authorities that permit an aggrieved person to challenge other decisions under NEPA, like a finding of no significant impact, and would require plaintiffs to wait until a subsequent final agency action were ripe.

by SALECA and that will not support all future decisions under federal law, Federal
Defendants lack authority to convey Oak Flat, and this Court must enjoin Federal
Defendants from doing so until such time that they publish a compliant EIS.

**B.    The Tribe Has Article III Standing Because the 2025 FEIS Has Injured
the Tribe and Its Members and Further Injuries Are Imminent.**

Enjoining Oak Flat's transfer is necessary to redress immediate harms that the
Tribe and its members have already suffered and also to prevent further imminent harm.
To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in
fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or
hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant;
and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a
favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167,
180-81 (2000).  Now that the Forest Service has published the 2025 FEIS, the Tribe and
its members have suffered injuries and they will imminently suffer several more.  Those
injuries are traceable to publication of the 2025 FEIS, which does not meet the express
requirements of SALECA, and a favorable decision immediately enjoining Oak Flat's
transfer and later vacating the FEIS will redress these injuries.

*1.    The defective FEIS and ensuing transfer of Oak Flat cause six actual and
imminent injuries that are concrete and particularized.*

By publishing the FEIS in its present state, the Tribe has actually or will
imminently suffer six distinct injuries that are concrete and particularized.  These include:
(1) the Tribe did not receive due consideration of the issues it raised before both the 2021
FEIS and 2025 FEIS were published; (2) the Tribe did not receive an opportunity to
review and comment on new issues presented in the 2025 FEIS that should have been
published as part of a supplemental DEIS and to have those comments thoughtfully
considered; (3) the Forest Service's inadequate consideration of action alternatives
increases the risk of catastrophic harm to important Apache areas and resources; (4) the

Tribe and its members will imminently and permanently lose access to all but 50 of Oak Flat's 2,422 acres (2%); (5) Oak Flat's physical destruction will be irreversibly set in motion by its transfer to Resolution; and (6) the Tribe and its members will lose any further opportunity to identify, preserve, and mitigate the loss of historic properties within Oak Flat through NHPA consultation.

An injury is actual when it has been sustained and is imminent when it is "immediately in danger of [being] sustained." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). Of the Tribe's six injuries enumerated above, the first three became actual upon publication of the 2025 FEIS, and the remaining three are imminent because Federal Defendants intend to convey Oak Flat at the soonest possible opportunity, at which time the harms will become actual or will be irreversibly set in motion.

Further, these injuries to the Tribe and its members are concrete and particularized. The injuries stemming from publication of an invalid EIS that does not consider the Tribe's comments and deprives the Tribe of the opportunity to review and comment on a supplemental DEIS pertain to statutory rights conferred on them by SALECA, NEPA, and NHPA. Similarly, injuries flowing from the transfer of Oak Flat, including its destruction, lost access to it, and the lost opportunity to protect historic properties located within it—are personal to the Tribe and its members through their continuing use of Oak Flat, and their unique spiritual and ancestral connection to that place; indeed, Apache culture, tradition, and history is what makes these properties historic. *See Friends of the Earth,* 528 U.S. at 181-82.

> 2. *The Tribe's injuries directly follow from the Forest Service's decision to publish a defective FEIS.*

By any measure, the Tribe's injuries are "fairly traceable" to the Forest Service's decision to publish the FEIS, which is the very act that either directly injures the Tribe and its members, or purports to be the final condition precedent before Federal Defendants convey Oak Flat to Resolution, causing the remaining injuries. *See Friends*

*of the Earth*, 528 U.S. at 180-81.  There is no serious argument that this nexus is lacking.

      3.   *Immediately enjoining Oak Flat's transfer and ultimately vacating the EIS will redress the Tribe's injuries.*

Whether viewed from the vantage point of preliminary relief or the ultimate relief sought in the Tribe's SAC, the Tribe's injuries will be redressed by a favorable decision of this Court.[16]  *See Friends of the Earth*, 528 U.S. at 180-81.  Regarding preliminary relief, enjoining Oak Flat's transfer will preserve the *status quo* during which time the Tribe and its members may continue to access the entirety of Oak Flat for important religious and cultural purposes.  Further, preliminary relief would prevent Resolution from moving forward with action alternatives that expose the Tribe and the region to unnecessary risk and preserve the Tribe's opportunity to identify and preserve important, historic Apache properties within Oak Flat though promised consultation.  If relief is not granted, Oak Flat will become private property, NHPA will no longer apply, and the Tribe's opportunity for further consultation will be forever lost.  Moreover, Resolution and Federal Defendants will move forward with preferred action alternatives, risking further harm to important Apache areas and resources.

Likewise, the ultimate relief of vacating the FEIS would redress the Tribe's remaining injuries by sending the Forest Service back to consider each issue that the Tribe raised before the 2021 FEIS was published, by giving the Tribe the opportunity to comment on and receive responses related to new issues the Forest Service may present in a supplemental DEIS.  Of course, vacating the 2025 FEIS would mean that Federal Defendants lack authority under SALECA to convey Oak Flat to Resolution, preventing

---

[16]To establish standing generally, the Tribe's claims under the Religious Freedom Restoration Act, Free Exercise Clause of the First Amendment, Apache Treaty of 1852, Indian title, and State and Federal water rights would further redress the Tribe's injuries by  prohibiting the land exchange or limiting Resolution's destructive use of Oak Flat. However, because the Tribe does not seek preliminary relief on these grounds, it does not argue them here, even though they unambiguously establish standing.

its destruction for the time being.  The Tribe has Article III standing.  *See Friends of the Earth*, 528 U.S. at 180-81.

## III.    THE COURT SHOULD ENJOIN OAK FLAT'S TRANSFER DURING THE PENDENCY OF THIS ACTION

The Tribe is entitled to a preliminary injunction during the pendency of this action that enjoins Oak Flat's transfer to prevent the irreparable harms that the Tribe and its members have suffered and will suffer.

### A.  Preliminary Injunction Standard

To obtain an injunction, a party must show the balance of four factors warrants relief.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011).  These include: (1) likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities favors an injunction; and (4) an injunction is in the public interest.  *Id.*  So long as irreparable harm is likely, a party need not carry all four factors, because courts analyze them on a sliding scale.  *Id.*  As such, a plaintiff only needs to show "serious questions" exist on the merits and that the balance of hardships tips in its favor.  *Id.*  The serious-questions standard only requires a "fair chance of success."  *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024).

### 1.  *The Tribe Is Likely to Succeed on the Merits Because the 2025 FEIS Fails to Satisfy the Requirements of SALECA, NEPA, and NHPA*

As a starting point, SALECA includes a condition precedent before Federal Defendants can convey Oak Flat.  SALECA states that "[p]rior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement." 16 U.S.C. § 539(c)(9)(B).  This language is mandatory and it specifies an order of operations:  "[p]rior to conveying [Oak Flat], the Secretary *shall* prepare a single [EIS]."  There is no way of interpreting the command other than that SALECA requires a legally compliant EIS before allowing Oak Flat's transfer.  As a mandatory condition precedent, the Secretary lacks statutory authority to transfer Oak Flat to Resolution in the absence of

a legally valid EIS.

Further, the EIS required by SALECA is not an ordinary EIS; rather, SALECA requires one that is far more robust and comprehensive such that it will support each and every future action related to the Resolution Mine.  Had this not been the case, various federal agencies would produce numerous EISs related to the Resolution Project at various times, as well as several Environmental Assessments and possibly findings of no significant impact ("FONSI")—each on a discrete component of the Project.

Rather than allowing piecemeal processes to proceed by various agencies, SALECA requires the Secretary to prepare a single, comprehensive EIS.  It states, "[e]xcept as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969."  16 U.S.C. § 539p(c)(9)(A).  Further, the "exceptions" provided in SALECA do not lessen NEPA's requirements, but heighten them by including additional requirements exceeding the ordinary mandates of NEPA and that make no allowance for a FONSI.  *See* 16 U.S.C. § 539p(c)(9)(B) ("Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement . . . , which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.").

The defects in 2025 FEIS are extraordinary and would render several decisions under federal law that would be based upon it as inadequately explained, arbitrary, and capricious.  As Dr. Steven Emerman states in his declaration, the 2025 FEIS is woefully inadequate in how it addresses issues related to the tailings storage facility alternatives and both the tailings and concentrate pipelines.  In particular, Emerman opines that the 2025 FEIS:

(1)    Greatly underestimates the likelihood of a tailings pipeline failure by a factor of 20-to-1 and, even then, only considers one of ten possible causes and ignores the most common cause. (EXH. 32 New Emerman declaration, p. 2-6).

(2)    Greatly understates the consequence of a tailings pipeline failure by failing to account for the volume of tailings, the inability of Resolution to rapidly halt production in the event of a failure, and the high-risk features like canyon crossings.  (EXH. 32 New Emerman declaration, p. 6-9).

(3)    Entirely fails to evaluate the probability of a concentrate pipeline failure. (EXH. 32 New Emerman declaration, p. 9-10).

(4)    Greatly understates the consequence of a concentrate pipeline failure including the toxicity and harms caused by such a failure to the immediate environment and downstream communities.  (EXH. 32 New Emerman declaration, p. 10-12).

(5)    Entirely fails to include a dam breach analysis or emergency preparedness and response plan, despite recognizing the need to do so in the DEIS.  Such an analysis would demonstrate that several communities could be directly impacted before any kind of emergency action may be taken, exposing people to an unreasonable risk of death with no ability to receive advance notice of a breach, much less protect themselves.  (EXH. 32 New Emerman declaration, p. 12-16).

(6)    Employs an inappropriate and erroneous "empirical" model to evaluate the consequences of a tailings dam failure instead of a dam breach analysis, and then fails to use the output of such model.  Indeed, where an empirical model predicts a runout distance of 268 miles in the event of a tailings dam failure, the 2025 FEIS arbitrarily considered no more than 50 miles.  (EXH. 32 New Emerman declaration, p. 16-19).

(7)    Fails to consider all credible failure models by arbitrarily defining a "credible" failure in terms of probability rather than possibility, which is industry standard.  (EXH. 32 New Emerman declaration, p. 19-20).

(8)    Relies on a preliminary foundation characterization for the tailing storage facility when industry standards would require a characterization that is built upon intrusive investigations, in situ testing, geophysics, and laboratory testing.  Selection of the Skunk Camp alternative without this basic information is arbitrary and capricious.  (EXH. 32 New Emerman declaration, p. 20-21).

(9)     Fails to include a stability analysis of tailings and instead asserts an unsupported safety factor.  (EXH. 32 New Emerman declaration, p. 21).

(10)    Allows outer embankment slopes that are steeper than allowed by U.S. Army Corp of Engineers, arbitrarily increasing the risk of catastrophic failure.  (EXH. 32 New Emerman declaration, p. 22-24).

(11)    Asserts that the tailings dam design follows the most stringent international standards without considering international standards for minimum separation between tailings dams and downstream communities.  (EXH. 32 New Emerman declaration, p. 24-26).

(12)    Arbitrarily prefers a modified centerline method for the tailings dam rather than a much safer downstream method.  (EXH. 32 New Emerman declaration, p. 26-28).

(13)    Erroneously labels the majority of tailings as non-potentially acid generating ("NPAG"), a classification not recognized in the industry, when such tailings will include potentially acid generating ("PAG") tailings, and then selects an alternative that will allow these potentially acid-generating NPAG tailings to be exposed to oxygen (increasing the chances that acid will form), covers PAG tailings with so-called NPAG tailings, and uses so-

called NPAG tailings to construct the tailings dam—increasing the risks of dam failure and of uncontrolled acid mine drainage into the aquifer and downstream waterways, including the Gila River.  (EXH. 32 New Emerman declaration, p. 28-31).

(14)    Greatly underestimates the water consumption of the Project by a factor of three.  (EXH. 32 July 2025 Emerman declaration, ¶ 4).

These errors completely undermine the Forest Service's decision to prefer the Skunk Camp tailing storage facility alternative and render that decision and any decision based upon the selection of this action alternative as arbitrary and capricious.  Indeed, had the Forest Service completed a basic investigation into the Skunk Camp alternative as is minimally expected in the industry, it would have eliminated the Skunk Camp alternative instead of selecting it as the preferred action alternative.  *See Seven County Infrastructure Coalition*, 145 S. Ct. at 1514 (APA may require a court to vacate an EIS when there is reason to believe agency would disapprove a decision once it corrects failures).

Likewise, as Dr. James Wells states in his declaration, the 2025 FEIS acknowledges that the DEIS "misconstrued" the geochemical modeling results for estimating the water quality in the block-cave zone post-closure and that the new modeling and results aimed at correcting this error were so substantive that the Forest Service was required to issue a supplemental DEIS for public comment.  (EXH. 33 July 2025 Wells declaration, ¶¶ 4-7).  Similarly, Dr. Wells opines that the FEIS erroneously concludes there would be no acid rock drainage during mine operation as water from the Apache Leap Tuff Aquifer and deep groundwater percolates through the collapse zone and the mineralized zone before eventually being captured & removed in the mine sump. This will impact water quality at the mine and the tailings facility as this recovered water will be pumped out of the mine and used for ore processing.  Thus, by underestimating the level of contamination in the water recovered from the collapse zone, the 2025 FEIS not only underestimates the contaminant levels of water in the tailings storage facility and

the concentrations in seepage, it also underestimates groundwater impacts downstream of the tailings storage facility and demonstrates that the 2025 FEIS's conclusion that there will be no acid rock drainage is completely erroneous.  (*Id.* ¶¶ 14-16).  As such, selection of the Skunk Camp action alternative was further arbitrary and capricious and proper consideration likely would have resulted in the Forest Service preferring a different alternative.  (*Id.* ¶¶ 17-18); *see Seven County Infrastructure Coalition*, 145 S. Ct. at 1514.

Moreover, the 2025 FEIS, like the 2021 FEIS before it, fails to address the hydrological impacts that the Tribe raised in its comment of December 23, 2019, related to the regional subsidence that would result from groundwater depletion and the effects on the precipitation and groundwater flows that would follow.  In addition to requirements in SALECA to fully investigate and consider these impacts, the trust responsibility owed to the Tribe by the United States government—including the Forest Service—requires Federal Defendants to fully consider these impacts.  Nevertheless, the Forest Service failed to include any such analysis in the 2025 FEIS and did not evaluate any alternative to block-cave mining that might prevent these catastrophic results.  (*See generally*, Exh. 23, 2025 FEIS).

Regarding NHPA, SALECA requires the Secretary to assess and identify mitigation measures related to the impacts of "mining and related activities on the Federal land conveyed to Resolution Copper."  Under § 106, the Forest Service was required to consult with State and Tribal Historic Preservation Officers and other parties to negotiate an agreement that establishes how the Forest Service will avoid, minimize, and mitigate adverse effects.  *See* 36 C.F.R. § 800.6(b)(1)(i-iv).

The Forest Service did not complete a Programmatic Agreement for treatment of historic and cultural properties in 2021 and still has not done so.  The Forest Service has not substantively addressed the comments ACHP offered when it terminated consultation or that it presented by letter on March 29, 2021.  (Exh. 1, 14).  Moreover, even though the Forest Service withdrew the 2021 FEIS to resume tribal consultation, it did not

substantively consult with the Tribe about those NHPA issues.  Instead, the Forest Service suddenly gave notice of the forthcoming FEIS.  The same day, the Secretary responded to the ACHP's recommendations in a letter that defended the 2021 FEIS, a position contrary to the Forest Service's statements when it withdrew the 2021 FEIS. (*Compare* Doc. 36, *with* Exh. 14).

Because the 2025 FEIS fails to satisfactorily address these substantive areas, any subsequent decision based on that 2025 FEIS would be arbitrary and capricious, particularly those discussed above.  Further, because SALECA requires that all this analysis occur "*prior to*" Oak Flat's transfer, the statute includes a condition precedent that must be satisfied.  Until such time that Federal Defendants adequately consider these issues in a comprehensive FEIS, they lack authority to convey Oak Flat to Resolution.

The Tribe also incorporates by reference the NEPA challenges raised by the Arizona Mining Reform Coalition, *et al.*, in *Arizona Mining Reform Coalition v. United States Forest Service*, 2:21-cv-00122-DWL, in their amended complaint and motion for preliminary injunction.

Federal Defendants and Resolution insist that these defects in the 2025 FEIS can be litigated and remedied after Oak Flat changes hands.  This assertion, however, is unsupported by SALECA's text and, as discussed next, would unnecessarily cement several of the Tribe's injuries, eliminating any ability for them to be redressed.

> 2. *The Tribe Will Be Irreparably Harmed on Oak Flat's Transfer and Many Harms May Still Be Avoided.*

As more fully explained in Section II.B.1, *supra*, the Tribe has and will suffer six distinct injuries that directly resulted from publication of the 2025 FEIS or that will imminently follow with the transfer of Oak Flat to Resolution.  None of these harms are compensable with damages and, as to three of them, there can be no dispute they will be cemented upon Oak Flat's transfer.  Accordingly, they are textbook examples of irreparable harm.  These include: (1) the Tribe and its members would lose access to all

but 50 of Oak Flat's 2,422 acres, and even the limited access that remains would be temporary and subject to Resolution's unilateral choice; (2) Oak Flat's destruction would be set in motion and, therefore, accelerated; and (3) the Tribe and its members would lose the ability to identify and meaningfully preserve historic properties located within Oak Flat once it becomes private property and, acutely, when Resolution moves forward with "improvements" throughout all but the 50-acre campground.

In designating these harms as definitionally irreparable, the Tribe does not concede that the other three harms are otherwise reparable. Indeed, if the Resolution Project proceeds forward without a preliminary injunction prohibiting Oak Flat's transfer, Resolution will press forward with the Project such that these remaining harms will become cemented regardless of what any legally compliant EIS may eventually conclude. That is, even if the 2025 FEIS is ultimately vacated and a new EIS is produced which (1) duly considers the Tribe's pre-2021 comments; (2) duly considers any comments the Tribe presents on a supplemental DEIS; and (3) prefers action alternatives that result in lesser harms to important Apache areas and resources, Resolution may have made so much progress and wrought so much destruction by that time that the Tribe's injuries are redressed on paper, they would be written in stone. Only a preliminary injunction can prevent all six of the Tribe's injuries from becoming irreparable.

### 3. *Public Interest and the Balance of Hardships Favor Enjoining Oak Flat's Transfer.*

If Oak Flat's transfer is not enjoined, Resolution will press forward with the entire Project, creating a tremendous hardship for the Tribe and its members. The imminent transfer will seal Oak Flat's fate and start the irreversible countdown to its destruction and the end of certain traditional Apache religious practices. The American public will hardly benefit from the land transfer and subsequent mining under Oak Flat. No royalties will be paid to the United States Treasury and the limited smelting capacity in the United States strongly indicates that copper extracted will be shipped abroad for the global market, much

of it to China. Rio Tinto's largest shareholder is the state-owned Chinese Corporation Chinalco. The Resolution mine is not in the American public's interest; instead, the mine will primarily serve China's national security and economic interests.

For its part, the only hardship that the Forest Service would suffer is that it would continue to have an open file and continue to manage public lands that it has continually managed since 1955. Resolution, likewise, only suffers the same short delay of its publicly funded windfall and, since its profits are calculated over the long-term, it will suffer no loss in profits. Indeed, as Judge Logan concluded, Resolution voluntarily elected to incur costs related to the Project *before* securing title to Oak Flat, and Resolution cannot manufacture an exigency after accepting this calculated risk. Because the balance of factors favors the Tribe, the Court should enjoin Oak Flat's transfer during the pendency of this case.

In addition to the hardships and interests above, the Forest Service's failure to comply with NEPA and NHPA under SALECA further tips in favor of a preliminary injunction. If Federal Defendants execute the land transfer before publishing a legally compliant FEIS, then neither the government nor the people will have the information guaranteed by these statutes before the action is taken. NEPA embodies the policy of our nation that the government only moves forward with its eyes open to the environmental consequences of its actions, so the public may be heard before they result. Without a legally compliant NHPA process, members of the Tribe will forever lose invaluable ancestral, cultural, and religious properties that might be meaningfully preserved.

## 4. CONCLUSION

To avoid irreparable harm that will come with the destruction of Oak Flat, the Tribe asks the Court to maintain the *status quo* by enjoining Oak Flat's transfer during the pendency of this action.

Respectfully submitted this 14th day of July 2025.

San Carlos Apache Tribe
Office of the Attorney General

By: */s/ Alexander B. Ritchie*
    Alexander B. Ritchie
    Justine Jimmie
    Laurel Herrmann
    Jana Sutton
    Bernardo M. Velasco
    *Attorneys for Plaintiff San Carlos*
    *Apache Tribe*

By: */s/ Joe P. Sparks (with permission)*
    Joe P. Sparks
    *Attorney for Plaintiff San Carlos*
    *Apache Tribe*

TITLA & PARSI, PLLC
By: */s/ Steve Titla (with permission)*
    Steve Titla
    *Attorney for Plaintiff San Carlos*
    *Apache Tribe (of counsel)*