**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| San Carlos Apache Tribe, | No. CV-21-00068-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| United States Forest Service, et al., | |
| Defendants. | |
| Arizona Mining Reform Coalition, et al., | No. CV-21-00122-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| United States Forest Service, et al., | |
| Defendants. | |

## INTRODUCTION

This order addresses the sometimes overlapping motions for preliminary injunction filed in two cases: (1) *San Carlos Apache Tribe v. United States Forest Service et al.*, No. 21-cv-68-PHX-DWL (hereinafter, "*San Carlos*"), and (2) *Arizona Mining Reform Coalition v. United States Forest Service et al.*, No. 21-cv-122-PHX-DWL (hereinafter, "*AMRC*"). Each motion seeks an injunction to block a land exchange, now scheduled to occur on August 19, 2025, that Congress authorized over a decade ago, as part of the National Defense Authorization Act for Fiscal Year 2015 ("NDAA").

More specifically, § 3003 of the NDAA, known as the Southeast Arizona Land

Exchange and Conservation Act ("SALECA"), authorizes the exchange of 2,422 acres of federal land in the Tonto National Forest for land held by a private company, Resolution Copper ("Resolution Copper").  *See also* 16 U.S.C. § 539p(a) ("The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States.").  The federal land to be transferred to Resolution Copper includes an Apache ceremonial ground called *Chí'chil Biłdagoteel*.  That area, known in English as Oak Flat, "is a site of great spiritual value to the Western Apache Indians, who believe that it is indispensable to their religious worship," but "also sits atop the world's third-largest deposit of copper ore." *Apache Stronghold v. United States*, 101 F.4th 1036, 1044 (9th Cir. 2024) (en banc).  Congress's intent in authorizing the land exchange was "[t]o take advantage of that deposit" by enabling Resolution Copper to "mine the ore." *Id.*

Congress weighed considerable tradeoffs when deciding whether to approve the land exchange.  On the one hand, the contemplated mining activity is expected to produce significant economic benefits in Arizona, as "the mine is projected to directly employ 1,434 workers . . . [and] increase the average annual economic value added in Arizona by about $1.2 billion." (*San Carlos*, Doc. 105-9 at 31-32.)  Additionally, and perhaps more important, the mine is also expected to promote America's national security interests, by ensuring domestic access to a mineral that is essential to energy distribution, generation, and storage.

On the other hand, it is difficult to overstate just how profoundly the land exchange will undermine the ability of members of the San Carlos Apache Tribe ("the Tribe") to practice their religion.  Put simply, the mining techniques that will be used to extract the copper will "turn Oak Flat into a massive hole in the ground. . . .  It is undisputed that the government's plan will permanently destroy the Apaches' historical place of worship, preventing them from ever again engaging in religious exercise at Oak Flat." *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480 (2025) (Gorsuch, J., dissenting from the denial of certiorari) (cleaned up).  "[T]he government's plan will effectively end Apache religious existence as we know it.  Even the government has acknowledged that the

destruction of Oak Flat will inflict indescribable hardship on the Apaches." *Id.* at 1488 (cleaned up).

The contemplated mining activity also has the potential to cause potentially devastating environmental effects. For example, Resolution Copper's mining activity will generate massive quantities of toxic waste material, known as tailings, that will need to be pumped through miles of pipelines before reaching a tailings storage facility. "There is public apprehension over the creation, and type, of a tailings embankment for the tailings storage facility. The catastrophic collapse of [a] tailings dam in Brazil in January 2019, resulting in 259 confirmed fatalities with 11 people still missing, has heightened concerns." (*San Carlos*, Doc. 105-9 at 7.) "The consequences of a catastrophic failure and the downstream flow of tailings would include possible loss of life and limb, destruction of property, displacement of large downstream populations, disruption of the Arizona economy, contamination of soils and water, and risk to water supplies and key water infrastructure like the CAP [Central Arizona Project] canal." (*Id.* at 30.)

Additionally, the contemplated mining activity will require tremendous quantities of water, which is of particular concern in drought-stricken Arizona. (*Id.* at 7 ["Water use is a major concern among the public, other government agencies, and interested parties."].) "Over the mine life, 87,000 acre-feet of water would be pumped from the mine, and between 180,000 and 590,000 acre-feet of makeup water would be pumped from the Desert Wellfield in the East Salt River valley. . . . The wellfield pumping would incrementally contribute to the lowering of groundwater levels and cumulatively reduce overall groundwater availability in the area." (*Id.* at 28.) This water use may result in alarming long-term consequences. (*AMRC*, Doc. 93-1 at 169 ["[U]ltimately, long-term use of groundwater may become unsustainable . . . ."].)

Given these stark tradeoffs, it should come as no surprise that the land exchange has been the subject of intense opposition and an array of legal challenges. In 2019, several members of Congress attempted, unsuccessfully, to introduce legislation to overturn SALECA. (*San Carlos*, Doc. 105-9 at 7.) In 2021, when the land exchange appeared to

be imminent, three lawsuits (including these two lawsuits) were filed in the District of Arizona seeking to enjoin it. In the other lawsuit, a nonprofit organization alleged that the land exchange would violate tribal members' rights under the First Amendment's Free Exercise Clause, the Religious Freedom Restoration Act ("RFRA"), and an 1852 treaty between the United States and the Tribe. *Apache Stronghold v. United States et al.*, No. 21-cv-50-PHX-SPL (hereinafter, "*Apache Stronghold*"). The procedural history surrounding *Apache Stronghold* is summarized in more detail in a previous order in this case. (*San Carlos*, Doc. 99 at 3-6.) In a nutshell, the Ninth Circuit narrowly rejected the plaintiff's claims in a 6-5 *en banc* decision issued in March 2024 and the Supreme Court denied certiorari in May 2025, albeit only after relisting the matter for consideration more than a dozen times and over the dissent of Justices Gorsuch and Thomas.

In light of those developments, the plaintiffs in these two actions have not advanced any religion-based claims in their pending motions. Instead, the claims underlying those motions broadly fall into the following four categories:

1. Appraisal Claims: Under SALECA, the United States Forest Service ("Forest Service") must perform an appraisal to calculate the value of the federal and non-federal land to be exchanged. 16 U.S.C. § 539p(c)(4). SALECA also creates an "equalization process" providing that if the federal land is more valuable than the non-federal land, Resolution Copper must make up the difference by conveying additional land and/or "mak[ing] a cash payment." *Id.* § 539p(c)(5)(B)(i). According to AMRC, the Forest Service violated its appraisal-related duties under SALECA by failing to account for the value of the copper deposits underlying one of the federal parcels to be exchanged, known as the Mining Claim Zone ("MCZ") parcel—an omission that resulted in the Forest Service "low-ball[ing] the appraised value" of that parcel by potentially billions of dollars. (*AMRC*, Doc. 97 at 10.)

2. NEPA Claims: SALECA provides that "[p]rior to conveying Federal land under this section, the Secretary [of Agriculture] shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 ['NEPA'], which

- 4 -

shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." 16 U.S.C. § 539p(c)(9)(B). On June 20, 2025, the Forest Service published its voluminous final environmental impact statement ("FEIS") related to the land exchange,[1] as well as its draft record of decision ("DROD"). In their motions, AMRC and the Tribe identify an array of perceived shortcomings and omissions in the FEIS, which they contend violate NEPA.

3.    Consultation Claims:  SALECA provides that "[t]he Secretary shall engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange."  16 U.S.C. § 539p(c)(3)(A).  Additionally, under section 106 of the National Historic Preservation Act ("NHPA"), agencies "shall take into account the effect of an undertaking on any historic property" and afford the Advisory Council on Historic Preservation ("ACHP") "a reasonable opportunity to comment with regard to the undertaking."  *Tohono O'odham Nation v. U.S. Dept. of the Interior*, 138 F.4th 1189, 1193 (9th Cir. 2025) (cleaned up).  According to the Tribe, the Forest Service did not fulfill these consultation duties before publishing the FEIS.

4.    NFMA Claims:  The National Forest Management Act ("NFMA") includes a provision that requires the Forest Service to prepare a land and resource management plan for each national forest.  16 U.S.C. § 1604(a).  Such a plan exists for the Tonto National Forest (the "Forest Plan") and was last amended in 2023.  In the FEIS, the Forest Service acknowledges that some of the contemplated mining-related activities will occur within the Tonto National Forest and thus require an amendment of the Forest Plan (*San*

---

[1]    "The FEIS consists of six volumes.  It includes a nine-chapter, 1,000-page body and twenty-one appendices, which together span more than 2,500 pages.  Over the course of nearly 400 pages in Appendix R, the FEIS responds to the more than 29,000 comments the agency received on the Draft EIS."  (*San Carlos*, Doc. 114 at 4.)

*Carlos*, Doc. 105-9 at 11, 54), and the DROD proposes 16 amendments to the Forest Plan that would be required for approving Skunk Camp as the preferred tailings storage facility alternative (*AMRC*, Doc. 87-3 at 19-25).  According to AMRC, this approach violates NFMA's forest planning regulations, which appear at 36 C.F.R. Part 219, because those regulations require a public notice-and-comment process "which did not occur here" before any forest plan may be amended.  (*AMRC*, Doc. 87 at 28.)

On August 6, 2025, the Court held a lengthy hearing to hear oral argument from the parties.  Having given careful consideration to the parties' arguments, the Court now concludes that Plaintiffs have not established a likelihood of success on any of their claims. In all cases, this determination is based on an evaluation of the merits.  Additionally, in some cases, this determination is also based on various jurisdictional and other threshold issues identified by the Federal Defendants and Resolution Copper.

Moreover, even if the merits of some of Plaintiffs' claims could be said to satisfy the lesser "serious questions" standard, the Court would still decline to issue injunctive relief.  Although Plaintiffs have sufficiently established the second preliminary-injunction factor (a likelihood of irreparable injury in the absence of injunctive relief), the remaining factors (balance of hardships and public interest) present a mixed picture and thus do not tip sharply in Plaintiffs' favor.  It is evident that Plaintiffs and their supporters profoundly disagree with Congress's decision to authorize the land exchange, which may generate significant economic and national security benefits but will also "effectively end Apache religious existence as we know it" and pose significant environmental threats. Nevertheless, in our system of government, the political branches are responsible for weighing these sorts of competing objectives and determining how to balance them.  Here, Congress chose to pursue the land exchange despite the existence of many significant tradeoffs and the President chose to ratify Congress's choice by signing the law into effect. As a result, the Court must accept that this choice advances the public interest and operate from that premise.  *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) ("[A] court sitting in equity cannot ignore the judgment of Congress, deliberately

expressed in legislation. . . .  Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute.") (cleaned up).  A NEPA lawsuit is not the proper forum for second-guessing the wisdom of Congress's decision to pursue the land exchange.  *Seven County Infrastructure Coalition v. Eagle County, Colo.*, 145 S. Ct. 1497, 1511 (2025) ("Plaintiffs' policy objections to this 88-mile Utah railroad may or may not be persuasive.  But . . . [t]he political process, and not NEPA, provides the appropriate forum in which to air policy disagreements.") (cleaned up).

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up).  *See also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted); *Dymo Industries, Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) ("The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it.").

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  However, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (cleaned up).[2]  Additionally, when, as here, "a government agency is a party," "the final

---

[2]     The existence of serious questions often turns on the presence of disputed factual issues.  *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) ("[P]arties do not show serious questions when they raise a merely plausible claim, nor can a district court forgo legal analysis just because it has not identified precedent that places the question beyond debate.  This less demanding merits standard requires serious factual questions that need to be resolved in the case.") (cleaned up); *Alliance for the Wild Rockies*

1    two injunction factors—the balance of equities and the public interest—merge."

2    *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

3        Regardless of which standard applies, the movant "carries the burden of proof on

4    each element of either test." *Env't. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016,

5    1027 (E.D. Cal. 2000).

6                                    **ANALYSIS**

7    I.    First *Winter* Factor

8        The analysis begins with the first *Winter* factor—whether Plaintiffs have shown a

9    likelihood of success on the merits. *Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025)

10   ("Likelihood of success on the merits is the most important *Winter* factor and is a threshold

11   inquiry.") (cleaned up).

12       As noted, the Federal Defendants and Resolution Copper have, in addition to

13   addressing Plaintiffs' arguments on the merits, identified various jurisdictional and other

14   threshold reasons why, in their view, Plaintiffs will not be able to succeed on their claims.

15   Those arguments also go to whether Plaintiffs have satisfied the first *Winter* factor. *See,*

16   *e.g.*, *LA Alliance for Human Rights v. Cnty. of Los Angeles*, 14 F.4th 947, 958 (9th Cir.

17   2021) (reversing preliminary injunction in part because "Plaintiffs have not made the

18   required 'clear showing' that any individual Plaintiff has standing to bring the . . . claim");

19   *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) ("At this preliminary injunction stage,

20

21   *v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023) ("[L]ike many legal questions, the meaning of
     HFRA's unambiguous provisions would not become clearer with at least some discovery
22   or a further hearing on the merits. There is no need for more deliberative investigation or
     development of the record to resolve the plain meaning of HFRA.") (cleaned up).
23   However, the Ninth Circuit has indicated that unsettled and debatable legal issues may also
     qualify as serious questions. *See, e.g., hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180,
24   1184, 1195 (9th Cir. 2022) (identifying unresolved issue of statutory interpretation over
     the meaning of the term "without authorization" before concluding that "[a]t the very least,
25   . . . hiQ has raised a serious question as to this issue" and also noting that, during an earlier
     stage in the case, "we focused on whether hiQ had raised serious questions on the merits
26   of the factual *and legal* issues presented to us") (emphasis added); *City of Tenakee Springs
     v. Clough*, 915 F.2d 1308, 1311 (9th Cir. 1990) (reversing denial of preliminary injunction
27   in part because the movants' "interpretation of the language of the contract [was] not
     reasonable" and raised "at least a serious question as to its proper interpretation");
28   *Adultworld Bookstore v. City of Fresno*, 758 F.2d 1348, 1351-52 (9th Cir. 1985) (reversing
     denial of preliminary injunction because "the question of the constitutionality of the Fresno
     ordinance presents a fair ground for litigation" and "at least a serious litigation question").

1    Yazzie must make a clear showing of each element of standing . . . .") (cleaned up);

2    *Mitchell v. City of Cincinnati*, 2022 WL 4546852, *4 (6th Cir. 2022) ("[W]hether plaintiffs

3    had standing . . . is a component of the likelihood of success on the merits.").

4            A.    **Appraisal Claims**

5                    1.    <u>Threshold Issues</u>

6                            a.    **Standing/Redressability**

7            "[S]tanding is an essential and unchanging part of the case-or-controversy

8    requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

9    "[T]he irreducible constitutional minimum of standing contains three elements.  First, the

10   plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest

11   which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

12   hypothetical.  Second, there must be a causal connection between the injury and the

13   conduct complained of—the injury has to be fairly traceable to the challenged action of the

14   defendant, and not the result of the independent action of some third party not before the

15   court.  Third, it must be likely, as opposed to merely speculative, that the injury will be

16   redressed by a favorable decision." *Id.* at 560-61 (cleaned up).

17           Focusing on the redressability element, Resolution Copper argues that Plaintiffs

18   lack Article III standing to pursue all of their claims because any asserted "injuries flowing

19   from conveyance of title . . . are not redressable through their claims here. . . .  Nothing in

20   [SALECA] grants the Forest Service the power to refuse to make the exchange based on

21   court challenges to the FEIS, the appraisals, or the consultations.  Even if Plaintiffs could

22   convince this Court that flaws in the FEIS, appraisals, or the consultations require

23   additional study or correction, Plaintiffs cannot show that the Forest Service 'could be

24   influenced' ultimately to do anything other than comply with its duty under the Act to

25   proceed with the land exchange." (*AMRC*, Doc. 94 at 14.)  Meanwhile, although it is not

26   clear whether the Federal Defendants also challenge AMRC's Article III standing with

27   respect to the appraisal claims,[3] the Federal Defendants argue that, at a minimum, "AMRC

28   _____

     [3]      Although the Federal Defendants raise redressability arguments that are similar to
     the redressability arguments raised by Resolution Copper, their brief suggests they only

1    lacks prudential standing to challenge the appraisal at all, because its alleged injuries

2    caused by the privatization of and eventual impacts to the federal lands fall outside the zone

3    of interests protected by [SALECA's] appraisal provisions." (*AMRC*, Doc. 93 at 34.)

4        Even though, as explained in later portions of this order, Defendants' redressability

5    arguments present a closer call when applied to some of Plaintiffs' other claims, they are

6    unpersuasive in relation to AMRC's appraisal-related claims. *Davis v. Fed. Election*

7    *Comm'n*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross. Rather, a plaintiff

8    must demonstrate standing for each claim he seeks to press and for each form of relief that

9    is sought.") (cleaned up). The starting point for the analysis is the Ninth Circuit's decision

10   in *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000). There, "three

11   environmental organizations" sought to challenge a decision by the Bureau of Land

12   Management ("BLM") to enter into a land exchange, arguing that BLM relied "on an

13   outdated appraisal that undervalued the federal lands." *Id.* at 1174. The district court

14   denied the plaintiffs' request for a preliminary injunction on the ground that they lacked

15   standing but the Ninth Circuit "reversed . . . [and] remanded for entry of a preliminary

16   injunction setting aside this land exchange pending further proceedings in accordance with

17   this opinion." *Id.* at 1188.

18       As an initial matter, the Ninth Circuit rejected the district court's determination that

19   the plaintiffs' appraisal-related arguments "only constituted an attack on the way federal

20   money is spent, making [their] injury indistinguishable from that of other taxpayers and

21   therefore insufficiently particularized to confer standing," concluding that "the present

22   challenge . . . is not merely a generalized allegation of federal revenue loss at taxpayers'

23   expense. Rather, it is an effort by land users to ensure appropriate federal guardianship of

24   the public lands which they frequent. If, by exchange, public lands are lost to those who

25   use and enjoy the land, they are certainly entitled under the APA to file suit to assure that

26

27   _____

     view those redressability arguments as applying to Plaintiffs' NEPA and NHPA claims.
     (*AMRC*, Doc. 93 at 13 ["Plaintiffs' NEPA and NHPA claims also fail for want of standing
28   because the injury that Plaintiffs trace to the land exchange is not redressable; the Forest
     Service has a non-discretionary obligation to transfer title."].)

no exchange takes place unless the governing federal statutes and regulations are followed, including the requirement that the land exchanged is properly valued by the agency." *Id.* at 1176-77.  Turning to the issue of redressability, the defendants argued—similar to Defendants here—that a ruling in the plaintiffs' favor would not redress their injuries because "even if [plaintiffs] succeeded on the merits and BLM relied on a new appraisal," the land exchange would still eventually go forward and "the public lands would nevertheless be traded away." *Id.* at 1178.  The Ninth Circuit disagreed, holding that it would "place[] an unreasonable burden" on the plaintiffs to be required to conclusively establish "that no subsequent exchange would take place" following a reappraisal.  *Id.* Instead, the court held, it was enough for redressability purposes that "the transfer based on the current appraisal would not have taken place and [plaintiffs] members could have continued to use and enjoy the selected federal lands." *Id.*  Finally, the Ninth Circuit also held that the plaintiffs fell within the zone of interests protected by the statute giving rise to their appraisal-related claims—there, the Federal Land Policy and Management Act ("FLPMA")—and thus had prudential standing.  *Id.* at 1179-80.  Among other things, the court emphasized that FLPMA is intended to protect various environmental values, which "policy encompasses [plaintiffs'] interest in seeking to invalidate an allegedly unlawful transfer of federal land that will deprive its members of their aesthetic and recreational interest in the land," and that FLPMA contains provisions that encourage judicial review of public land adjudication decisions.  *Id.*

For the same reasons that the environmental organizations in *Desert Citizens* had Article III standing to challenge the appraisal underlying the land exchange they sought to enjoin, AMRC likely has Article III standing to challenge the Forest Service's appraisal of the MCZ parcel.  Defendants' primary basis for seeking to distinguish *Desert Citizens* is that the land exchange in that case "was a discretionary administrative land exchange—not one ordered by Congress" and thus "it was possible that, if the plaintiff prevailed, the agency might change its mind and the federal land might not 'be traded away,'" which is "not possible here" because "[e]ven if the . . . appraisals were found to need revision . . .

1    there is no possibility that the Forest Service may 'decide' not to make the land exchange."

2    (*AMRC*, Doc. 94 at 15, emphases omitted.)  But this is a distinction without a difference.

3    If, hypothetically, the Court were to agree with the merits of AMRC's appraisal-related

4    arguments and enjoin the land exchange pending a reappraisal, and if the Forest Service

5    were to conclude following the reappraisal that the MCZ parcel is actually worth billions

6    of dollars (as AMRC contends it should be valued), these developments might very well

7    derail the land exchange.  True, the Forest Service would still be required to *attempt* to

8    convey title to Resolution Copper at the conclusion of the reappraisal process, but

9    Resolution Copper might then decline to *accept* title because doing so would require it,

10   pursuant to the equalization process set forth in § 539p(c)(5), to write a multi-billion dollar

11   check to the federal government to make up the difference in value between the federal and

12   non-federal parcels.[4]  The bottom line is that correcting the alleged statutory violation (*i.e.*,

13   the flawed appraisal) will create some possibility that the alleged injury-causing event (*i.e.*,

14   the land exchange) will not occur.  *Save Bull Trout v. Williams*, 51 F.4th 1101, 1106-07

15   (9th Cir. 2022) (explaining that the "relaxed" requirement of redressability in a case

16   involving an alleged procedural injury requires there to be "'some possibility' that the

17   requested relief . . . will redress their alleged harms").

18          Turning to prudential standing, SALECA itself, which provides the basis for

19   AMRC's appraisal-related claims, does not create a private right of action.  *Concerned*

20   *Citizens & Retired Miners Coalition v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 942-43 (D.

21   Ariz. 2017) (rejecting tribal plaintiff's claim "that the Forest Service violated § 3003 of the

22   NDAA" in part because "the Tribe has not shown that this statute provides a cause of action

23   for it").  Thus, AMRC must assert those claims via the Administrative Procedure Act

24   ("APA").  "[A] person suing under the APA must satisfy not only Article III's standing

25   requirements, but an additional test: The interest he asserts must be arguably within the

26

27   ――――――――――――――
     [4]     The FEIS acknowledges this point.  (*San Carlos*, Doc. 105-9 at 137 [FEIS page 92:
     "[E]ven though directed by Congress, the land exchange remains a discretionary decision
28   on the part of Resolution Copper, which may or may not choose to undertake the exchange
     after receipt of the appraised value."].)

zone of interests to be protected or regulated by the statute that he says was violated." *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018) (citation omitted). "The purpose of this prudential standing requirement is to exclude those plaintiffs whose suits are more likely to frustrate rather than to further statutory objectives. The test is not meant to be especially demanding. The benefit of any doubt goes to the plaintiff. Still, the 'zone of interests' standard forecloses suit when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 797 (9th Cir. 2013) (cleaned up). *See also Bennett v. Spear*, 520 U.S. 154, 163 (1997) (characterizing the zone of interests in APA cases as "generous").

On the one hand, although AMRC unsurprisingly views *Desert Citizens* as establishing the existence of prudential standing here, there are differences between the underlying statutes in that case and in this one. There, the plaintiffs relied on FLPMA, which includes provisions that expressly call for the protection of scenic and environmental interests and expressly encourage judicial review. *Desert Citizens*, 231 F.3d at 1179. The Ninth Circuit concluded those provisions created a zone of interests that was capacious enough to encompass the environmental organizations' "interest in seeking to invalidate an allegedly unlawful transfer of federal land that will deprive its members of their aesthetic and recreational interest in the land." *Id.* SALECA, in contrast, has one and only one stated purpose, which is to facilitate the land exchange.[5] Additionally, although the Court disagrees with Defendants' contention (addressed in more detail in later portions of this order) that SALECA should be construed as evincing an intent to implicitly preclude any form of judicial review related to the land exchange, it does not explicitly encourage judicial review in the same manner as FLPMA.

On the other hand, one of the plaintiffs in *AMRC* is the Inter Tribal Association of Arizona, Inc. and SALECA has provisions that evince an intent to protect the interests of

---

[5]    16 U.S.C. § 539p(a) ("The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States.").

1    affected Indian tribes.[6]  Although those provisions do not specifically state that affected

2    Indian tribes have a protected interest in the appraisal and equalization portions of the

3    statute, that was also the situation in *Desert Citizens*—the Ninth Circuit concluded the

4    environmental organizations fell within the zone of interests created by FLPMA's

5    equalization provisions by looking to other portions of the statute that were not expressly

6    related to the equalization process.  Nor is *Desert Citizens* the only Ninth Circuit decision

7    to conclude that environmental groups had prudential standing to challenge agency

8    financial determinations.  *Nat'l Wildlife Fed. v. Burford*, 871 F.2d 849, 852-55 (9th Cir.

9    1989) (plaintiffs fell within the zone of interests of the Coal Leasing Act, and thus could

10   challenge whether agency leases were made at fair market value, even though the

11   challenged determination was purely economic).  More broadly, the zone-of-interests test

12   is "generous," *Bennett*, 520 U.S. at 163, and "not . . . especially demanding."  *Wild Fish

13   Conservancy*, 730 F.3d at 797.  *See also Lexmark Int'l, Inc. v. Static Control Components,

14   Inc.*, 572 U.S. 118, 130 (2014) ("[W]e have often conspicuously included the word

15   'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff . . . .")

16   (cleaned up).  Given those principles, AMRC likely possesses prudential standing to pursue

17   its appraisal-related claims, even if the case for prudential standing is not a slam dunk.

18              b.    **Implicit Preclusion Of Judicial Review**

19            Defendants contend that SALECA should be construed as barring judicial review

20   of the type of challenges Plaintiffs seek to advance here.  Resolution Copper emphasizes

21   that (1) the text of SALECA only identifies four enumerated conditions to the land

22   exchange and "the issues that Plaintiffs seek to litigate here are not among them"; (2) "the

23   unambiguous statutory obligation to transfer title within 60 days of FEIS publication is

24   irreconcilable with Plaintiffs' contention that conveyance of title must wait for judicial

25   review of [their] various claims"; and (3) the only purpose of the FEIS, as explained in

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [6]      *See, e.g.*, 16 U.S.C. § 539p(c)(3)(A)-(B) (requiring "government-to-government
28   consultation with affected Indian tribes concerning issues of concern to the affected Indian
     tribes related to the land exchange" and corresponding efforts to "address the concerns of
     the affected Indian tribes").

§ 539(c)(9), is to guide future agency discretionary decisions related to the contemplated mining activity after the land exchange. (*AMRC*, Doc. 94 at 9-14.) Similarly, the Federal Defendants argue: "The practical effect of [the 60 day] statutory deadline is that title will necessarily be transferred before any judicial challenge to the FEIS could be resolved, or for that matter, before any Final ROD could issue. Congress would have understood this when it enacted the Land Exchange Act. . . . Aware that NEPA challenges are not resolved in a mere sixty days, Congress sought to ensure that the land exchange proceeded expeditiously. Read together, subsections (c)(9) and (c)(10) evince Congress' intent to expedite the land exchange and to prevent an endless series of environmental reviews— and attendant judicial reviews—from frustrating that intent." (*AMRC*, Doc. 93 at 19-20.)

These arguments lack merit. Congress could have expressly precluded judicial review of claims related to the land exchange but declined to do so. Defendants are thus left to argue that such intent should be inferred from various features of SALECA's text. But such intent is not to be inferred lightly: "A strong presumption exists that the actions of federal agencies are reviewable in federal court." *KOLA, Inc. v. United States*, 882 F.2d 361, 363 (9th Cir. 1989). As the Supreme Court has explained:

> We begin with the strong presumption that Congress intends judicial review of administrative action. From the beginning our cases have established that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress. . . . Congress ordinarily intends that there be judicial review, and . . . only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review. This standard has been invoked time and again when considering whether the Secretary has discharged the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of his decision.

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670-72 (1986) (cleaned up).

The features of SALECA emphasized by Defendants are too ambiguous to overcome this strong presumption. Although the compressed 60-day transfer deadline has certainly complicated the task of providing judicial review of Plaintiffs' challenges, it has

1    not rendered judicial review impossible.  As the Tribe persuasively argues in its reply:

2    "Congress certainly knew that NEPA and APA challenges are common and often lengthy.

3    If it wanted to eliminate any such challenges, Congress could have excluded the Project

4    from NEPA entirely.  Congress did the opposite by requiring an EIS consistent with NEPA

5    but subject to additional requirements.  In this context, a preferable interpretation of the

6    sixty-day timeframe is that it permits sufficient time for aggrieved parties to seek

7    preliminary relief . . . ."  (*San Carlos*, Doc. 119 at 10.)

8                                          c.    **Final Agency Action**

9            The Federal Defendants contend that "[t]he Court lacks jurisdiction over Plaintiffs'

10   claims because neither the FEIS nor the Draft ROD is a final agency action."  (*AMRC*, Doc.

11   93 at 7, capitalization omitted.)  Likewise, Resolution Copper argues that "[o]nly agency

12   actions that are both discretionary and final are subject to APA review" and that "final

13   agency action . . . is absent here."  (*AMRC*, Doc. 94 at 6, 48, emphasis omitted.)

14           Although Defendants' "final agency action" arguments have more force when

15   applied to some of Plaintiffs' other claims, they are unpersuasive in relation to AMRC's

16   appraisal-related claims.  As background, under the APA, "the person claiming a right to

17   sue must identify some 'agency action' that affects him in the specified fashion" and "the

18   'agency action' in question must be 'final agency action.'"  *Lujan v. National Wildlife*

19   *Federation*, 497 U.S. 871, 882 (1990).  "The APA defines 'agency action' broadly to

20   include the whole or a part of an agency rule, order, license, sanction, relief, or the

21   equivalent or denial thereof, or failure to act.  This definition is meant to cover

22   comprehensively every manner in which an agency may exercise its power."  *Francisco*

23   *Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 575-76 (9th Cir. 2019) (cleaned up).

24   For purposes of AMRC's appraisal-related claims, the challenged conduct is the Forest

25   Service's appraisal of the MCZ parcel.  The Court has little trouble concluding that this

26   appraisal qualifies as "agency action."

27           To determine whether agency action is "final," courts in the Ninth Circuit apply the

28   two-part test from *Bennett v. Spear*, 520 U.S. 154 (1997): *first*, the action must "mark the

consummation of the agency's decision-making process"; and *second*, the action must "determine rights or obligations or be one from which legal consequences will flow." *Envt'l Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 867-68 (9th Cir. 2022) (cleaned up). "The law surrounding the APA's finality requirement is hardly crisp and our precedent lacks many self-implementing, bright-line rules, given the pragmatic and flexible nature of the inquiry as a whole." *MediNatura, Inc. v. Food & Drug Administration*, 998 F.3d 931, 938 (D.C. Cir. 2021) (cleaned up). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties. The court focuses on the practical and legal effects of the agency action: the finality element must be interpreted in a pragmatic and flexible manner." *Tohono O'odham Nation*, 138 F.4th at 1200 (cleaned up).

The finality analysis is straightforward as applied to AMRC's appraisal-related claims. As for the first finality element, the appraisal process has now been completed—and, thus, there has been a "consummation of the agency's decision-making process" with regard to the challenged appraisal decision. In this way, that decision differs from the discretionary permitting and land-use determinations discussed in the FEIS and DROD, which remain subject to change pending public comment and objection. As for the second finality element, the appraisal decision will certainly "determine rights or obligations," as it will provide part of the basis under the equalization process set forth in § 539p(c)(5) for determining whether Resolution Copper has to write a check to the federal government—a check that, at least theoretically, could be for billions of dollars—to complete the land exchange.

Defendants' arguments to the contrary are unavailing. Although Resolution Copper contends that SALECA "establishes its own remedy for any purported defect in the appraisal: a make-whole payment, not an injunction against conveyance" (*AMRC*, Doc. 94 at 35-36), this ignores that the make-whole process only addresses what happens if the appraised value of the federal land exceeds the appraised value of the non-federal land. It doesn't create a process for questioning the accuracy of the appraisal itself. Again, as to

1    that issue, final agency action has already occurred.

2                   d.    **No Agency Discretion**

3          Defendants also raise an array of arguments that hinge, in one way or another, on

4    the concept of agency discretion.  For example, the Federal Defendants argue that because

5    "Congress required the Forest Service to carry out the land exchange," it follows that "the

6    Forest Service lacks discretion with respect to that statutory mandate" and thus "Plaintiffs

7    cannot state a cognizable APA challenge to the land exchange."  (*AMRC*, Doc. 93 at 17.)

8    The Federal Defendants also contend that because "NEPA does not apply in the absence

9    of agency discretion" and non-discretionary actions are exempted "from NEPA's definition

10   of a 'major federal action,'" "[t]he mandatory transfer of title is not a major federal action

11   subject to NEPA."  (*Id.* at 22-23.)  Likewise, Resolution Copper argues that "the [APA] is

12   no help to Plaintiffs here, because what they seek to enjoin—conveyance of the federal

13   land—is not an agency decision subject to any discretion."  (*AMRC*, Doc. 94 at 2.)

14         These "no agency discretion" arguments lack merit in relation to AMRC's

15   appraisal-related claims.  Again, the challenged conduct here is the appraisal of the MCZ

16   parcel, and SALECA expressly vests the Secretary of the Forest Service with discretion

17   regarding that appraisal.  *See* 16 U.S.C. § 539p(c)(4)(B)(ii) ("After the final appraised

18   values of the Federal land and non-Federal land are determined and approved by the

19   Secretary . . . .").  *See also Ctr. for Biological Diversity v. U.S. Forest Serv.*, 2025 WL

20   947472, *2 (D.D.C. 2025) ("To comply with [SALECA's] equalization requirement,

21   Congress mandated that the land parcels be independently appraised.  The Forest Service

22   contracted with Barry Weissborn to serve as lead appraiser.  Within the Forest Service,

23   Gerald Sanchez was designated to assess the appraiser's work. . . .  On January 20, 2023,

24   the appraisal was completed, and on January 22, 2023, the appraisal was 'provided' to the

25   Forest Service, meaning that Sanchez was granted authorization to view it. . . .  On January

26   25, 2023, Sanchez completed the technical review of the results of the appraisal and issued

27   a report.  Sanchez's technical report assessed the completeness and accuracy of the

28   appraisal to ensure that it used appropriate methods and techniques, and that its

conclusions, analyses, and opinions were reasonably supported with market data.  Sanchez also prepared an appraisal summary.  Both documents were prepared to *assist the Secretary when deciding whether to accept the appraisal . . . .*") (citations omitted) (emphasis added).

### e. **Vacatur As A Remedy**

Defendants' final threshold argument turns on the issue of the appropriate remedy in a NEPA action.  According to Defendants, the usual remedy for a flaw in an environmental impact statement is not to order vacatur of the statement but simply to remand to the agency for additional analysis or consultation.  (*AMRC*, Doc. 93 at 50 ["Vacatur is generally not appropriate in NEPA cases . . . ."]; *AMRC*, Doc. 94 at 19 ["Plaintiffs' motions also rest on a mistaken premise about the appropriate remedy for a NEPA violation—even assuming they could establish one.  Plaintiffs assert without analysis that this Court should vacate the FEIS and enjoin conveyance if it finds the FEIS somehow flawed.  But . . . even if Plaintiffs were right that the FEIS is flawed, this Court at most might remand the FEIS without vacatur for further analysis or consultation."].)  According to Defendants, this principle is significant here because, absent vacatur, the land exchange must go forward on August 19, 2025 pursuant to SALECA's statutory directive that the land exchange occur within 60 days of publication of the FEIS.  (*Id.*)

This argument does not undermine AMRC's likelihood of success in relation to the appraisal claims.  As discussed, *Desert Citizens* holds that a district court may enjoin a land exchange based on appraisal-related errors.  Indeed, in *Desert Citizens*, the Ninth Circuit remanded to the district court with directions to issue a preliminary injunction that would retroactively unwind a land exchange that had already occurred.  *Desert Citizens*, 231 F.3d at 1188 ("The district court's dismissal and its denial of a preliminary injunction are reversed, and the case is remanded for entry of a preliminary injunction setting aside this land exchange pending further proceedings in accordance with this opinion.").  Even though, as Defendants emphasize, the land exchange in *Desert Citizens* was not congressionally mandated, the Court still construes *Desert Citizens* (rather than the NEPA decisions cited by Defendants) as supplying the relevant authority in evaluating whether

1    an available remedy exists in the appraisal context that would redress AMRC's asserted

2    injuries.

3         2.    <u>Merits</u>

4         Even though AMRC will likely to be able to survive the various jurisdictional and

5    threshold issued raised by Defendants in relation to its appraisal-related challenges, that is

6    only half the battle—AMRC must also establish that it is likely to prevail on those

7    challenges (or at least demonstrate the existence of serious questions going to the merits).

8         AMRC has failed to make that showing.  As background, the challenged appraisal

9    concerns the MCZ parcel, which comprises "1,655.53 acres of vacant land east of Superior

10   and just south of U.S. 60. . . .  Much of the property is within the site of the proposed

11   Resolution Copper underground copper mine." (*AMRC*, Doc. 93-3 at 7.)  In the appraisal

12   report, the Forest Service acknowledged that "[i]t is understood that a significant porphyry

13   copper deposit exists beneath the Subject Property." (*Id.* at 9.)  Nevertheless, the Forest

14   Service declined to consider the value of that copper when appraising the value of the MCZ

15   parcel because that copper is "subject . . . to 148 unpatented mining claims held by

16   Resolution Copper." (*Id.*)  The Forest Service explained: "An unpatented mining claim is

17   a conditional, possessory, interest in real property ownership of a mineral estate in

18   accordance with the Mining Law . . . .  Since the Subject Property is encumbered by mining

19   claims held by a party other than the United States; said mining claims confer all rights to

20   locatable minerals to that party in accordance with the Mining Law and are not part of the

21   estate owned by the United States." (*Id.* at 10, citations omitted.)  The Forest Service

22   concluded: "The Subject Property was regarded as a split estate since the unpatented

23   mining claims confer all rights to locatable minerals. . . .  Therefore, the total purchase

24   price is allocated to the surface interest, with no adjustments applied." (*Id.* at 12.)

25        AMRC raises an array of challenges to this appraisal, all of which hinge, one way

26   or another, on the appraiser's failure to include the value of the copper underlying the MCZ

27   parcel in the value of the parcel.  (*See, e.g.*, *AMRC*, Doc. 87 at 8 ["[T]he appraisal for the

28   MCZ parcel arbitrarily failed to include *any* value for the tens of billions of dollars worth

of copper, valuing the entire 1,655-acre parcel at less than $2 million."]; *id.* ["[T]he MCZ appraisal is based on the erroneous assumption that the value of the 35 billion pounds of copper on these federal lands is zero, simply because Resolution has filed mining claims on these lands."]; *id.* at 12 ["There is simply no rational, economic comparison between the types of nondescript surface lands that the appraiser considered as comparable sales and the invaluable MCZ parcel, which sits atop nearly 90 percent of the world's third-largest known copper deposit (35 of the estimated 40 billion pounds)."].)

In the Court's view, the appraiser's approach was correct and AMRC's criticisms all flow from a misunderstanding of how unpatented mining claims work. In *United States v. Shumway*, 199 F.3d 1093 (9th Cir. 1999), the Ninth Circuit provided an overview of this "relatively arcane area of law." *Id.* at 1097. The court explained that under "the Mining Law of 1872"—which, despite being the subject of "much contemporary hostility," "remains the law"—"the finder of valuable minerals on government land is entitled to exclusive possession of the land for purposes of mining and to all the minerals he extracts." *Id.* at 1098-99. The court further explained that although "[t]he phrase 'mining claim' . . . probably connotes to most laymen an unsupported assertion or demand from which no legal rights can be inferred," "that is emphatically not so" under the Mining Law of 1872 because "the word 'claim' in connection with the phrase 'mining claim' represents a federally recognized right in real property." *Id.* at 1099-1100. The court continued:

> The Supreme Court has established that a mining "claim" is not a claim in the ordinary sense of the word—a mere assertion of a right—but rather is a property interest, which is itself real property in every sense, and not merely an assertion of a right to property. . . . In *United States v. North American Transportation & Trading Co.*, the Army had been sent to Nome to bring order during its gold rush, and the president established a federal reservation for the Army base. The Court, in an opinion by Justice Brandeis, held that a company holding a mining claim at the site was entitled to compensation for the taking, with interest from the date of the reservation. This case establishes that the government cannot reserve its own land from an unpatented mining claim without paying the owner the value of the claim, because an unpatented mining claim is property.

1     *Id.* at 1100 (citations omitted).

2          Recently, in *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 33 F.4th

3     1202 (9th Cir. 2022), the Ninth Circuit further addressed these concepts.  There, the court

4     explained that "[t]he Mining Law of 1872 . . . gives to United States citizens free of charge,

5     except for small filing and other fees, mining rights upon discovery of 'valuable minerals'

6     on federal land."  *Id.* at 1208.  "[T]he Mining Law remains in effect for much federal land

7     and for many minerals, including copper.  Within the scope of its operation, the Mining

8     Law continues to be a source of wealth—sometimes great wealth—for those who discover

9     valuable minerals on federal land."  *Id.* at 1209.  "A miner who finds valuable minerals

10    may 'locate' (or 'stake') a claim and thereby obtain an 'unpatented mining claim.'  A valid

11    unpatented claim gives the miner the right to 'occupy' the claim and to mine the minerals

12    free of charge."  *Id.* (citations omitted).

13         In light of these principles, it is difficult for the Court to find any fault in the Forest

14    Service's appraisal.  Resolution Copper already effectively owns the exclusive right to

15    mine the copper underlying the MCZ parcel.  *See, e.g.*, *Ickes v. Virginia-Colorado*

16    *Development Corp.*, 295 U.S. 639, 644 (1935) (explaining that an unpatented mining claim

17    "is property in the fullest sense of that term" and "is alienable, inheritable, and taxable");

18    *Ctr. for Biological Diversity*, 33 F.4th at 1209 ("A valid unpatented claim gives the miner

19    the right to 'occupy' the claim and to mine the minerals free of charge."); *Shumway*, 199

20    F.3d at 1100 ("[T]he government cannot reserve its own land from an unpatented mining

21    claim without paying the owner the value of the claim, because an unpatented mining claim

22    is property.").  *See also Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d

23    633, 643 (9th Cir. 2010) ("Asarco has a right to engage in mining on the selected lands

24    under the Mining Law even if the exchange does not proceed, based on its 747 unpatented

25    mining and mill site claims."); *Kunkes v. United States*, 32 Fed. Cl. 249, 252 (1994), *aff'd*,

26    78 F.3d 1549 (Fed. Cir. 1996) ("Although legal title to the land remains in the United

27    States, the claimant enjoys a valid, equitable title in the claim, possessing all of the

28    incidents of real property.").  It would be odd if the value of that copper were nevertheless

- 22 -

1  included in the value of the federal government's interest in the parcel.  Following that

2  approach would force Resolution Copper, as part of the land exchange, to pay the federal

3  government for the copper it effectively already owns the exclusive right to mine.  The

4  Court thus agrees with Resolution Copper that "AMRC's real complaint is not with the

5  MCZ appraisal but with the General Mining Law of 1872" and that adopting AMRC's

6  argument "that Resolution should pay the United States for rights it already owns in the

7  MCZ would nullify the 1872 Law and 150 years of Supreme Court precedent, as well as

8  take Resolution's property." (*AMRC*, Doc. 94 at 37-38.)  As the Federal Defendants

9  correctly note in their response: "[E]ven if Congress had never enacted [SALECA],

10  Resolution Copper would retain the exclusive rights to exploit the locatable minerals

11  (assuming it paid the annual claim maintenance fee), and those rights would remain an

12  encumbrance on the land owned by the United States." (*AMRC*, Doc. 93 at 39.)

13      In its motion papers, AMRC never directly addresses the absurd consequences that

14  would flow from adopting its position.  Nor do AMRC's more granular arguments change

15  the analysis.  For example, although the federal government may still technically "own[]

16  the mineral estate" underlying the MCZ parcel (*AMRC*, Doc. 87 at 8), that interest does not

17  include the right to *mine* the minerals, which belongs to Resolution Copper.  *Ctr. for

18  Biological Diversity*, 33 F.4th at 1209.  AMRC also identifies various regulations and

19  standards that call for appraisers to include the value of "minerals" in any appraisal (*AMRC*,

20  Doc. 87 at 9-10; *AMRC*, Doc. 97 at 7-11), but those general statements do not explain how

21  to perform the valuation when, as here, the minerals are subject to unpatented mining

22  claims.[7]  Finally, AMRC's "highest and best use" and "must be appraised as private lands"

23  arguments (*AMRC*, Doc. 87 at 11-13) rely on the false premise that, in those scenarios,

24  Resolution Copper's exclusive right to mine the minerals would somehow cease to exist.[8]

---

25  [7]    Indeed, the appraisal guidelines appear to recognize that valuing "mineral
26  properties" can be complicated by the existence of mining claims. (*AMRC*, Doc. 87-17 at
   57 ["Appraisers valuing mineral properties impacted by the 1872 Mining Law are advised
27  to coordinate with client agency staff to clarify the approaches to valuing those interests."].)

28  [8]    AMRC also raises, in its reply brief, what the Court perceives to be a new argument
   not properly raised in AMRC's motion—that the appraiser should have disregarded
   Resolution Copper's unpatented mining claims to the copper underlying the MCZ parcel

AMRC also places heavy emphasis on certain statements that were made during the legislative process surrounding SALECA's enactment. (*AMRC*, Doc. 87 at 9-10 [discussing congressional testimony by a Forest Service representative, a report by the Congressional Budget Office, and a House report].)  As an initial matter, although those statements reflect a belief that the value of "mineral deposits" or "ore deposits" would be included in the appraised value of the federal land, that belief is not necessarily inconsistent with the approach the Forest Service took in this case.  Although AMRC confines its objections to the appraisal related to the MCZ parcel, the Forest Service also completed an appraisal of a different parcel of federal land to be included in the land exchange, called the Mineral Withdrawal Area (or "MWA") parcel. (*AMRC*, Doc. 87-12.)  The MWA parcel also sits atop large and valuable copper deposits, but those deposits—unlike the deposits underlying the MCZ parcel—are not the subject of unpatented mining claims held by

---

because Resolution Copper has never "actually determine[d] whether the mine is financially viable." (*AMRC*, Doc. 97 at 7-8.)  First, "[t]he district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  Second, at any rate, it was logical—and certainly not arbitrary and capricious—for the appraiser to operate from the premise that the copper deposits underlying the MCZ parcel are valuable enough to validate Resolution Copper's mining claims.  Indeed, AMRC itself asserts in its motion that the MCZ parcel includes "tens of billions of dollars worth of copper," is "invaluable," and "sits atop nearly 90 percent of the world's third-largest known copper deposit (35 of the estimated 40 billion pounds)." (*AMRC*, Doc. 87 at 8, 12.)  Furthermore, SALECA can be reasonably interpreted as reflecting a congressional determination that Resolution Copper's mining claims are valid and that the contemplated mine will be financially viable.  16 U.S.C. § 539p(i)(C) ("Nothing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims . . . currently held by Resolution Copper on the Federal land, nor in any way change, diminish, qualify, or otherwise impact Resolution Copper's rights or ability to conduct activities on the Federal land under such unpatented mining claims and the general mining laws of the United States.").  *Center for Biological Diversity* is not to the contrary, as the disputed issue in that case was not whether the mining company had valid mining claims to the land containing the copper deposits but rather whether the company's mining claims to the adjacent land (where the mining waste would be dumped) were valid.  *Ctr. for Biological Diversity*, 33 F.4th at 1212 ("Rosemont proposes to dump 1.9 billion tons of waste rock onto 2,447 acres of nearby National Forest land on which it has mining claims, to an average depth of 700 feet.  Undisputed evidence in the administrative record shows that no valuable minerals have been found on the mining claims that Rosemont proposes to occupy with its waste rock."); *id.* at 1217 ("Rosemont owns valid mining rights on the National Forest land where it would dig its proposed pit mine.  Mining rights on that land were given by the federal government under the Mining Law, essentially free of charge. Rosemont has now asked the Forest Service to authorize it to permanently occupy with its waste rock 2,447 acres of additional National Forest land on which it does not have valid mining rights, also essentially free of charge.").

1    Resolution Copper.  As a result, the Forest Service included the value of those copper

2    deposits when appraising the value of the MWA parcel.  (*Id.* at 12 ["The property rights

3    for the subject includes the surface and sub-surface mineral interests."].)  In other words,

4    the Forest Service *did* include the value of at least some of the relevant mineral deposits in

5    its appraisals, which is broadly consistent with the expectations reflected in the cited

6    legislative history materials.[9]

7            More important, the isolated statements that AMRC has been able to pull from the

8    extensive legislative record surrounding SALECA's enactment shed little light on how to

9    construe the statutory text that Congress ultimately chose to adopt.  *Epic Sys. Corp. v.*

10   *Lewis*, 584 U.S. 497, 523 (2018) ("[L]egislative history is not the law.  It is the business of

11   Congress to sum up its own debates in its legislation, and once it enacts a statute we do not

12   inquire what the legislature meant; we ask only what the statute means.") (cleaned up).  To

13   that point, SALECA contains a clear textual indication that Congress was aware of

14   Resolution Copper's unpatented mining claims and intended to preserve them: "Nothing

15   in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims

16   . . . currently held by Resolution Copper on the Federal land, nor in any way change,

17   diminish, qualify, or otherwise impact Resolution Copper's rights and ability to conduct

18   activities on the Federal land under such unpatented mining claims and the general mining

19   laws of the United States."  16 U.S.C. § 539p(i)(C).

20           One final point bears emphasizing.  Because SALECA does not create a private

21   right of action, AMRC must assert its appraisal-related challenges via the APA.  Under the

22   APA, final agency action can only be set aside if it is "arbitrary, capricious, an abuse of

23   discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "This standard

24   of review is highly deferential, presuming the agency action to be valid and affirming the

25   agency action if a reasonable basis exists for its decision."  *Northwest Ecosystem Alliance*

26   ──────────────
     [9]        To the extent AMRC argues the cited legislative history materials reflect a belief
27   "that the appraisals of both the MWA and MCZ parcels must include the value of the
     minerals" (*AMRC*, Doc. 87 at 9, emphasis omitted), the Court disagrees—the cited
28   passages are ambiguous as to which minerals and ore would be included in the valuation
     and do not specifically state that the minerals underlying both parcels would be included.

1  *v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). "This rule ensures that
2  the reviewing court affords sufficient deference to the agency's action. The APA gives an
3  agency substantial discretion to rely on the reasonable opinions of its own qualified experts
4  even if, as an original matter, a court might find contrary views more persuasive." *San
5  Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014)
6  (cleaned up). "A court simply ensures that the agency has acted within a zone of
7  reasonableness and, in particular, has reasonably considered the relevant issues and
8  reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423
9  (2021).

10     These principles are relevant here because AMRC has failed to identify any
11  appraisal standard that specifically requires the value of minerals that are the subject of
12  unpatented mining claims to be included when calculating the federal government's
13  interest in the parcel of land that contains those minerals; failed to identify any prior
14  appraisal adopting that approach; and failed to identify any judicial decision suggesting
15  that approach is permissible (let alone required). Given this backdrop, it is difficult to see
16  how the challenged appraisal decision—which followed the recommendations of an expert
17  whose credentials AMRC has not challenged—could be deemed not just wrong, but so
18  wrong as to qualify as arbitrary and capricious. *Cf. Greer Coalition, Inc. v. U.S. Forest
19  Serv.*, 2011 WL 671750, *9-16 (D. Ariz. 2011) (rejecting various objections to appraisal,
20  noting that "courts should not overturn agency decisions when the agency has considered
21  relevant factors and reached a rational conclusion," and emphasizing that "[t]his is
22  particularly true where, as in the case of these appraisals, the agency chooses to rely on the
23  opinions of qualified experts"). Put another way, even if the appraisal decision was
24  wrong—and the Court is skeptical it was—it at least fell within the "zone of
25  reasonableness," *Prometheus Radio Project*, 592 U.S. at 423, given the absence of contrary
26  authority and the presence of a reasoned explanation for the decision.

27          3.    Conclusion As To Appraisal Claims
28     Although AMRC will likely be able to overcome the jurisdictional and other

- 26 -

threshold challenges that Defendants have raised to its appraisal-related claims, AMRC has not shown a likelihood of success on the merits of those claims or even serious questions going to the merits of those claims.

B.     **NEPA Claims**

1.     Threshold Issues

Defendants' jurisdictional and other threshold challenges to Plaintiffs' NEPA claims raise unsettled, complicated questions.  To understand why, it is necessary to take a step back and consider how SALECA's statutorily-mandated process for performing an environmental impact analysis differs from the typical process for performing such an analysis.

Ordinarily, "[t]he NEPA review process concludes in one of two ways: (1) the agency determines through an EA [environmental assessment] that a proposed action will not have a significant impact on the environment and issues a FONSI [finding of no significant impact], or (2) the agency determines that the action will have a significant impact and issues an EIS *and* record of decision."  *Envt'l Defense Ctr.*, 36 F.4th at 868 (emphasis added).  As the italicized text indicates, the issuance of the FEIS is typically not the final step in the agency's analysis in a case where a FEIS is required—instead, the final step is the issuance of the final record of decision ("ROD").  *See, e.g.*, *Seven County Infrastructure Coalition*, 145 S. Ct. at 1511 ("Because an EIS is only one input into an agency's decision and does not itself require any particular substantive outcome, the adequacy of an EIS is relevant only to the question of whether an agency's final decision . . . was reasonably explained."); *Oregon Natural Resources Council v. Harrell*, 52 F.3d 1499, 1508 (9th Cir. 1995) ("A record of decision comes at the end of the pre-decision, environmental review process and is intended to make public the agency's decision, to identify the alternatives considered and which are environmentally preferable, to state whether all practicable means to avoid or minimize environmental harm have been adopted, and to summarize the monitoring and enforcement program that has been adopted.").  For these reasons, the usual rule is that "[o]nce an EIS's analysis has been

1   solidified in a ROD, an agency has taken final agency action." *Oregon Natural Desert*

2   *Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010).

3          The environmental review process mandated by SALECA differs in some ways. As

4   noted, SALECA provides that "[p]rior to conveying Federal land under this section, the

5   Secretary shall prepare a single environmental impact statement under [NEPA], which

6   shall be used as the basis for all decisions under Federal law related to the proposed mine

7   and the Resolution mine plan of operations and any related major Federal actions

8   significantly affecting the quality of the human environment, including the granting of any

9   permits, rights-of-way, or approvals for the construction of associated power, water,

10  transportation, processing, tailings, waste disposal, or other ancillary facilities." 16 U.S.C.

11  § 539p(c)(9)(B).  In isolation, this provision is consistent with the typical NEPA review

12  process in that it contemplates the issuance of a FEIS followed by the subsequent issuance

13  of a ROD setting forth the agency's final decisions regarding various discretionary matters.

14  However, SALECA also contains the following additional provision: "Not later than 60

15  days after the date of publication of the [FEIS], the Secretary shall convey all right, title,

16  and interest of the United States in and to the Federal land to Resolution Copper." *Id.*

17  § 539p(c)(10).  In other words, SALECA tethers a non-discretionary act—the conveyance

18  of title necessary to complete the land exchange—to the issuance of the FEIS.  SALECA

19  also effectively requires this non-discretionary act to occur before the issuance of the ROD,

20  because "[t]he Final ROD will not be signed until after the conclusion of the objection

21  process" and "this process is unlikely to conclude before the end of 2025."  (*San Carlos*,

22  Doc. 114 at 4.)

23         These unique features of SALECA—the parties have not identified any similar

24  statute—make it particularly challenging to apply the relevant Ninth Circuit and Supreme

25  Court authorities addressing the concepts of redressability, final agency action, and

26  discretionary agency action in NEPA cases.  From the Court's perspective, attempting to

27  applying those precedents has sometimes been akin to attempting to pound a round peg

28  into a square hole—the principles and standards set forth in other APA and NEPA cases

don't map neatly onto how SALECA operates.

The unique features of SALECA also create other complications. One purpose of the environmental review process under NEPA is to require an agency to provide a reasoned comparison of the projected benefits and environmental consequences of a proposed course of action. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97-98 (1983) ("NEPA has twin aims. First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. Congress in enacting NEPA, however, did not require agencies to elevate environmental concerns over other appropriate considerations. Rather, it required only that the agency take a 'hard look' at the environmental consequences before taking a major action. The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.") (cleaned up). Thus, "[i]n addition to the proposed agency action, every EIS must rigorously explore and objectively evaluate all reasonable alternatives to that action. . . . A no action alternative in an EIS allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action." *Ctr. for Biological Diversity*, 623 F.3d at 642 (cleaned up).

Nevertheless, SALECA contemplates that the land exchange will occur within 60 days of, *and regardless of the analysis set forth in*, the FEIS. This has the feel of a "ready, fire, aim" approach because it suggests, as Resolution Copper's counsel acknowledged during oral argument, that the land exchange must go forward even if the Forest Service determines it will result in catastrophic environmental consequences. Again, this is not how the environmental review process usually works under NEPA, which complicates the task of applying existing NEPA precedents.

…

…

a.    **Standing/Redressability**

The Federal Defendants contend that Plaintiffs cannot establish redressability in relation to their NEPA claims "because there is no chance that additional environmental review could prompt the Forest Service to decide not to complete the land exchange to which Plaintiffs trace their injury. The decision to transfer Oak Flat to Resolution Copper was made by Congress, and the Forest Service does not have discretion to take another course." (*AMRC*, Doc. 93 at 14.) Similarly, Resolution Copper argues: "Even if Plaintiffs could convince this Court that flaws in the FEIS . . . require additional study or correction, Plaintiffs cannot show that the Forest Service 'could be influenced' ultimately to do anything other than comply with its duty under the Act to proceed with the land exchange." (*AMRC*, Doc. 94 at 14.)

Although this argument has some force, the Court perceives two related weaknesses in it. First, it seems to presuppose that the Court lacks authority to order vacatur of the FEIS as a remedy even if the FEIS is deemed deficient under NEPA. The question of vacatur is addressed in later portions of this order, but assuming for now that vacatur is an option, that remedy would, at least temporarily, prevent the land exchange from occurring (because the exchange can only occur, per § 539p(c)(1), "after" the date of publication of the FEIS).

Second, Defendants' argument also overstates the sort of relief that is required to establish redressability for a procedural injury. In *W. Watersheds Project v. Grimm*, 921 F.3d 1141 (9th Cir. 2019), environmental organizations brought an "action to enjoin the federal government's participation in the killing of gray wolves in Idaho pending additional analysis under" NEPA. *Id.* at 1143. The district court concluded the plaintiffs lacked standing because the challenged activity would likely continue to occur regardless of the injunction, and thus the plaintiffs could not establish redressability, but the Ninth Circuit reversed, explaining that "[i]f Wildlife Services were to cease its activities—even temporarily—it is possible that fewer wolves would be killed, particularly in the short term." *Id.* at 1148.

Similarly, in *Center for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017), after the Department of Defense ("DOD") approved the location, construction, and specifications for a military base in Okinawa, Japan, an environmental organization sought "to protect a local animal population and cultural property from the base's alleged adverse effects by bringing claims for declaratory and injunctive relief based on the Government's alleged violations of [NHPA]." *Id.* at 808. The DOD's decision to construct the military base arose from a bilateral executive agreement between the United States and Japan, *id.* at 811, and the Ninth Circuit noted that the plaintiff lacked standing to challenge the executive agreement itself or the DOD's decision to construct the base, *id.* at 819. Nevertheless, even though the construction of the base would eventually go forward, the Ninth Circuit concluded the plaintiff had standing to seek an injunction to prevent "any activities in furtherance of the [base construction], including granting permits . . . until [the DOD] complies with section 402 of the NHPA." *Id.* at 826 (cleaned up).

Here, too, if the land exchange were enjoined "temporarily" and "in the short term," *W. Watersheds Project*, 921 F.3d at 1148, that would redress at least some of Plaintiffs' injuries. *See also Ctr. for Biological Diversity v. Export-Import Bank of the U.S.*, 894 F.3d 1005, 1013 (9th Cir. 2018) (explaining that, in a prior case, the Ninth Circuit applied "the relaxed standard for procedural-injury" to hold "that a change in agency decisionmaking (from granting the permits to denying the permits, *even temporarily*)" was sufficient to establish redressability) (emphasis added). As Plaintiffs' counsel explained during oral argument, every day that Oak Flat remains intact is another day that members of the Tribe can use the land in its current, unspoiled form for religious purposes and ceremonies. Thus, even a temporary delay may, for example, allow another Sunrise Ceremony to take place. *See generally Apache Stronghold*, 145 S. Ct. at 1480-82 ("[T]ribal members have worshipped at Oak Flat for centuries, conducting there a number of religious ceremonies that cannot take place anywhere else. One example, the 'Sunrise Ceremony,' is a multiday coming-of-age ceremony for young women. . . . Tribal members believe the destruction of Oak Flat will close off a portal to the Creator forever and will completely devastate the

1   Western Apaches' spiritual lifeblood.  For the women who came of age at Oak Flat in
2   particular, that means their ties to *Chí'chil Biłdagoteel*, and to all of the girls past, present,
3   who have had their Sunrise Ceremony there, will be severed.") (Gorsuch, J., dissenting
4   from the denial of certiorari) (cleaned up).  This will make all the difference in the world
5   to the young women who are allowed to participate in that ceremony, even if it does not
6   ensure that future ceremonies will take place that would benefit additional young women.

7       *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008),
8   which Defendants view as conclusively foreclosing any claim of redressability, is
9   distinguishable.  There, three environmental plaintiffs challenged the validity of a 1999
10  biological opinion ("BiOp") that the National Marine Fisheries Service ("NMFS")
11  prepared to advise the United States on the implementation of a treaty with Canada and
12  "evaluate the effects of . . . the Treaty on the recovery and survival of listed salmon."  *Id.*
13  at 1222-23.  The BiOp concluded that "Canadian take under the Treaty was not likely to
14  jeopardize the continued existence of threatened or endangered salmon stocks."  *Id.* at
15  1224.  The Ninth Circuit rejected the plaintiffs' challenge to the validity of the BiOp for
16  lack of standing, explaining that even though the "defective BiOp could theoretically be
17  set aside," the court lacked the power to require the State Department to withdraw from the
18  treaty—the ultimate basis for the plaintiffs' injury—and thus that injury was beyond
19  redress.  *Id.* at 1226.

20      Although *Salmon Spawning* has some parallels to this case, an important difference
21  is that the Court may have the power (subject to the additional vacatur discussion *infra*) to
22  order the Forest Service to vacate the FEIS.  That remedy would at least temporarily
23  preclude the land exchange from going forward, because SALECA identifies the issuance
24  of the FEIS as a condition precedent to the land exchange.  In contrast, there was no step
25  the court in *Salmon Spawning* could take that would undo, even temporarily, the treaty
26  between the United States and Canada.[10]  *See also Ctr. for Biological Diversity*, 868 F.3d

27  ――――――――――――――――
    [10]    Additionally, the plaintiffs in *Salmon Spawning* asserted a separate claim for relief
28  based on the theory that "the State Department and NMFS were obligated by [the
    Endangered Species Act] and its implementing regulations to reinitiate consultation on the
    1999 BiOp" following the discovery of new methods and criteria for evaluating the impact

at 818-19 (distinguishing *Salmon Spawning*).

For these reasons, Plaintiffs have established a likelihood (albeit not a certainty) that they will be able to satisfy the "relaxed" requirement of redressability in a case involving an alleged procedural injury, as "there is 'some possibility' that the requested relief . . . will redress their alleged harms." *Save Bull Trout*, 51 F.4th at 1106-07. *See also Salmon Spawning*, 545 F.3d at 1226 ("Plaintiffs alleging procedural injury can often establish redressibility [sic] with little difficulty . . . .").

### b.    Implicit Preclusion Of Judicial Review

Defendants' "implicit preclusion" argument fares no better in relation to Plaintiffs' NEPA claims than it did in relation to AMRC's appraisal claims. SALECA does not expressly preclude judicial review and a strong presumption exists in favor of judicial review. *Bowen*, 476 U.S. at 670-72; *KOLA, Inc*, 882 F.2d at 363. The statutory features that Defendants emphasize are too ambiguous to overcome this presumption. Indeed, SALECA provides that "[e]xcept as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969." 16 U.S.C. § 539p(A)(9). The natural reading of this provision is that judicial review under NEPA (via the APA) is available. True, the initial prefatory phrase "[e]xcept as otherwise provided in this section" suggests there may be some deviation from the norm in how that NEPA review is conducted, but that is not the same thing as a clear, unambiguous expression of congressional intent to preclude any judicial review of NEPA claims related to the land exchange.

### c.    Final Agency Action

Because Plaintiffs must "proceed under the APA in order to challenge claimed violations of NEPA," they also must comply with the APA's "series of procedural

---

of commercial fishing on wild salmon. *Salmon Spawning*, 545 F.3d at 1229. Although the Ninth Circuit expressed doubt about "whether reinitiation will ultimately benefit the [plaintiffs]," it declined to dismiss that claim for lack of standing because the redressability requirement is diminished for procedural injuries and "[u]nlike the other claims, this claim is a forward-looking allegation whose remedy rests in the hands of federal officials and does not hinge on upsetting the Treaty." *Id.*

requirements [that] litigants must fulfill before bringing suit in federal court," including that "the challenged agency action must be final." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1093, 1096-97 (9th Cir. 2005). As noted, the following two-part test governs whether agency action is considered final: *first*, the action must mark the consummation of the agency's decision-making process; and *second*, the action must determine rights or obligations or be one from which legal consequences will flow. *Envt'l Defense Ctr.*, 36 F.4th at 867-68.

The second element of the finality test is likely satisfied in relation to Plaintiffs' NEPA claims. SALECA provides that "[n]ot later than 60 days" after the FEIS is published, the Forest Service "shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper." 16 U.S.C. § 539p(c)(10). This suggests the land exchange is a "legal consequence" that will "flow" from the issuance of the FEIS. Although Plaintiffs have not identified any prior case concluding that a land exchange may qualify as a "legal consequence" for purposes of this test, this absence of authority is unsurprising given SALECA's uniqueness and is not an obstacle to relief, given that the finality inquiry is meant to be "pragmatic and flexible" and "focus[] on the practical and legal effects of the agency action." *Tohono O'odham Nation*, 138 F.4th at 1200 (cleaned up).

The first element of the finality test—whether there has been a "consummation of the agency's decision-making process"—presents a more complicated question. As noted, in an ordinary NEPA process, the issuance of the FEIS does not mark the completion of the agency's decision-making process—instead, that process only reaches completion after the agency issues its final ROD (which has not yet occurred here). For this reason, the Federal Defendants argue that "[a]s to the discretionary decisions that are before the Forest Service, neither the FEIS nor the Draft ROD represent the consummation of that process. The Forest Service's decision-making process is ongoing and will not be complete until the Final ROD is signed. Any contrary interpretation would render the entire objection process meaningless." (*AMRC*, Doc. 93 at 9.) Meanwhile, Plaintiffs accuse Defendants of

focusing on the wrong decision-making process and argue that the relevant process here was simply the decision to issue the FEIS, which has now been completed. (*AMRC*, Doc. 97 at 12 ["The FEIS here is final as it concluded the agency's responsibilities under NEPA. . . . Under § 3003, the FEIS is the Forest Service's final word before the Exchange is executed and title is conveyed to RCM."]; *San Carlos*, Doc. 119 at 5 ["[B]ecause SALECA requires no further decisions—other than the decision to publish—before Oak Flat is transferred, the 2025 FEIS necessarily consummates Federal Defendant's environmental review and decision-making processes under SALECA, NEPA, and NHPA."].)[11]

Defendants likely have the better of this argument. As an initial matter, although Plaintiffs identify several passages and parentheticals from Ninth Circuit decisions that can be construed, at least in isolation, as suggesting that the issuance of a FEIS may alone qualify as final agency action for purposes of a NEPA claim,[12] Defendants persuasively explain why the better reading of those cases is that final agency action only occurs when the FEIS *and* the ROD have been published. (*AMRC*, Doc. 93 at 9-10; *AMRC*, Doc. 94 at

---

[11]    Plaintiffs also cite cases recognizing that an agency's choice to embark on a particular course of conduct without preparing an EIS may constitute final agency action in the NEPA context. *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1099-1100 (9th Cir. 2025) (final agency action existed where one agency (the Air Force) applied to a different agency (the Guam EPA) for the renewal of a waste disposal permit without "tak[ing] the requisite 'hard look' at the environmental impacts . . . and appropriately engag[ing] the public before committing to its plan for disposal"); *Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d 1095, 1104 (9th Cir. 2007) ("[A]n agency's decision not to issue an EIS concludes the agency's procedural inquiry into the environmental impact of a proposed project and therefore constitutes a final agency action, regardless of whether the agency has decided to fund the project."). However, as noted, the "NEPA review process concludes in one of two ways: (1) the agency determines through an EA that a proposed action will not have a significant impact on the environment and issues a FONSI, or (2) the agency determines that the action will have a significant impact and issues an EIS and record of decision." *Envt'l Defense Ctr.*, 36 F.4th at 868. Plaintiffs' cited cases are thus unhelpful because they address situations where the agency neglected environmental review altogether or achieved final agency action through an EA/FONSI. Neither case addresses the FEIS/ROD option (which is the option the Forest Service pursued here).

[12]    *Envt'l Defense Ctr.*, 36 F.4th at 868 ("We have repeatedly held that final NEPA documents are final agency actions."); *Oregon Natural Desert Ass'n*, 625 F.3d at 1118 (parenthetical stating that, according to the Eighth Circuit, the Supreme Court "has strongly signaled that an agency's decision to issue . . . an environmental impact statement is a 'final agency action' permitting immediate judicial review under NEPA") (citation omitted). In the order addressing Plaintiffs' earlier round of preliminary injunction motions, the Court simply noted that these cases might support Plaintiffs' position before clarifying that it was not yet deciding the issue. (*AMRC*, Doc. 81 at 11 & n.3.)

17-18.)  Indeed, one of Plaintiffs' cited cases makes that exact point: "*Once an EIS's analysis has been solidified in a ROD*, an agency has taken final agency action, reviewable under § 706(2)(A)."  *Oregon Natural Desert Ass'n*, 625 F.3d at 1118 (emphasis added). So do other cases from within the Ninth Circuit.  *See, e.g.*, *Oregon Natural Resources Council*, 52 F.3d at 1508 ("A [ROD] comes at the end of the pre-decision, environmental review process . . . .");  *Oregon Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 830 (D. Or. 2022) ("NEPA review does not dictate a final agency decision until the agency adopts the proposed alternative with a ROD.").  The Supreme Court also recently emphasized this point: "Because an EIS is only one input into an agency's decision and does not itself require any particular substantive outcome, the adequacy of an EIS is relevant only to the question of whether an agency's final decision . . . was reasonably explained."  *Seven County Infrastructure Coalition*, 145 S. Ct. at 1511.  "[R]eview of an agency's EIS is not the same thing as review of the agency's final decision concerning the project."  *Id.* at 1514.

Moreover, even if it might be theoretically possible for an EIS alone to qualify as final agency action in some other context, the analysis here must be "pragmatic and flexible" and take account of SALECA's specific features.  SALECA provides that the "[e]nvironmental analysis" set forth in the FEIS is to "be *used as the basis for all decisions under Federal law* related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities."  16 U.S.C. § 539p(c)(9)(B) (emphasis added).  This is a strong indication that the environmental analysis set forth in the FEIS was not intended to serve as a "decision" in and of itself—instead, it was simply intended to help inform the Forest Service's separate discretionary "decisions under Federal law" regarding pipelines, permits, and the like that have not yet been made with finality (and will eventually be set forth in the ROD).

This conclusion is also consistent with the line of Ninth Circuit cases stating that

courts should "look to see whether the agency has rendered its last word on the matter" when evaluating the first element of *Bennett*'s finality test. *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006). *See also Whitman v. Am. Trucking Associations*, 531 U.S. 457, 478 (2001) ("Only if the EPA has rendered its last word on the matter in question, is its action final and thus reviewable."). The Forest Service hasn't "rendered its last word" on any of the discretionary decisions it will be making in relation to the land exchange because it still has not issued the ROD. The *proposed* decisions addressed in the DROD are still subject to public review and revision.

With all of that said, it is a challenge to apply the Ninth Circuit's "final agency action" precedents here because SALECA contemplates a unique environmental review process that deviates from how that process usually operates. Congress's choice to make the issuance of the FEIS, rather than the issuance of the ROD, the triggering event for the land exchange makes it at least possible to conceptualize the FEIS as the agency's "final word" on the matter of the land exchange, even though the FEIS does not inform the decision to transfer the land. This uncertainty raises serious questions about how to characterize the issuance of the FEIS under the first step of *Bennett*'s "pragmatic and flexible" finality test.

### d.    **No Agency Discretion**

The Court is unpersuaded by Defendants' "no agency discretion" arguments as applied to Plaintiffs' NEPA claims. In advancing those arguments, Defendants rely on cases explaining that the question of *whether NEPA applies* ordinarily turns on whether an agency has discretion in relation to the underlying project that would be the subject of the environmental impact analysis. *See, e.g.*, *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) (explaining that NEPA's "procedural requirements are triggered by a discretionary federal action"); *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001) ("The touchstone of whether NEPA applies is discretion . . . . If, however, the agency does not have sufficient discretion to affect the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have

no affect on the agency's actions, and therefore NEPA is inapplicable."). Here, Congress has already specified that NEPA applies—the Forest Service "shall carry out the land exchange in accordance with the requirements of [NEPA]" and "shall prepare a single environmental impact statement under [NEPA]." 16 U.S.C. § 539p(c)(9)(A)-(B).

Additionally, the Forest Service possesses discretion with respect to many issues related to the land exchange, "including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." *Id.* § 539(c)(9)(B). It is permissible, under NEPA, for Plaintiffs to challenge the adequacy of the Forest Service's analysis of the environmental impact of those decisions. That challenge may be premature, due to the likely absence of "final agency action," but it does not fail for want of agency discretion. In arguing otherwise, Defendants conflate the substance of Plaintiffs' NEPA challenge with the remedy they seek. (*San Carlos*, Doc. 105 at 14 ["In an effort to defeat standing and avoid judicial review, Federal Defendants and Resolution reduce the Tribe's challenges to one contesting Oak Flat's transfer, which they assert is not a 'decision' within the meaning of the APA because Congress gave them no discretion. The Tribe, however, does not challenge the decision to convey Oak Flat as arbitrary and capricious. Instead, the Tribe asserts that the Forest Service's decision to publish the 2025 FEIS, as well as the decisions in it related to various action alternatives are arbitrary and capricious."].)

e.    **Vacatur As A Remedy**

As noted, Defendants argue that because the usual remedy under the APA and NEPA for a flaw in an environmental impact statement is not to order vacatur of the statement but simply to remand to the agency for additional analysis or consultation, and because the land exchange must go forward on August 19, 2025 in the absence of vacatur, Plaintiffs are effectively without a meaningful remedy with respect to their NEPA claims. (*AMRC*, Doc. 93 at 50; *AMRC*, Doc. 94 at 19.)

On the one hand, Defendants are correct that vacatur is not always the remedy in an APA action—sometimes, it is enough to remand for further consideration without formally

vacating the agency decision that was found to be flawed.  *See, e.g.*, *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 141 F.4th 976, 1015-16 (9th Cir. 2025) ("Having weighed the equities, vacatur is unwarranted because the procedural error is minor and the on-the-ground consequences of vacatur would be severe.  Still, we expect and urge BLM to move promptly in rectifying the ROD's deficiencies on remand.   But because we have been given no reason to believe that the agency would be unable to cure those deficiencies, we remand without vacating BLM's 2023 approval of the Project.") (cleaned up); *Cal. Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) ("That brings us to whether we must vacate the EPA's final rule.  A flawed rule need not be vacated. Indeed, when equity demands, the regulation can be left in place while the agency follows the necessary procedures to correct its action. . . .  Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed.") (cleaned up).  *See also Seven County Infrastructure Coalition*, 145 S. Ct. at 1514 ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS.").

On the other hand, Defendants' cited cases do not foreclose the availability of vacatur as a remedy.  Indeed, the Ninth Circuit has stated that "[w]e order remand without vacatur only in limited circumstances."  *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015).  Further, Defendants' cited cases emphasize that vacatur should be avoided when actions have already been undertaken in reliance on the agency's final decision and the "on-the-ground" consequences of halting those actions would be "severe" and "disruptive."  But that is not the situation here—Plaintiffs seek to enjoin the land exchange before it occurs.  Nor has the Forest Service yet made any final discretionary decisions related to the land exchange—those will only come when the ROD is issued.

This marks another instance where, due to the unique nature of SALECA, the applicable precedents do not provide an obvious answer.  The Court thus concludes that

1    Plaintiffs have, at a minimum, established serious questions going to the availability of

2    vacatur as a remedy (which, in turn, informs the redressability analysis).

3            2.    Merits

4            Before turning to the merits of Plaintiffs' NEPA claims, it is helpful to begin with

5    some first principles.  Earlier this year, the Supreme Court announced "[a] course

6    correction of sorts . . . to bring judicial review under NEPA back in line with the statutory

7    text and  common sense." *Seven County Infrastructure Coalition*, 145 S. Ct. at 1514.  The

8    Court continued: "In light of the continuing confusion and disagreement in the Courts of

9    Appeals over how to handle NEPA cases, we think it important to reiterate and clarify the

10   fundamental principles of judicial review applicable in those cases." *Id.* at 1511.

11           Throughout the opinion, the Court emphasized that the "central principle of judicial

12   review in NEPA cases is deference." *Id.  See also id.* at 1515 ("The bedrock principle of

13   judicial review in NEPA cases can be stated in a word: Deference.").  The Court also

14   clarified that "[w]hen a party argues that an agency action was arbitrary and capricious due

15   to a deficiency in an EIS, the reviewing court must account for the fact that NEPA is a

16   purely procedural statute.  Under NEPA, an agency's only obligation is to prepare an

17   adequate report. . . .  Unlike a plethora of other federal environmental statutes (such as the

18   Clean Air Act, the Clean Water Act, etc.), NEPA imposes no substantive constraints on the

19   agency's ultimate decision to build, fund, or approve a proposed project.  So when

20   reviewing an agency's EIS, the only role for a court is to confirm that the agency has

21   addressed environmental consequences and feasible alternatives as to the relevant project."

22   *Id.* at 1511 (cleaned up).  "In short, when determining whether an agency's EIS complied

23   with NEPA, a court should afford substantial deference to the agency." *Id.* at 1511-12.

24           The Court also provided concrete examples of the forms this deference should take.

25   For instance, "the question of whether a particular report is detailed enough in a particular

26   case itself requires the exercise of agency discretion—which should not be excessively

27   second-guessed by a court." *Id.* at 1512.  Additionally, "[a]n agency must make predictive

28   and scientific judgments in assessing the relevant impacts . . . and alternatives . . . .  Black-

letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Id.* "To tie all of this together: When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 1513.

The Court concluded that "the proper judicial approach for NEPA cases is straightforward: Courts should review an agency's EIS to check that it addresses the environmental effects of the project at hand. . . . In conducting that review, courts should afford substantial deference to the agency as to the scope and contents of the EIS." *Id.* at 1518. The Court also emphasized that "Congress did not design NEPA for *judges* to hamstring new infrastructure and construction projects." *Id.* at 1514.

a.    **Statement Of "Purpose And Need" And Range Of Alternatives**

AMRC's first NEPA argument is that the Forest Service "reviewed the project under an incorrect legal regime, resulting in an improper statement of the 'purpose and need' and range of reasonable alternatives." (*AMRC*, Doc. 87 at 18-20.) The thrust of this argument is that the Forest Service operated under the "mistaken belief" that "it had no authority to deny the proposed pipelines, transmission lines, roads, and other facilities" that would be located on federal land following the land exchange. (*Id.*) According to AMRC, the Forest Service thus mistakenly applied "the agency's mining regulations at 36 C.F.R. Part 228A" when reviewing those proposals, rather than applying "the totally-discretionary FLPMA special use permitting rules at 36 C.F.R. Parts 251 and 261." (*Id.*) In its reply, AMRC reiterates this criticism—"The agency believes that because it would not have authority over the underground mine (after the Exchange), it also does not have discretionary

authority over the infrastructure permits on the remaining public lands"—and argues, in a related vein, that the Forest Service mistakenly "failed to consider the alternative that, after the Exchange, the mine could not proceed if the agency denies the special use permits for the pipelines and other infrastructure." (*AMRC*, Doc. 97 at 15-16.)

AMRC is unlikely to succeed on these arguments. It is simply not true that the Forest Service mistakenly believed it was required to automatically approve all of the pipelines and other mine-related infrastructure that, under the proposed mine plan of operations, would be located on federal land following the land exchange. Although page 92 of the FEIS states that "the Forest Service is unable to refuse approval of the GPO within their regulations and guidance" (*AMRC*, Doc. 93-1 at 15), that statement, when viewed in proper context, only refers to Resolution Copper's planned use of *non*-federal land following the land exchange. The executive summary of the FEIS states in plain terms that "[t]he purpose and need of this project is twofold," one of which is "[t]o *consider* approval of a proposed GPO governing surface disturbance on NFS lands—*outside the exchange parcels*—from mining operations that are reasonably incident to extraction, transportation, and processing of copper and molybdenum." (*San Carlos*, Doc. 105-9 at 9, emphasis added [FEIS page ES-6].) Other portions of the record likewise make clear that the Forest Service understood that it had discretion over proposals related to the post-exchange use of federal land and that its evaluation of those proposals was governed by the special use permitting rules appearing at 36 C.F.R. Part 251:

> The Forest Service is making a decision regarding *whether* and how to authorize the use and occupancy of NFS land for mine-related pipeline and power line infrastructure crossing NFS lands, along with maintenance, reconstruction, and use of NFS roads. *Any associated uses of NFS land for pipelines and utilities are special uses and are regulated under 36 CFR § 251.50 . . . [and] requires submittal of a special use application (SF-299).* This application process is designed to ensure that authorizations to use and occupy NFS lands are in the public interest. . . . In processing the application, the Forest Service must consider the potential environmental effects of authorizing the proposed uses of NFS land in accordance with the National Environmental Policy Act (NEPA), and the Forest Supervisor must proceed to either approve or deny the authorization. The special use authorization

1

2

3

> (SUA) must include terms and conditions, including minimizing damage to the environment, protecting the public interest, and requiring compliance with water and air quality standards.

4

(*AMRC*, Doc. 87-3 at 16, emphasis added.)

5

6

7

8

9

10

11

12

13

14

15

16

17

Indeed, throughout the FEIS, the Forest Service explicitly stated that it was aware of, and applying, both sets of regulations.  (*AMRC*, Doc. 93-1 at 16 [FEIS page 135: "The role of the Forest Service under its primary authorities in the Organic Administration Act, Locatable Regulations (36 CFR 228 Subpart A), and Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources. The role of the Forest Service under special use authorizations (36 CFR 251 Subpart B) would include terms and conditions to minimize damage to the environment, protect the public interest, and require compliance with water and air quality standards."]; *id.* at 13, emphasis added [FEIS page 21: "If the land exchange occurs, then the mine, all processing facilities, and the tailings storage facility would be located off of NFS lands.  The remaining portions of the project on NFS land would be roads, pipelines, and utilities.  *Any associated uses of NFS land such as roads, pipelines, and utilities are considered special uses and regulated under 36 CFR 251.50.*"].)

18

19

20

21

22

23

24

25

26

27

28

Finally, to the extent AMRC contends these perceived flaws also tainted the Forest Service's identification of the no-action alternative, this argument fails not only because it rests on a faulty premise but also because agencies are entitled to substantial deference when assessing "feasible alternatives" and making "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry."  *Seven County Infrastructure Coalition*, 145 S. Ct. at 1513.  Given Congress's policy judgment, expressed in SALECA, that the land exchange should go forward so Resolution Copper can engage in copper mining, it was logical—and, at a minimum, fell within the "broad zone of reasonableness" described in *Seven County Infrastructure Coalition*—for the Forest Service to reject the no-action alternatives posited by AMRC.  *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990) ("[NEPA] does not

1    require the consideration of alternatives whose effect cannot be reasonably ascertained, and

2    whose implementation is deemed remote and speculative.  Nor must an agency consider

3    alternatives which are infeasible, ineffective, or inconsistent with the basic policy

4    objectives for the management of the area.") (cleaned up).

5                    b.        **Direct, Indirect, And Cumulative Impacts**

6            AMRC's second NEPA argument is that the Forest Service "failed to properly

7    analyze the project's direct, indirect, and cumulative impacts."  (*AMRC*, Doc. 87 at 20-22.)

8    More specifically, AMRC argues that (1) despite the massive amount of water the mine

9    will require, the FEIS did not meaningfully disclose and analyze the direct and indirect

10   effects of the planned Desert Wellfield; and (2) the FEIS did not consider other reasonably

11   foreseeable activities that will cumulatively impact the available water in the East Salt

12   River Valley—most notably, by arbitrarily deeming it "speculative" that the Superstition

13   Vistas development would continue growing even though over 900,000 people are

14   expected to live there.  (*Id.*)

15           AMRC is unlikely to succeed on these arguments.  As an initial matter, some of

16   AMRC's arguments regarding Superstition Vistas are factually inaccurate.  True, the FEIS

17   contains passages characterizing the further development of this project as "speculative,"

18   but ARMC ignores that the Forest Service proceeded to analyze the expected water use

19   associated with this development despite that characterization:

20           We considered a number of specific projects or actions related to water
21           supplies during the cumulative effects analysis process, including the . . .
             Future Superstition Vistas Development Area on Arizona State Trust Land.
22           *Some of these normally would not be analyzed as cumulative effects because*
23           *they do not meet the appropriate screening criteria* to be considered
             reasonably foreseeable future actions.  For example, . . . [t]he Superstition
24           Vistas development area . . . development plans are conceptual and lack
             adequate detail to allow substantial analysis of resource effects and thus
25           normally would be considered speculative, not reasonably foreseeable.
26           *Regardless of the screening outcomes, due to the great interest expressed by*
             *the public and cooperating agencies in water-related issues, we have added*
27           *this section to the cumulative effects analysis to discuss these regional water*
             *supply issues in the context of the Resolution Copper Project's use of water.*
28

1   (*AMRC*, Doc. 93-1 at 157, emphases added [FEIS page 977].)   Elsewhere, the FEIS

2   elaborates: "While the lack of detailed water use plans prevents specific analysis of most

3   of the Superstition Vistas development, some estimates indicate that a population of

4   900,000 could live in this area. Throughout the Resolution Copper Project NEPA process,

5   the ASLD has raised concerns about the potential future water supply to support the

6   Superstition Vistas development.  The cumulative effects modeling described below was

7   undertaken in part to investigate the potential impacts to the Superstition Vistas water

8   supply."  (*Id.* at 164 [FEIS page 165].)   Finally, in Appendix R, the Forest Service

9   explained that although "Superstition Vistas was not analyzed as a standalone RFFA" for

10  various reasons, including that "[it] is considered too speculative to estimate if, when, or

11  to what extent development may occur in these areas," "*we still incorporated the future*

12  *growth in the Superstition Vistas planning area conceptually*. . . .  Note that we expanded

13  the FEIS cumulative effects analysis (chapter 4) to quantify the cumulative effects of

14  competing water uses in the region and the ramifications of ongoing drought or future

15  meteorological trends.  This includes the Superstition Vistas development."  (*Id.* at 234,

16  emphasis added [FEIS page R-340].)

17         AMRC also contends, seemingly in the alternative, that even if the Forest Service

18  made some effort to consider the anticipated water use associated with Superstition Vistas,

19  it used flawed modeling techniques by only considering "holistic" or "qualitative" impacts

20  and not performing an "objective," "quantified assessment."  (*AMRC*, Doc. 97 at 17.)

21  AMRC raises similar criticisms regarding the Forest Service's techniques for analyzing

22  Desert Wellfield's anticipated water use.  But as recently emphasized by the Supreme

23  Court, "when an agency makes those kinds of speculative assessments or predictive or

24  scientific judgments, . . . a reviewing court must be at its 'most deferential.'" *Seven County*

25  *Infrastructure Coalition*, 145 S. Ct. at 1512.  The bottom line is that the FEIS contains

26  extensive analysis regarding water-use issues, including various forms of modeling related

27  to the anticipated water use associated with Desert Wellfield and Superstition Vistas.

28  Chapter 3.7 of the FEIS, entitled "Water Resources," itself spans over 200 pages.  (*San*

*Carlos*, Doc. 106-3 at 4 [FEIS table of contents: showing that Chapter 3.7 spans pages 381-599].) "This section analyzes how the Resolution Copper Project could affect water availability and quality in three key areas: groundwater quantity and groundwater-dependent ecosystems (GDEs), groundwater and surface water quality, and surface water quantity." (*San Carlos*, Doc. 105-9 at 28 [FEIS page ES-25: executive summary of Chapter 3.7].) The FEIS also repeatedly acknowledges that the anticipated water use by the mine will be substantial and may result, directly and indirectly, in alarming environmental consequences. (*See, e.g.*, *AMRC*, Doc. 93-1 at 169 [FEIS page 989: "[U]ltimately, long-term use of groundwater may become unsustainable, even without considering the growth of the Superstition Vistas development."]; *San Carlos*, Doc. 105-9 at 6-7 [FEIS pages ES-3-4: noting that "[t]he estimated total quantity of external water needed for the life of the mine . . . is substantial" and that "[w]ater use is a major concern among the public, other government agencies, and interested parties"].)

It is thus evident that the Forest Service took the requisite "hard look" at water-use issues that is required by NEPA. *Cf. Audubon Society of Portland v. Haaland*, 240 F.4th 967, 984 (9th Cir. 2022) ("We next consider whether, under NEPA, [the agency] took a sufficiently thorough 'hard look' at the environmental effects of pesticides on the Refuges in concluding that pesticides could continue to be used with minimal environmental consequences. In performing this review, we do not fly-speck [the agency's] analysis and . . . employ a rule of reason to determine whether it contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. Under NEPA, we refrain from acting as a type of omnipotent scientist and must defer to an agency's decision that is fully informed and well-considered.") (cleaned up). Even if the Forest Service could have used different technical water-use modeling techniques in some instances, such "fact-dependent, context-specific, and policy-laden choices" are entitled to "substantial deference" and "should not [be] micromanage[d]" so long "as they fall within a broad zone of reasonableness." *Seven County Infrastructure Coalition*, 145 S. Ct. at 1513. Such is the case here.

1

                         c.    **Comments From Other Agencies**

2        AMRC's third NEPA argument is that "[t]he Forest Service failed to meaningfully

3 consider comments from other agencies." (*AMRC*, Doc. 87 at 22-25.) More specifically,

4 AMRC contends the Forest Service ignored the "significant criticisms" raised by the

5 Bureau of Land Management ("BLM") and the Arizona State Lands Department

6 ("ASLD"), both of whom are "cooperating agencies" on the FEIS. (*Id.* at 22.) Relying on

7 cases from outside the Ninth Circuit, AMRC contends that NEPA creates a duty to provide

8 a reasoned response to any criticisms raised by cooperating agencies. (*Id.* at 23.)

9        Even assuming the Ninth Circuit follows such a rule, AMRC is unlikely to succeed

10 on this argument because it rests on an inaccurate factual premise—although the Forest

11 Service may not have *adopted* the views of BLM and ASLD on certain disputed issues, it

12 did not *ignore* those agencies' views. For example, BLM issued a 26-page, singled-spaced

13 report in June 2022 that raised an array of concerns with, *inter alia*, how the 2021 version

14 of the EIS addressed hydrology and water-use issues. (*AMRC*, Doc. 87-1.) Those concerns

15 were often extremely technical in nature and involved, for example, contentions that the

16 2021 version of the EIS improperly "include[d] dewatering in the analysis of the No Action

17 alternative" (*id.* at 14); failed to consider "indirect effects of mining impacting groundwater

18 resources in the Cutter Basin" (*id.*); failed to properly address "[t]he Drought Contingency

19 Plan" (*id.* at 15); and failed to consider the cumulative impact of the planned mining

20 activities on private well owners (*id.* at 20 ["The BLM reviewers wondered if the

21 dewatering of the shallow aquifer will forever prevent any future landowner or

22 development from using the shallow Apache Leap tuff aquifer as a water source, which

23 would force any development or landowner to either drill a more expensive well to a deeper

24 water source, or force them to obtain water from another basin?"]). The 2025 FEIS, in

25 turn, directly acknowledges and addresses many of those concerns, even if it does not

26 specifically identify the BLM report as their source:[13]

27       —————————————————
[13]     In addition to arguing that the FEIS functionally addressed the criticisms in the BLM

28 report without "[m]entioning the BLM report by name," the Federal Defendants contend
that the Forest Service separately issued "[a] detailed memorandum on the BLM report,"
which "is part of the administrative record for the project." (*AMRC*, Doc. 93 at 27 n.13.)

We received many comments expressing concern with regional water supplies, current and future stresses on water supplies from drought and future meteorological trends, and the ramifications of Resolution Copper's use of water in the face of competing water uses. We considered a number of specific projects or actions related to water supplies during the cumulative effects analysis process, including the following: Arizona's Drought Contingency Plan; Resolution Copper's Potential Allocation of CAP Water; Town of Florence Development Projects; Population Change; Recent Modeling Reports Projecting Water Shortages in Pinal County; Assured Water Supplies in the East Salt River Valley; Future Superstition Vistas Development Area on Arizona State Trust Land. . . . Regardless of the screening outcomes, due to the great interest expressed by the public *and cooperating agencies* in water-related issues, we have added this section to the cumulative effects analysis to discuss these regional water supply issues in the context of the Resolution Copper Project's use of water.

(*AMRC*, Doc. 93-1 at 157, emphasis added [FEIS page 977]. *See also id.* at 42-46 [FEIS pages 437-41: providing an extensive new discussion of "indirect impacts to Tribal water resources in the Cutter Basin" in response to "concerns [that] were raised" regarding the 2021 EIS's analysis of that topic].)

Perhaps the Forest Service could have done even more to specifically address each and every one of the many detailed, technical criticisms set forth in BLM's June 2022 report, but NEPA does not require that level of detail. As the Federal Defendants note without contradiction in their brief, "[t]he water analysis alone included 38 participants representing the Forest Service and contractors, six cooperating agencies or stakeholders (including Dr. Wells on behalf of the San Carlos Apache Tribe), and Resolution Copper and contractors." (*AMRC*, Doc. 93 at 28 n.14.) Particularly in a project of this magnitude, it will always be possible to identify some argument, raised by some stakeholder, that could have been analyzed in more detail in the FEIS. Nevertheless, "the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency

_____

AMRC, in turn, contends the Court may not consider this memorandum because it was not included in the FEIS or published on the Forest Service's website at the time of the FEIS's publication. (*AMRC*, Doc. 97 at 18 & n.4.) The Court finds it unnecessary to resolve this argument because, as discussed above, AMRC's NEPA challenge fails even if the analysis is confined to the FEIS.

discretion—which should not be excessively second-guessed by a court." *Seven County Infrastructure Coalition*, 145 S. Ct. at 1512. *See also id.* at 1518 ("Courts should review an agency's EIS to check that it addresses the environmental effects of the project at hand. . . . In conducting that review, courts should afford substantial deference to the agency as to the scope and contents of the EIS."). With recognition that the "central principle of judicial review in NEPA cases is deference," *id.* at 1511, the Court concludes that AMRC is unlikely to succeed on its contention that the Forest Service arbitrarily and capriciously ignored BLM's criticisms.

The analysis is even more straightforward with respect to ASLD. AMRC contends that ASLD raised various concerns regarding Superstition Vistas and that those "concerns were largely ignored, as the Forest Service erroneously concluded that most of the Superstition Vistas is 'speculative.'" (*AMRC*, Doc. 87 at 25.) But as discussed in the preceding section of this order, the Forest Service proceeded to analyze the expected water use associated with the Superstition Vistas development despite the purportedly speculative nature of that development. Furthermore, the Forest Service specifically indicated, in various portions of the FEIS, that it had revised its analysis in response to concerns identified by ASLD. (*See, e.g.*, *San Carlos*, Doc. 109-2 at 50-51 [FEIS pages R-43-44: photocopy of November 7, 2019 letter from ASLD with superimposed comment boxes indicating where the Forest Service's responsive comments may be located in the FEIS]; *id.* at 81 [FEIS page R-74: table identifying ASLD's comment and indicating where the Forest Service's responsive comments may be located in the FEIS]; *AMRC*, Doc. 93-1 at 233 [FEIS page R-287: "These comments concern the potential impact to Arizona State Trust land, specifically the future Superstition Vistas development area in the East Salt River valley. Many public comments raised the issue of competing water uses, water scarcity, and regional water supplies. We added discussion of this topic to the FEIS. This includes the Superstitions Vistas development."]; *id.* at 234 [FEIS page R-340: "These comments specifically mention the planned Superstitions Vistas development area in the East Salt River valley. . . . Note that we expanded the FEIS cumulative effects analysis

- 49 -

1   (chapter 4) to quantify the cumulative effects of competing water uses in the region and

2   the ramifications of ongoing drought or future meteorological trends.  This includes the

3   Superstition Vistas development."].)  Again, even if the Forest Service could have done

4   more to specifically address ASLD's criticisms, the Court must give deference to the Forest

5   Service's determination as to just how detailed the FEIS needed to be.  *Seven County*

6   *Infrastructure Coalition*, 145 S. Ct. at 1512, 1518.  Particularly in light of that deference,

7   the Forest Service's choice likely fell within the "broad zone of reasonableness," which

8   means that AMRC is unlikely to succeed on its NEPA challenge.

9                        d.    **Mitigation Measures**

10          AMRC's fourth NEPA argument is that the Forest Service "failed to consider, and

11  require, sufficient mitigation measures," "especially regarding the groundwater pumping

12  and transport via the proposed pipelines."  (*AMRC*, Doc. 87 at 25-27.)

13          These criticisms require little additional discussion in light of the analysis in the

14  preceding sections of this order.  The FEIS includes hundreds of pages of detailed analysis

15  regarding water usage, including analysis regarding mitigation measures: "We developed

16  a robust monitoring and mitigation strategy to avoid, minimize, rectify, reduce, or

17  compensate for resource impacts that have been identified during the process of preparing

18  this EIS.  Appendix J contains descriptions of mitigation measures that are being required

19  by the Forest Service and mitigation measures voluntarily brought forward and committed

20  to by Resolution Copper.  Appendix J also contains descriptions of monitoring that would

21  be needed to identify potential impacts and mitigation effectiveness."  (*AMRC*, Doc. 93-1

22  at 72 [FEIS page 562].  *See also id.* at 16-24 [FEIS pages 135-43: overall framework for

23  mitigation].)    AMRC's criticisms of the scope and substance of that analysis are

24  insufficient  to  overcome  the  deference  required  by  *Seven  County  Infrastructure*

25  *Coalition*.[14]

26  _____

27  [14]      In a related vein, to the extent AMRC argues the Forest Service should have made
    "Measure PF-WR-03" mandatory (*AMRC*, Doc. 87 at 26), the Court agrees with the
28  Federal Defendants that Forest Service did not act arbitrarily and capriciously in
    concluding it lacked regulatory authority as to this specific issue because Resolution
    Copper's recovery wells will not be located on federal land.  (*AMRC*, Doc. 93-1 at 228

1

        **e.**    **Tailings Storage Facility Alternatives And Pipelines**

2        The Tribe's first NEPA argument is that the "FEIS is woefully inadequate in how it

3 addresses issues related to the tailings storage facility alternatives and both the failings and

4 concentrate pipelines." (*San Carlos*, Doc. 105 at 19-22.)  In support, the Tribe proffers a

5 declaration from Dr. Steven Emerman, which identifies 14 asserted deficiencies in the

6 FEIS's analysis.  (*San Carlos*, Doc. 109-6 at 3-6.)  Enclosed as an attachment to the

7 declaration is a 67-page report from Dr. Emerman, which describes the asserted

8 deficiencies in more detail.  (*Id.* at 7-73.)  The Federal Defendants, in turn, have moved to

9 strike Dr. Emerman's declaration because it "offer[s] improper expert opinions that were

10 not before agency decision-makers from the United States Forest Service in this matter."

11 (*San Carlos*, Doc. 115 at 1.)  In response, the Tribe identifies various reasons why Dr.

12 Emerman's declaration may be considered despite the usual rule barring the consideration

13 of extra-record evidence in an APA action.  (*San Carlos*, Doc. 120.)

14        The Court agrees with the Tribe that at least some aspects of Dr. Emerman's

15 declaration may be considered—and, thus, the declaration need not be stricken.  Of course,

16 "[w]hen reviewing an agency decision, the focal point for judicial review should be the

17 administrative record already in existence, not some new record made initially in the

18 reviewing court.  Parties may not use post-decision information as a new rationalization

19 either for sustaining or attacking the Agency's decision." *Ctr. for Biological Diversity v.*

20 *U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (cleaned up).  The Ninth

21 Circuit has "recognized four exceptions to this rule, allowing extra-record materials (1) if

22 necessary to determine whether the agency has considered all relevant factors and has

23 explained its decision, (2) when the agency has relied on documents not in the record,

24 (3) when supplementing the record is necessary to explain technical terms or complex

25 subject matter, or (4) when plaintiffs make a showing of agency bad faith." *Id.* (cleaned

26 up).  "These exceptions are narrowly construed and applied," *Lands Council v. Powell*, 395

27 F.3d 1019, 1030 (9th Cir. 2004), and the party seeking to invoke an exception bears a

28 _____

[FEIS page R-235].)

1   "heavy burden," *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th
2   Cir. 2010).

3         If Dr. Emerman had simply been retained by the Tribe, following the conclusion of
4   the Forest Service's environmental impact analysis, to attempt to poke holes in that
5   analysis, there is a strong argument his declaration would be impermissible.  Although the
6   Tribe asserts that Dr. Emerman's declaration "do[es] not ask the district court to second
7   guess the Forest Service's scientific judgments or conclusions" and is simply being
8   provided to identify the relevant factors the Forest Service should have considered (*i.e.*, the
9   first *Lands Council* exception) and/or to provide background information regarding
10  technical terms (*i.e.*, the third *Lands Council* exception) (*San Carlos*, Doc. 120 at 5-6), this
11  is obviously untrue—the main point of Dr. Emerman's declaration is to criticize the
12  substance of the Forest Service's conclusions.  (*See, e.g.*, *San Carlos*, Doc. 109-6 ¶ 4 ["As
13  more fully stated in the memorandum that I authored, attached as Exhibit A, the 2025 FEIS
14  fails to adequately address fourteen substantive areas related to tailings storage facilities
15  and both tailings pipelines and concentrate pipelines."]; *id.* ¶ 8 ["As such, the 2025 FEIS
16  fails to address and analyze the risks and potential environmental impacts presented by the
17  Application to the degree required under NEPA . . . ."].)  Courts should not allow litigants
18  in an APA action to sneak in after-the-fact substantive criticisms of the agency's analysis
19  under the guise of providing background details.  *See, e.g.*, *Asarco, Inc. v. U.S. Envt'l
20  Protection Agency*, 616 F.2d 1153, 1160-61 (9th Cir. 1980) ("[W]e think that the district
21  court went too far in its consideration of evidence outside the administrative record. . . .
22  Most of the expert testimony . . . should not have been admitted or at least not have been
23  considered for the purpose of judging the wisdom of the EPA's stack-testing requirement.
24  This technical testimony was plainly elicited for the purpose of determining the scientific
25  merit of the EPA's decision."); *Bartell Ranch LLC v. McCullough*, 2021 WL 6118738, *5
26  (D. Nev. 2021) (denying supplementation request where "the Court is left with the
27  impression . . . that Lithium Nevada seeks to use the Monitoring Plan," "not to explain
28  technical subject matter," but "to impermissibly support the 'correctness or wisdom of the

agency's decision'") (citation omitted); *Alsea Valley Alliance v. Evans*, 143 F. Supp. 2d 1214, 1216 (D. Or. 2001) ("[A] party may not circumvent the general rule, that judicial review is limited to the administrative record, by simply labeling a declaration as 'assisting the court.'") (citation omitted).

With that said, Dr. Emerman is not attempting to raise entirely *new* arguments and criticisms that were not previously presented to the Forest Service. The FEIS reflects that Dr. Emerman raised many of the criticisms set forth in his declaration as objections to the draft EIS and that the Forest Service specifically considered and addressed those criticisms in the appendix to the FEIS. (*See, e.g.*, *San Carlos*, Doc. 109-2 at 220 [FEIS page R-213: "Comment response" regarding "Volcanism and seismic data sources," explaining that "additional investigation and updated data sources have been received since the DEIS . . . including a report by Dr. S. Emerman (Appendix B-5 to the letter)"]; *id.* at 311 [FEIS page R-304: "Comment response" regarding "FMEA, breach analysis, seismic analysis, planning," which was "Responsive to these comments: . . . 30145-5 (Emerman4), 30145-6 (Emerman4), 30145-7 (Emerman4), 30145-8 (Emerman4)."]; *id.* at 340 [FEIS page R-333: "Comment response" regarding "Disclosed water use is incorrect and unrealistic," addressing various criticisms raised by Dr. Emerman].) Under these circumstances, at least some portions of Dr. Emerman's declaration may be considered. *Cf. Asarco*, 616 F.2d at 1156, 1160-61 (concluding that the testimony from Cahill describing "the history of Asarco's communications with the EPA concerning compliance with its testing requirements" "could be considered under the standards we have set forth," even though much of the other testimony was impermissible, where Cahill "sent a letter to the EPA discussing the possibility that chemical reactions might occur in the stack and restating Asarco's position that accurate tests could be conducted at the existing sampling sites" and the EPA then issued the challenged decision but "made no response to Cahill's letter" in its decision).

Nevertheless, on the merits, Dr. Emerman's declaration does not establish a likelihood that the Forest Service acted arbitrarily and capriciously. Resolution Copper's

brief succinctly identifies the various flaws in the Tribe's arguments regarding Dr.
Emerman's opinions and the Court agrees with that analysis.  For example, "[t]he FEIS
exhaustively analyzed various alternatives for the tailings facility.  The FEIS and the draft
ROD explain why the Forest Service selected Skunk Camp, located off Forest Service
Land: it is 'the most remote location' and 'offers the best ability to control seepage and
protect water quality, has the least visibility, and is located in an area with little recreation
use.' . . .  The FEIS [also] devotes an entire 51-page section to tailings and pipeline safety
that addresses all of Dr. Emerman's concerns.  The agency undertook an exhaustive and
collaborative process to assess the inherent risks in the tailings designs and a range of
breach scenarios." (*San Carlos*, Doc. 116 at 32.)  Furthermore, although "Dr. Emerman
states that he would have relied more heavily on a different analytical method that
estimated the pipeline failure risk to be higher, 0.62 incidents per 1,000 miles," this merely
reflects that "one engineer disagreed with other engineers about the best way to evaluate
the risk of pipeline failures" and "[b]oth *Seven County* and long-time NEPA precedents
unambiguously teach that this Court should decline to interject itself into disputes about
technical details—reached after a painstaking process fully described in the FEIS—and
should instead defer to the agency's well-reasoned analysis." (*Id.* at 33.)  And again,
although Dr. Emerman raises criticisms regarding "the Forest Service's methodology for
modeling the risk of tailings dam failure, its selection of tailings dam engineering criteria,
and its alleged failure to consider international standards for tailings dam locations," "[t]he
Forest Service addressed these engineering minutiae in detail in the FEIS and its supporting
analyses, explaining how the agency exercised its judgment and referencing a massive
library of technical documents supporting that judgment.  Among these are a
comprehensive breach (*i.e.*, total failure) analysis for each of the Project alternatives.
These are again simply instances of one engineer disagreeing with others.  They supply no
basis to find the FEIS arbitrary and capricious . . . ." (*Id.*)

In reaching this conclusion, the Court does not mean to diminish the gravity of the
concerns raised by Dr. Emerman.  Among other things, Dr. Emerman contends that the

actual failure rate for tailings pipelines "is 21 times the annual failure rate estimated in the FEIS" (*San Carlos*, Doc. 109-6 at 10); that, as a result, "tailings pipeline failure should be regarded as an expected outcome for the Resolution Copper project" (*id.* at 12); that "a great deal of toxic tailings and water could be released before the pipeline is shut down upon detecting that a leak has occurred" (*id.* at 14); that "the failure of a concentrate pipeline is an expected outcome of the Resolution Copper project" (*id.* at 16); that the cost of performing Dr. Emerman's preferred form of dam breach analysis would have been quite low, ranging from $10,000 to $35,000 (*id.* at 18, 23); that "the Skunk Camp site might not even be suitable for a tailings storage facility" due to flaws in the Forest Service's analysis of its foundation (*id.* at 26-27); and that "the tailings dam (outer embankment) of the tailings storage facility at the Skunk Camp site (Alternative 6) will be a source of uncontrolled acid mine drainage into the underlying aquifer and downstream waterways" (*id.* at 36). It is difficult to read Dr. Emerman's report without developing a sense of unease. Even so, the Forest Service was aware of his criticisms and provided extensive, reasoned analysis to justify its conclusions. "Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Seven County Infrastructure Coalition*, 145 S. Ct. at 1512. "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 1513. Courts must resist the urge to "fly-speck" the agency's analysis and "act[] as a type of omnipotent scientist." *Audubon Society of Portland*, 240 F.4th at 984.

### f.    **Lack Of Supplemental EIS**

The Tribe's second NEPA argument is that because the FEIS included new "substantive" modeling and analysis that did not appear in the 2021 version of the EIS, "the Forest Service was required to issue a supplemental DEIS for public comment." (*San Carlos*, Doc. 105 at 22.) In support, the Tribe proffers a declaration from Dr. James Wells. (*San Carlos*, Doc. 109-7 at 2-6.) Among other things, Dr. Wells asserts that "[t]he new

information that should have been published for public comment in a supplemental DEIS includes nine reports totaling thousands of pages on issues related to the Skunk Camp tailings storage facility ('TSF') site, stability analyses, aquifer testing, seismic hazard analyses, water quality and level analyses, TSF seepage analyses, groundwater flow models, site investigation summaries, and conceptual hydrogeological models." (*Id.* at 4 ¶ 5.) Enclosed as an attachment to Dr. Wells's declaration is a 24-page report from Dr. Wells. (*Id.* at 7-30.) In that report, Dr. Wells opines that the NEPA implementing regulations at 40 C.F.R. § 1502.9 provide the foundation for his "professional opinion that [the Forest Service] had no discretion under NEPA regulations and should have published a Supplemental Draft EIS because there were significant new circumstances or information relevant to environmental concerns bearing on the proposed action." (*Id.* at 11-12.)

As a threshold matter, Dr. Wells is not qualified to opine on legal issues, such as when NEPA's implementing regulations require the issuance of a draft EIS. As a further threshold matter, Dr. Wells fails to acknowledge that the regulation on which he bases his impermissible legal opinion was rescinded in February 2025, several months before the FEIS's publication. (*San Carlos*, Doc. 105-9 at 54 [FEIS page 9: "In January 2025, Executive Order 14154 was issued, directing the CEQ to propose rescinding CEQ's NEPA regulations found at 40 CFR 1500 et. seq. In February 2025, CEQ published an interim final rule removing CEQ regulations from the Code of Federal Regulations."].)

Yet even assuming the rescinded regulation still applied at the time of the FEIS's publication,[15] the Tribe has not established a likelihood of success on this claim. "[T]he standard that governs an agency's decision whether to prepare a supplemental EIS . . . [is] that an agency should apply a 'rule of reason' . . . . [A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."

---

[15] The Tribe argues in its reply that the rescinded regulation remained applicable based on a memo issued by the President's chief of staff. (*San Carlos*, Doc. 119 at 16 n.7.) For the reasons outlined above, it is unnecessary to resolve this issue.

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1980).  "If an agency had to file a supplemental draft EA and repeat the public comment process every time it makes any . . . modifications, the NEPA review process would never end . . . ."  *Earth Island Inst. V. U.S. Forest Serv.*, 87 F.4th 1054, 1067 (9th Cir. 2023).

The now-rescinded 40 C.F.R. § 1502.9(d) provided that an agency "shall prepare supplements to either draft or final environmental impact statements if a major Federal action is incomplete or ongoing, and . . . [t]here are substantial new circumstances or information about the significance of adverse effects that bear on the analysis."  *Id.*  "The "supplement requirement is triggered by 'new circumstances' when the underlying *project* significantly changes."  *Greer Coal., Inc. v. U.S. Forest Serv.*, 470 F. App'x 630, 633 (9th Cir. 2012).  And "[w]hether new information is sufficiently significant to necessitate an SEIS turns on the value of the new information to the still pending decisionmaking process."  *Protect Our Cmtys. Found. v. Lacounte*, 939 F.3d 1029, 1040 (9th Cir. 2019) (cleaned up).  By the Tribe's own account, that standard was not satisfied here—the Tribe contends the "added content" was merely included in an "attempt[] to shore up glaring deficiencies in the now-withdrawn EIS that the Forest Service published in 2021."  (*San Carlos*, Doc. 105 at 3.)  Particularly in light of the deferential standard that applies in this context—"Courts must uphold an agency determination that a supplemental EIS is not required if that determination is not arbitrary and capricious," *Or. Natural Res. Council v. Lyng*, 882 F.2d 1417, 1422 (9th Cir. 1989)—the Tribe is unlikely to succeed on this claim.  *Cf. Protect Our Cmtys. Found.*, 939 F.3d at 1040-41 ("We agree with the district court that the new information is not significant because it merely confirmed concerns that the 2011 EIS already articulated and considered.") (cleaned up).

### g.  **Acid Rock Drainage And Associated Errors**

The Tribe's third NEPA argument is that "the FEIS erroneously concludes there would be no acid rock drainage during mine operation" and also "underestimates groundwater impacts downstream of the tailings storage facility," which errors render the "selection of the Skunk Camp action alternative . . . arbitrary and capricious."  (*San Carlos*,

Doc. 105 at 22-23.)  In support, the Tribe once again relies on the declaration of Dr. Wells.  (*Id.*)  The Federal Defendants move to strike Dr. Wells's declaration and the Tribe defends it.  (*San Carlos*, Docs. 115, 120.)

The threshold analysis regarding the admissibility of Dr. Wells's declaration mirrors the analysis regarding Dr. Emerman's declaration.  Although one of the obvious purposes of Dr. Wells's declaration is to substantively attack the Forest Service's conclusions, Dr. Wells was personally involved in Forest Service's analytical process.  (*San Carlos*, Doc. 114 at 28 n.14 [Federal Defendants' acknowledgement that "Dr. Wells on behalf of the San Carlos Apache Tribe" was one of the "38 participants" who formed the "workgroups" that contributed to the Forest Service's "water analysis"]; *San Carlos*, Doc. 116 at 25 [Resolution Copper's acknowledgement that "[t]he FEIS process also included two working groups formed to evaluate water concerns" and "[t]ribal consultant James Wells participated extensively in both"].)  Thus, at least some aspects of Dr. Wells's declaration can be viewed as being offered for the permissible purpose of identifying the opinions and information that were before the Forest Service at the time it made the challenged decision (which may be helpful in determining whether the agency failed to consider the relevant factors and properly explained its decision).

Nevertheless, on the merits, Dr. Wells's declaration does not establish a likelihood that the Forest Service acted arbitrarily and capriciously.  The Federal Defendants' brief persuasively explains why, and the Court agrees with that analysis: "Dr. Wells's criticism of the Forest Service's conclusions related to the risks of acid rock drainage . . . second-guesses the Forest Service's scientific and technical analysis to which this Court must defer.  The FEIS analyzed the likelihood that oxygen would penetrate the tailings, causing a risk of acid rock drainage, disclosed uncertainties in the modeling related to this issue, and assessed the reasonableness of various assumptions.  The Forest Service therefore gave a hard look to the likely effects . . . ."  (*San Carlos*, Doc. 114 at 32-33, citations omitted.)

Just as with Dr. Emerman, the Court does not mean to diminish the seriousness of the concerns raised by Dr. Wells.  Among other things, Dr. Wells contends that "it is highly

irregular (from a policy as well as scientific perspective) that water quality impacts from the various alternatives would be addressed using different methodologies" (*San Carlos*, Doc. 109-7 at 13); that the Forest Service "ask[ed] too much of a single groundwater model" and although "it is a great technical challenge to construct a groundwater model of this size and complexity, . . . 'best we can do' is not an adequate answer if the calibration issues render the model unreliable for its intended purpose" (*id.* at 15-16); that the Forest Service "is giving the public a false sense that it understands the future groundwater impacts from this project . . . when, in reality, the uncertainties in the groundwater modeling are often too large for the modeling results to be considered reliable at that scale" (*id.* at 17); and that "the FEIS fails to take a hard look at one of the most important environmental issues facing virtually any hard-rock mine: acid rock drainage," as its "conclusions on this issue are illogical and unsupported by reliable scientific analysis" (*id.* at 18).  Again, these are alarming criticisms, but "when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'"  *Seven County Infrastructure Coalition*, 145 S. Ct. at 1512.  Courts must resist the urge to "fly-speck" the agency's analysis and "act[] as a type of omnipotent scientist."  *Audubon Society of Portland*, 240 F.4th at 984.

> ### h.  **Failure To Address The Tribe's Hydrological Concerns**

The Tribe's fourth NEPA argument is that the FEIS "fails to address the hydrological impacts that the Tribe raised in its comment of December 23, 2019, related to the regional subsidence that would result from groundwater depletion and the effects on the precipitation and groundwater flows that would follow."  (*San Carlos*, Doc. 105 at 23.)

The Tribe is unlikely to succeed on this claim because it is belied by the record.  The FEIS expressly acknowledges and addresses the hydrology concerns that were raised by the Tribe.  (*San Carlos*, Doc. 114-1 at 42 [FEIS page 437: "During the re-initiation of Tribal consultation in 2021–2022, concerns were raised by the San Carlos Apache Tribe about indirect impacts to Tribal water resources in the Cutter Basin caused by Resolution

Copper dewatering around the East Plant Site, as well as long-term changes in regional groundwater from block-caving.  The concern raised was not that drawdown from the Resolution Copper Project would directly impact the Cutter Basin, but that drawdown from the Resolution Copper Project would impact regional water supplies, which might then result in water users replacing lost water resources with additional pumping in the Cutter Basin.  In response to these comments, the Forest Service conducted an analysis of these potential indirect effects (Garrett 2023b), summarized below."]; *id.* at 237 [FEIS page R-356: "Comment response: WT30, Hydrologic connection to San Carlos Apache Reservation. . . .  After the January 2021 publication of the Rescinded FEIS, we received further insights into the concerns raised by the San Carlos Apache Tribe with respect to water impacts.  We understand that the concern is not of direct drawdown impacts but of the potential for cascading regional effects to cause greater groundwater use near Tribal lands.  An analysis of this potential has now been added to section 3.7.1 of the FEIS."].)

### 3. Summary As To NEPA Claims

It is unlikely that Plaintiffs will be able to survive all of the jurisdictional and threshold challenges that Defendants have raised to their NEPA claims.  Plaintiffs are also unlikely to prevail on the merits of their NEPA claims.

### C. Consultation Claims

#### 1. Threshold Issues

##### a. Standing/Redressability

The Tribe will likely be able establish standing/redressability in relation to his consultation claims.  An order vacating the FEIS pending additional consultation would, at a minimum, postpone the land exchange and thus create more time for members of the Tribe to continue using Oak Flat in is current, unspoiled form for religious purposes and ceremonies.  As discussed in relation to Plaintiffs' NEPA claims, the Ninth Circuit has indicated that the temporary cessation of a planned development so an agency can comply with its procedural obligations, which will in turn lead to the temporary cessation of the challenger's asserted injuries arising from the planned development, may be enough to

establish the relaxed showing of redressability that is required in the APA context.  *W. Watersheds Project*, 921 F.3d at 1148.  The Ninth Circuit has also indicated that establishing redressability is not an onerous task in the context of consultation claims under NHPA seeking injunctive relief.  *Ctr. for Biological Diversity*, 868 F.3d at 826 ("Redressability . . . is a more relevant difference when comparing declaratory and injunctive relief because redressability depends on the relief envisioned.  Here, CBD seeks injunctive relief via an order that the Government not undertake any activities in furtherance of the FRF project . . . [and] rescind any such permits or approvals already granted, until it complies with section 402 of the NHPA.  The grant of injunctive relief in this case will result in (1) an adequate NHPA Section 402 process with (2) some likelihood of protecting CBD's interests.  Courts often exercise power under the APA to grant injunctive relief analogous to the halt that CBD requests.  Accordingly, CBD has satisfied the requirement of redressability.") (cleaned up).

### b.    **Implicit Preclusion Of Judicial Review**

Defendants' "implicit preclusion" argument fails in relation to the Tribe's consultation claims.  SALECA does not expressly preclude judicial review and a strong presumption exists in favor of judicial review.  *Bowen*, 476 U.S. at 670-72; *KOLA, Inc*, 882 F.2d at 363.  The statutory features that Defendants emphasize are too ambiguous to overcome this presumption, particularly given SALECA's express requirement that the Forest Service "engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange" and then "consult with Resolution Copper" to "seek to find mutually acceptable measures to . . . address the concerns of the affected Indian tribes; and . . . minimize the adverse effects on the affected Indian tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper under this section."   16 U.S.C. § 539p(c)(3).  Additionally, SALECA does not even mention NHPA, an omission that is difficult to reconcile with the idea that Congress clearly and unambiguously intended to preclude judicial review of NHPA claims related to the land exchange.

c.    **Final Agency Action**

The Tribe's consultation claims are based on alleged violations of the consultation obligations set forth in SALECA and NHPA, but neither statute has a private right of action.  *San Carlos Apache Tribe*, 417 F.3d at 1093 (no private right of action under NHPA); *Concerned Citizens*, 279 F. Supp. 3d at 942-43 (no private right of action under SALECA).  Thus, the Tribe must once again assert those claims via the APA, which requires a showing of final agency action.  *Tohono O'odham Nation*, 138 F.4th at 1200 ("Plaintiffs bring their NHPA challenge under the APA.  The APA allows judicial review only of a 'final agency action.'").  As noted, the following two-part test governs whether agency action is considered final: *first*, the action must mark the consummation of the agency's decision-making process; and *second*, the action must determine rights or obligations or be one from which legal consequences will flow.  *Envt'l Defense Ctr.*, 36 F.4th at 867-68.

The starting point for the finality analysis regarding the Tribe's consultation claims is the Ninth Circuit's recent decision in *Tohono O'odham Nation*.  There, a private company filed an application with BLM in 2008 for permission to build a 515-mile transmission line through New Mexico and Arizona.  *Tohono O'odham Nation*, 138 F.4th at 1194-95.  "A portion of the Route runs through the San Pedro Valley, northeast of Tucson.  The Valley is of great historic and cultural importance to several Native American Tribes, including the Tohono O'odham Nation, the San Carlos Apache Tribe, the Hopi Tribe, and the Zuni Pueblo."  *Id.* a 1195.  BLM then conducted an environmental review of the proposal under NEPA; issued a FEIS in June 2013; issued a final programmatic agreement ("PA") in December 2014 that addressed its consultation obligations under NHPA; and issued a ROD in January 2015 that granted the right-of-way application.  *Id.* However, the ROD clarified that that the company could not actually begin construction until it received a subsequent "limited notice to proceed" ("LNTP") and specified that that an LNTP could not be issued until the BLM's consultation obligations set forth in the PA were fulfilled.  *Id.*  Years later, in September and November 2023, BLM issued two LNTPs

to the company, which prompted the company to begin construction activities. *Id.* at 1197-98. In response, various tribal and environmental organizations filed a lawsuit and sought a preliminary injunction, claiming among other things "that the Department violated the NHPA by authorizing Project construction to begin in the San Pedro Valley before completing its NHPA obligations." *Id.* at 1198. The district court denied the request for injunctive relief and dismissed the lawsuit but the Ninth Circuit reversed the dismissal order. The court identified one of the "key issue[s]" as "whether the LNTPs constitute final agency actions." *Id.* at 1200. As for the first element of *Bennett*'s finality test, the court concluded that "the LNTPs mark the consummation of the agency's decisionmaking process about whether there are historic properties present in the San Pedro Valley" and "also represent the agency's final determination that construction will not restrict subsequent mitigation measures to protect historic properties, as such a determination was a prerequisite to authorizing construction under the PA." *Id.* at 1201 (cleaned up). As for the second element of *Bennett*'s finality test, the court concluded that "[t]he LNTPs also determine 'rights'" because, "[m]ost importantly, they expressly grant SunZia the right to begin construction in the San Pedro Valley." *Id.* Finally, the court rejected the defendants' argument "that the ROD is the only final agency action relevant here," explaining that "the ROD could not have marked the consummation of the Department's NHPA process under the PA; that process was incomplete when the ROD was issued." *Id.* "In sum, we hold that the LNTPs constitute final agency actions because they represent the Department's final decision that the PA requirements had been satisfied, and that [the company] could therefore begin construction in the San Pedro Valley." *Id.* at 1201-02.

Although the parallels between the two cases are not exact, *Tohono O'odham Nation* makes it likely the Tribe will be able to establish the finality element of its consultation claims. The analysis as to the second finality element is straightforward—just as the LNTPs in *Tohono O'odham Nation* determined rights because they served as the prerequisite for construction of the transmission line to begin, the FEIS determines rights and causes legal consequences to flow because it serves as the triggering event for the land

1    exchange.

2            The more complicated question is whether the FEIS marks the consummation of the

3    Forest Service's consultation obligations under SALECA and NHPA in the same way that

4    the LNTPs in *Tohono O'odham Nation* marked the consummation of BLM's consultation

5    obligations.   According to the Federal Defendants, the answer is no: "[T]hose limited

6    notices to proceed are not analogous to the FEIS and Draft ROD here.  The limited notices

7    to proceed 'expressly' authorized construction to commence.  Here, the FEIS describes and

8    analyzes the consultation that occurred, and the Draft ROD identifies the decisions that the

9    Forest Service will make—*but has not yet made*—with respect to mitigation measures.

10   Thus, neither document is a final agency action with respect to the NHPA."  (*San Carlos*,

11   Doc. 93 at 13.)

12           As explained in earlier portions of this order, the Court agrees with Defendants that

13   in the *NEPA* context, the Forest Service has likely not yet made any final discretionary

14   decisions and won't do so until it issues the ROD.  But for *consultation* purposes, the

15   analysis is somewhat different.  Although it's possible that comments and objections to the

16   DROD will prompt the Forest Service to revisit its proposed determinations and, perhaps,

17   engage in additional consultation, it's also possible that no further consultation will occur.

18   It can't be overlooked that the government's stated reason for rescinding the previous EIS

19   in March 2021 was that it had "concluded that additional time is necessary to fully

20   understand concerns raised by Tribes and the public and the project's impacts to these

21   important resources and ensures the agency's compliance with federal law," and thus "it

22   directed the Forest Service to take appropriate steps to re-initiate consultation."  (*San

23   Carlos*, Doc. 36-1 ¶ 6, cleaned up.)  The reissuance of the FEIS in June 2025 is a sign that

24   the government believes it has now satisfied those obligations.  To that end, the FEIS

25   expressly states that the consultation process under § 106 of NHPA has now been

26   completed.  (*San Carlos*, Doc. 106-3 at 171 [FEIS page 1000: "In accordance with 36 CFR

27   800.7(c)(4), the Secretary of Agriculture delivered a written response to the ACHP on April

28   17, 2025, and that response concluded the Section 106 process for this undertaking."].  *See*

*also San Carlos*, Doc. 82-15 [Secretary of Agriculture's letter to ACHP].)

Given this backdrop, and acknowledging that the issue is not free from doubt, the Court concludes that the Tribe will likely be able to establish the "final agency action" element of its consultation claims.

### d.    **No Agency Discretion**

The Court is unpersuaded by Defendants' "no agency discretion" arguments as applied to the Tribe's consultation claims.    The Forest Service possesses discretion regarding its consultation obligations, both with respect to how to fulfill them and in determining when they have been satisfied.  Additionally, as noted in relation to Plaintiffs' NEPA claims, Defendants' counterarguments conflate the substance of the Tribe's consultation claims with the remedy the Tribe seeks.

### e.    **Vacatur As A Remedy**

Earlier portions of this order explain why Defendants' arguments regarding the permissibility of vacatur as a remedy do not stand as an obstacle to preliminary injunctive relief on Plaintiffs' appraisal and NEPA claims.  The same is true with respect to the Tribe's consultation claims.  Even assuming that Defendants' cited NEPA cases apply in this context, they counsel against vacatur where, unlike here, the underlying project has already begun and actions have already been undertaken in reliance on the agency's challenged decision.

### 2.    Merits

### a.    **Tribal Consultation**

"The NHPA involves a series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance." *San Carlos Apache Tribe*, 417 F.3d at 1093-94 (cleaned up).  For instance, "[s]ection 106 [of NHPA] requires that federal agencies take into account the effect of their undertakings on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." *Id.* at 1094 (cleaned up).  "If a proposed undertaking will have an effect on historic properties to which Indian tribes attach religious and cultural significance, [NHPA]

requires the federal agency to consult with the affected tribes before proceeding." *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1059 (9th Cir. 2007), *overruled on other grounds*, 535 F.3d 1058 (9th Cir. 2008).  *See also* 36 C.F.R. § 800.2(c)(2)(ii) ("[T]he agency official [must] consult with any Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by an undertaking.").  Under the relevant regulations, "[c]onsultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process."  36 C.F.R. § 800.16(f).  "The agency official shall ensure that consultation . . . provides the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  36 C.F.R. § 800(c)(2)(A).

SALECA also requires "government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange."  16 U.S.C. § 539p(c)(3)(A).  It further requires the government to "consult with Resolution Copper and seek to find mutually acceptable measures to . . . address the concerns of the affected Indian tribes" and "minimize the adverse effects on the affected Indian tribes resulting from mining and related activities" on federal land included in the exchange.  *Id.* § 539p(c)(3)(B).  This "government-to-government consultation" and "minimize adverse effects" language mirrors the governing NHPA regulations.  36 C.F.R. § 800.2(c)(ii)(C) ("Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes."); *id.* § 800.6(a) ("The agency official shall consult with . . . other consulting parties, including Indian tribes . . . to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize or mitigate adverse effects on historic properties.")  In light of this parallel language, and because the Tribe has not argued that SALECA's requirements

1    are materially different from NHPA's requirements,[16] the Court will assume without

2    deciding that these requirements are the same.

3                              i.    Relevant Facts

4        Appendix S of the FEIS suggests that discussions between the federal government

5    and members of the Tribe regarding the land exchange began in 2003.  (*San Carlos*, Doc.

6    109-2 at 405.)  That year, Forest Service staff members met with members of the Western

7    Apache Coalition, including the Tribe, to "discuss[] proposed land exchange and request[]

8    Apache assistance in reviewing a CR survey."  (*Id.*)  In the two decades that followed,

9    Resolution Copper asserts, without contradiction, that "the Forest Service conducted . . .

10   434 documented consultations with the San Carlos Apache Tribe."  (*San Carlos*, Doc. 116

11   at 41.)[17]  The following non-exhaustive list of tribal contacts is instructive:

12       Between 2003 and 2008, the Forest Service sent several official letters to the San

13   Carlos Apache "Tribal Chair[]" and cultural staff; hosted a "formal" meeting[18] with "San

14   Carlos Cultural Staff"; and hosted an "[i]nformal meeting with the Western Apache

15   coalition."  (*San Carlos*, Doc. 109-2 at 405-07.)

16       Between 2008 and 2015, the Forest Service continued communications with the

17   Tribe through various emails and letters, as well as through formal and informal meetings.

18   (*Id.* at 406-21.)  Some of the topics discussed during this period included the possibility of

19   a "pre-feasibility" or "baseline" study regarding the proposed mine (*id.* at 406-07, 415) and

20   the possibility of an "[e]thnographic" study of the region (*id.* at 413).  Following these

21   discussions, the Tribe executed a Memorandum of Understanding ("MOU") with the

22   Forest Service outlining "[p]rotocols for San Carlos participation in

23   Ethnohistoric/Ethnographic Study."  (*Id.* at 414.)

24   _____

     [16]    One possible exception is that SALECA explicitly requires the FEIS to incorporate
25   discussion of adverse effects on cultural resources and possible mitigation measures.
     16 U.S.C. § 539p(c)(9)(C).

26   [17]    The Tribe does not dispute this number.  Instead, as discussed in more detail below,
27   the Tribe disputes whether certain consultations qualify as meaningful and/or
     "government-to-government" consultations.

28   [18]    Appendix S notes that meetings are designated as "formal" when a "Forest Service
     line officer [is] present."  (*See, e.g.*, *San Carlos*, Doc. 109-2 at 406.)

In 2015, the "Ethnographic and Ethnohistoric Study" was completed (*id.* at 416), including a literature review of "archival and existing literature" as well as "oral interviews and field visits with Tribal members to collect oral history and knowledge" (*San Carlos*, Doc. 106-3 at 44). Members of the Tribe (as well as members of other tribes) "accompanied research staff to important places throughout the study area and shared information about those places." (*Id.*) As a result of that study and "Tribal Monitor surveys," the Forest Service recorded "594 special interest areas," including various "cultural resources" and "natural resources." (*Id.* at 50.) In addition, "the ethnographic study identified seven places of traditional and cultural importance within the direct analysis area." (*Id.* at 51.)

Between 2015 and 2016, the Forest Service continued communications with the Tribe concerning the proposed "Baseline" project for "Hydrologic and Geotechnical Data Gathering Activities" and an accompanying environmental assessment of that proposed plan ("EA"). (*San Carlos*, Doc. 109-2 at 415, 417-25.) Following publication of the EA, the Tribe brought a lawsuit that challenged, *inter alia*, the sufficiency of the tribal consultations. *Concerned Citizens*, 279 F. Supp. 3d at 939-42. Judge Campbell rejected that challenge, explaining:

> Consultation is a two-way street. The administrative record makes clear that the Forest Service made numerous and substantial efforts to consult, while the Tribe made no meaningful effort to engage with the Forest Service. Were the Court to find that an agency had not satisfied the NHPA's consultation requirements simply because no actual consultation occurred, a tribe could block any undertaking by refusing to cooperate. The NHPA does not guarantee actual meaningful consultation, only that the tribe will have a reasonable opportunity for such consultation. The Tribe had such an opportunity here.

*Id.* at 942.

In August 2015, following the passage of SALECA, the Forest Service sent an "[o]fficial letter" to the Tribe's "[l]eaders and cultural staff" inviting them "to consult about the NDAA Land exchange." (*San Carlos*, Doc. 109-2 at 419.)

From 2015 to 2021, the Forest Service communicated regularly with tribal members through emails and letters.  (*See generally id.* at 418-87.)  The Forest service also hosted formal and informal meetings with "[t]ribal leaders and staff."  (*See, e.g.*, *id.* at 427.)  The topics discussed during this period included: the possibility of a MOU between the Tribe and the Forest Service (*id.* at 423); the forthcoming EIS (*id.* at 427); the proposed "mining technique[] and water analyses" (*id.* at 443); and the development of a proposed Programmatic Agreement ("PA") to guide further consultations (*id.* at 435).

In November 2018, the Forest Service made a "Field Trip" in the "Camp Verde area" along with members of the Tribe and other tribes to examine "potential groves." (*Id.* at 438.)  And in May 2019, tribal monitors led a tour of the proposed Skunk Camp tailings storage alternative, which tour included members of the Tribe.  (*Id.* at 442.)

Between 2018 and 2021, the Forest Service began including the Tribe in the development of a PA (*id.* at 434-82) with the aim of guiding future tribal consultations and outlining various mitigation measures concerning the land exchange and mine.  (*San Carlos*, Doc. 109-5 at 4-5 [ACHP comments: "Consultation has included the . . . San Carlos Apache Tribe . . . and resulted in the development of a draft PA that would provide a mechanism for further identification and evaluation of historic properties . . . as well as a broad array of measures to attempt to resolve identified adverse effects."].)  This process involved at least eight different versions of the PA, with the Forest Service soliciting comments and input from the Tribe (both in-person and via letter) concerning the successive drafts.  (*See, e.g.*, *San Carlos*, Doc. 109-2 at 475 ["San Carlos Apache Tribe . . . Provided comments on PA version 8."]; *id.* at 479 ["Reply to San Carlos . . . comments on PA version 8."].)

On November 22, 2019, the Forest Service met with the San Carlos Apache Tribal Council "during a special Tribal Council meeting."  (*San Carlos*, Doc. 116-2 at 42.)  At the meeting, the Forest Service solicited comments on the Draft EIS (*id.*), and the parties discussed the "[u]pdated status of EIS process, answered questions" and heard a "presentation by San Carlos water consultant."  (*San Carlos*, Doc. 109-2 at 455.  *See also*

*San Carlos*, Doc. 106-3 at 169 ["A seventh meeting, with the San Carlos Apache Tribe, took place on November 22, 2019."].)

Between 2019 and 2021, the parties continued exchanging emails and letters and participating in meetings concerning many of the same topics outlined above. (*San Carlos*, Doc. 109-2 at 456-88.)  During this period, the Tribe also began expressing concerns about the need for a supplemental EIS.  (*Id.* at 481.)

On March 1, 2021, the Secretary of Agriculture directed the Forest Service to "rescind the FEIS and ROD" because "additional time [was] necessary to fully understand concerns raised by Tribes and the public and the project's impacts to these important resources and ensure the agency's compliance with federal law."  (Doc. 36 at 2.)

In September 2021, the Forest Service sent an email inviting the Tribe to participate in an October 2021 listening session to "re-initiate consultations."  (*San Carlos*, Doc. 109-2 at 488, 491.)  On October 19, 2021, the listening session took place.  (*Id.* at 491.)

Between 2021 and 2025, the Forest Service continued sending emails and letters to the Tribe, attempting to arrange meetings (*id.* at 488-510), and providing updates on topics such as "water quality documents" and continued "review of hydrology aspects of the RCM EIS" (*see, e.g.*, *id.* at 494, 500).  The Forest Service also continued its consultation efforts with the various other tribal parties.  (*Id.* at 488-510.)

In November 2021, the Tribe's Chairman ("Chairman Rambler") "authorized his admin to set a telephone meeting with [Associate Deputy Chief] Gyant."  (*Id.* at 492.)

In December 2021, the Forest Service sent an email "[a]sk[ing] San Carlos Tribe to select date and time for meeting and provide topics they would like to discuss."  (*Id.* at 493.)

On February 10, 2022, the Forest Service met with Chairman Rambler, as well as with the Tribe's attorney general ("San Carlos AG"), at Oak Flat in a meeting marked in the FEIS as "CONFIDENTIAL."  (*Id.* at 495.)  The next day, another meeting was held in Peridot, Arizona, to discuss "San Carlos' concerns about the project and the FEIS" and other confidential topics.  (*Id.*)

In March 2023, the "USDA Under Secretary Wilkes" and other Forest Service staff attended a tour of Oak Flat along with "[p]resentations by proponents for saving Oak Flat." (*Id.* at 503.)

In April 2023, the Forest Service held another tribal listening session with multiple tribal members present, including members of the Tribe, and "[d]iscussed issues identified by Tribes and the status of the EIS." (*Id.* at 504.)

In August 2023, Chairman Rambler sent a letter to the Forest Service "propos[ing] a MOU, a working group, and 6 topics to be discussed by the working group." (*Id.* at 505.)

On May 15, 2024, after exchanging drafts of the MOU, the Forest Service met with the San Carlos Tribal Council in San Carlos, Arizona, to "[d]iscuss[] EIS and proposed consultation MOU." (*Id.* at 507.)

On June 7, 2024, the Forest Service met virtually with the San Carlos AG and other tribal staff to continue discussions of the proposed MOU. (*Id.* at 509. *See also San Carlos*, Doc. 119-2 [meeting agenda and transcript].) From the Tribe's perspective, the meeting was insulting. (*San Carlos*, Doc. 119 at 18 ["[A] 'transcript' of that June 7, 2024, meeting . . . [demonstrates] that the Forest Service resisted even the most basic acknowledgements, including whether Oak Flat was part of the Tribe's ancestral territory."].)

In April 2025, the Secretary of Agriculture sent a letter to the Tribe "[c]onvey[ing] USDA decision to publish the FEIS and draft Record of Decision, and conclude NHPA Section 106 process." (*San Carlos*, Doc. 109-2 at 510.)

ii.    Sufficiency Of Consultation

Two baseline principles guide the analysis of the Tribe's challenge to the Forest Service's compliance with its tribal consultation obligations under NHPA and SALECA. First, the obligation to engage in consultation is not the same thing as an obligation to reach an outcome that is acceptable from the perspective of the party being consulted. Section 106 of NHPA is simply "a 'stop, look, and listen' provision." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). It is "chiefly procedural in nature." *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982). Second, as

discussed, because NHPA and SALECA do not create a private right of action, the Tribe's challenge to the Forest Service's compliance with the consultation obligations created by those statutes arises under the APA. *Tohono O'odham Nation*, 138 F.4th at 1200 ("Plaintiffs bring their NHPA challenge under the APA."); *San Carlos*, 417 F.3d at 1093. The APA's arbitrary-and-capricious standard thus applies. *See, e.g.*, *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 573 (9th Cir. 1998) ("Decisions regarding NHPA . . . [are] reviewed under the arbitrary and capricious standard."); *Western Watersheds Project v. McCullough*, 2023 WL 4557742, *2 (9th Cir. 2023) ("The BLM's identification of tribes for consultation was not arbitrary or capricious and did not violate NHPA . . . ."). Under that "deferential" standard, the question is whether the Forest Service's consultation efforts fell "within a zone of reasonableness." *Prometheus Radio Project*, 592 U.S. at 423.

Applying those standards, the Tribe is unlikely to prevail on its tribal consultation challenges. As noted, the governing regulations only require the Forest Service to "seek[], discuss[], and consider[] the views" of the Tribe and "*where feasible*, seek[] agreement." 36 C.F.R. § 800.16(f) (emphasis added). This requires the Forest Service to provide the Tribe "a *reasonable opportunity* to identify its concerns" and "articulate its views on the undertaking's effects on [affected] properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800(c)(2)(iii) (emphasis added). The voluminous letters, emails, and meetings documented in the FEIS demonstrate that the Forest Service consistently sought the Tribe's input regarding the project over a period of more than two decades and provided many, many opportunities for the Tribe to participate in the decision-making process. Nor can it be ignored that the Tribe brought a previous challenge regarding the adequacy of the Forest Service's consultation efforts related to the land exchange, only for Judge Campbell to determine that those consultation efforts were sufficient, in part because the Tribe refused to engage in good faith. *Concerned Citizens*, 279 F. Supp. 3d at 941-42. Although the Tribe is dissatisfied with the outcome that ultimately resulted from the tribal consultation process, such dissatisfaction does not show the process itself was insufficient. *See, e.g.*, *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dept. of Interior*, 608 F.3d

592, 610 (9th Cir. 2010) ("In sum and as reflected in the record, the BLM has consulted with the Tribe regarding PCRIs within the project area for many years. In addition, the Tribe has made no showing that it would have provided new information had it been consulted again earlier in the Amendment's approval process. We therefore conclude that the BLM did not violate its obligation to consult with the Tribe and thus did not violate the NHPA."); *Navajo Nation*, 479 F.3d at 1060 ("[B]ecause of the extensive record of consultation undertaken by the Forest Service in this case, we agree with the district court that although the consultation process did not end with a decision the tribal leaders supported, this does not mean that the Forest Service's consultation process was substantively and procedurally inadequate.") (cleaned up).

The Tribe's more specific objections do nothing to change this conclusion. First, the Tribe appears to argue that any tribal consultations that took place before the March 2021 withdrawal of the initial EIS are irrelevant. (*San Carlos*, Doc. 105 at 23-24.) But the Ninth Circuit has rejected variants of this argument. *See, e.g.*, *Te-Moak*, 608 F.3d at 608-10 (rejecting NHPA-based tribal consultation challenge in part due to "BLM's previous consultation with the Tribe for the original HC/CUEP and other projects in the area" and emphasizing that those earlier consultation efforts took place "for many years"); *Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*, 496 F. App'x 712, 714-15 (9th Cir. 2012) ("The Tribe argues that BLM did not adequately consult with it regarding the proposed re-route, depriving it of its right to participate in the resolution of adverse effects as required by the regulations. *In addressing the adequacy of consultation, we consider both the consultation on the re-routing and the consultation that was conducted in connection with the initial approval of the project*. Indeed, it was BLM's consultation with the Tribe, which started at least as early as January 2009, that led it to propose the re-route in the first place, and BLM conducted four site visits with the Tribe to try to ascertain the boundaries of the traditional cultural property. We hold that this process, taken as a whole, fulfilled BLM's consultation obligation.") (emphasis added) (cleaned up). As noted, Judge Campbell previously rejected a challenge to the adequacy of one component of those earlier

1    consultation efforts.  *Concerned Citizens*, 279 F. Supp. 3d at 941-42.

2            Second, the Tribe argues for the first time in its reply brief that only consultations

3    with the San Carlos Apache *Tribal Council* qualify as "government-to-government

4    consultation."  (*San Carlos*, Doc. 119 at 17.)[19]  The Tribe thus argues that many of the

5    letters, phone calls, "listening sessions," and other meetings identified in the FEIS, which

6    involved communications with other San Carlos officials (including the San Carlos AG),

7    do not count.  (*Id.*)  As an initial matter, this argument is likely forfeited because it was

8    raised for the first time in a reply brief, *Zamani*, 491 F.3d at 997, and the Tribe did not cite

9    any supporting authority in its reply.  Moreover, given the interconnected nature of the

10   voluminous tribal contacts described in the FEIS, which suggests the Tribal Council was

11   kept apprised of the Forest Service's consultation efforts with other tribal officials and

12   representatives, it would be surprising if those consultation efforts were *irrelevant* for

13   purposes of evaluating the adequacy of the Forest Service's consultation efforts.[20]

14           In any case, the record establishes that the Forest Service's 400+ consultations and

15   communications with tribal representatives included two formal meetings, in November

16   2019 and May 2024, with the Tribal Council (*San Carlos*, Doc. 109-2 at 258, 455, 507);

17   additional formal meetings with individual members of the Tribal Council, such as the

18   Vice-Chair (*id.* at 417); and a variety of efforts to schedule even more formal meetings

19   with the Tribal Council (*see, e.g.*, *id.* at 430) and/or meetings and phone calls with

20   Chairman Rambler, the chairman of the Tribal Council (*see, e.g.*, *id.* at 492, 503).  It is

21   difficult to see how such consultation efforts could be deemed inadequate under the

22   ─────────────

23   [19]     The portion of the Tribe's motion raising consultation-related challenges says
     nothing about the consultations being directed toward the wrong tribal representatives.
     (*San Carlos*, Doc. 105 at 23-24.)

24   [20]     With that said, the Court has identified authority from outside the Ninth Circuit that

25   may provide support for the Tribe's position regarding which representatives matter for
     purposes of "government-to-government" consultation duties.  *City of Phoenix, Ariz. v.

26   Huerta*, 869 F.3d 963, 971 (D.C. Cir. 2017) ("[T]he FAA failed to fulfill these obligations
     because it consulted only low-level employees in the City's Aviation Department, whom

27   the City had never designated as its representatives.  True, the City never informed the
     FAA that low-level Aviation Department employees were inadequate points of contact, but
     that is irrelevant.  Neither statute nor regulation imposes a duty on local governments to

28   affirmatively inform the agency of their chosen representatives.  Just the opposite: the
     agency must ask local governments who their authorized representatives are.").

relevant Ninth Circuit precedents.  *Te-Moak*, 608 F.3d at 609 (9th Cir. 2010) (rejecting tribal consultation claim where "as reflected in the record, the BLM has consulted with the Tribe regarding PCRIs within the project area for many years"); *Navajo Nation*, 479 F.3d at 1060 (rejecting tribal consultation claim in light "of the extensive record of consultation undertaken by the Forest Service in this case").  *See also Concerned Citizens*, 279 F. Supp. 3d at 942 ("The administrative record makes clear that the Forest Service made numerous and substantial efforts to consult . . . .").

Third, the Tribe contends the formal May 2024 meeting between the Forest Service and the Tribal Council was not meaningful because "[a]t most, the Forest Service consulted with the San Carlos Council about the terms of a [MOU] to guide consultation that was never executed." (*San Carlos*, Doc. 119 at 17.)  But Chairman Rambler's declaration does not support the assertion that the parties only discussed the MOU at the May 2024 meeting. (*San Carlos*, Doc. 89-5.)   In that declaration, Chairman Rambler lists various "concerns that the Tribe expressed at the meeting," which included, among other things, (1) concerns that the "EIS is deeply flawed," (2) concerns about "[w]hether the Forest Service would fully assess the water needs and assess the viability of potential water sources," and (3) concerns about "[w]hether the Forest Service would provide thorough written responses to BLM's concerns."  (*Id.* ¶ 7.)

Fourth, to the extent the Tribe contends that various features of the parties' consultations (such as the fact that no MOU was ever finalized) show that the Forest Service acted in bad faith when carrying out its consultation duties, this claim is not supported by the law, *see Navajo Nation*, 479 F.3d at 1060 ("[a]lthough the consultation process did not end with a decision the tribal leaders supported, this does not mean that the Forest Service's consultation process was substantively and procedurally inadequate"), or by the record.  For example, the Tribe argues that "the Forest Service resisted even the most basic acknowledgements, including whether Oak Flat was part of the Tribe's ancestral territory." (*San Carlos*, Doc. 119 at 18.)  To support this argument, the Tribe cites the June 7, 2024 transcript of a virtual meeting between the Forest Service and certain tribal

representatives, including the San Carlos AG.  (*San Carlos*, Doc. 119-2.)  In that meeting, the Forest Service representative explained the decision to strike certain land acknowledgements from the proposed MOU: "[T]he concern of the Forest Service here was that . . . enumerating these facts might implicate some of the facts in the ongoing litigation regarding the land exchange."  (*Id.* at 27.)   The Forest Service then asked if these acknowledgments could be characterized as "[t]he San Carlos's perspective on these facts" and the tribal representatives pushed back, explaining that these acknowledgments were important for "establishing trust with the Council and the tribe."  (*Id.* at 27-28.)  As a possible compromise, the Tribe proposed "putting a 408 label"[21] on the proposed acknowledgments and the Forest Service asked if the Tribe would be "willing to draft up some of that . . . 408 language."  (*Id.* at 28.)  Rather than evincing bad faith, this exchange demonstrates—at least to the Court's eye—the enormous difficulties the parties faced in finding common ground given the specter of ongoing litigation and the Tribe's vehement opposition to the land exchange.

Fifth, the Tribe argues the Forest Service's consultation efforts were insufficient because they were not "responsive to the issues raised by the Tribe" and therefore not "meaningful."  (*San Carlos*, Doc. 119 at 17-18.)  However, the record demonstrates that the Forest Service responded to many of the Tribe's concerns.  For example, during the early phases of tribal consultation, the Tribe participated extensively in the development of a PA to identify possible mitigation measures concerning the land exchange.  Although "the PA was never executed," some of the "mitigation measures identified in the PA . . . will now be implemented through the final ROD and special use permit for use of Forest Service lands."  (*San Carlos*, Doc. 106-3 at 171 [FEIS page 1000].)  Among the mitigation measures addressed in the original PA and incorporated into the DROD are "preparation of an archeological [historic properties treatment plan]"; an "archeological research design" that will be "completed prior to the proposed ground-disturbing activities in the GPO project areas"; a plan to mitigate adverse "visual, atmospheric, auditory, and

---

[21]     Presumably this refers to Federal Rule of Evidence 408.

cumulative effects"; and an "archeological database fund"[22] "[i]n recognition of the substantial loss of cultural resources and historic properties on State Trust Lands." (*San Carlos*, Doc. 116-2 at 49-50 [DROD pages 38-39].)

In addition, following the May 2024 meeting between the Forest Service and the Tribal Council, a Forest Service representative, Troy Heithecker, sent a letter to Chairman Rambler assuring him that "issues raised through consultation have been considered and carefully analyzed." (*San Carlos*, Doc. 85-8 at 2.) Heithecker went on to address some of the concerns raised in the May 2024 meeting, explaining that "[b]ased on the information obtained through our consultation efforts and reviews of the withdrawn FEIS, the Forest Service is not aware of any information that would require a complete reinitiation of the [FEIS] process." (*Id.* at 3.) Heithecker also explained that, in response to tribal concerns about the mine's impact on water, the Forest Service conducted "additional analysis of potential indirect impacts to groundwater in the area known as the Cutter Basin" and "engaged a Bureau of Land Management (BLM) hydrological review team to review the water analysis section of the FEIS." (*Id.*) Heithecker concluded: "While we have determined that further discussion on some issues is complete, we recognize that compliance with Congress's mandate to complete the SALECA land exchange cannot be reconciled with Tribal concerns and understand there are still issues that allow for further engagement. I am committed to continued collaborative dialogue. Therefore, I am inviting you to reach out directly to me to engage on this proposed project in formal consultation at a time and place convenient for you and your leadership." (*Id.* at 4.)

More substantively, it appears the Forest Service incorporated a more thorough response to the Tribe's concerns regarding water at page 437 of the FEIS:

> During the re-initiation of Tribal consultation in 2021-2022, concerns were raised by the San Carlos Apache Tribe about indirect impacts to Tribal water resources in the Cutter Basin caused by Resolution Copper dewatering around the East Plant Site, as well as long-term changes in regional

---

[22] The Forest Service Acknowledges that it "no longer has the authority to require this measure" but that the measure is enforceable through "Letter Agreements" with Resolution "dated January 12, 2021." (*San Carlos*, Doc. 116-2 at 50.)

groundwater from block-caving. . . .   In response to these comments, the
Forest Service Conducted an analysis of these potential indirect effects . . . .

(*San Carlos*, Doc. 106-2 at 68.  *See also AMRC*, Doc. 93-1 at 235 [FEIS page R-356: "After the January 2021 publication of the Rescinded FEIS, we received further insights into the concerns raised by the San Carlos Apache Tribe with respect to water impacts.   We understand that the concern is not of direct drawdown impacts but of the potential for cascading regional effects to cause greater groundwater use near Tribal lands.  An analysis of this potential has now been added to section 3.7.1 of the FEIS."].)

### b.    ACHP Consultation

In addition to challenging the sufficiency of the Forest Service's tribal consultation efforts, the Tribe also argues that the Forest Service failed to adequately consult ACHP. As part of the NHPA consultation process, the Forest Service must "afford [ACHP] a reasonable opportunity to comment with regard to the undertaking."  *Tohono O'odham Nation*, 138 F.4th at 1193 (quoting 54 U.S.C. § 306108) (cleaned up).  After identifying potential adverse effects on a historic property, "[t]he agency official shall notify [ACHP][23] of the adverse effect" and "invite [ACHP] to participate in the consultation" "to seek ways to avoid, minimize or mitigate the adverse effects."  36 C.F.R. § 800.6(a)(1), (b)(2).[24]  For "certain complex project situations or multiple undertakings," ACHP "and the agency official may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects."  *Id.* § 800.14(b).

"After consulting . . . the agency official, the [State Historic Preservation Officer/Tribal Historic Preservation Officer], or [ACHP] may determine that further consultation will not be productive and terminate consultation.  Any party that terminates consultation shall notify the other consulting parties and provide them the reasons for

---

[23]      The regulations refer to ACHP as the "Council."  36 C.F.R. § 800.16(g) ("*Council* means the Advisory Council on Historic Preservation or a Council member or employee designated to act for the Council.").

[24]      Alternatively, ACHP has the option to enter "into the section 106 process . . . [w]hen the Council determines that its involvement is necessary."  36 C.F.R. § 800.2(b).

terminating in writing." *Id.* § 807(a).  "If [ACHP] terminates consultation, the [ACHP] shall notify the agency official . . . of the termination" and "transmit its comments within 45 days." *Id.* § 800.7(a)(4), (c)(2).  The head of the agency, in turn, "shall take into account [ACHP's] comments in reaching a final decision on the undertaking," including "[p]reparing a summary of the decision that contains the rationale for the decision and evidence of consideration of [ACHP's] comments" and "providing [the summary] to [ACHP] prior to approval of the undertaking." *Id.* § 800.7(c)(4).

i.    ACHP Consultations Generally

The evidence bearing on the issue of ACHP consultations is as follows.  "On December 7, 2017, the [Forest Service] notified the ACHP of its finding of adverse effect" regarding the proposed mine and the land exchange, "and on December 21, 2017, the ACHP informed the [Forest Service] that it would participate in the consultation." (*San Carlos*, Doc. 109-5 at 4.)  Over the next four years, ACHP "participated in the Section 106 consultation to seek ways to avoid, minimize, or mitigate adverse effects to historic properties that would result from this undertaking." (*San Carlos* 109-3 at 2.)  ACHP also assisted in coordinating consultations with interested parties and "the development of a draft PA that would provide a mechanism of further identification and evaluation of historic properties." (*San Carlos*, Doc. 109-5 at 4-5.)  As discussed in the preceding section, the PA went through numerous iterations.  Except for ACHP, all of the other required signatories signed the PA.  (*San Carlos*, Doc. 82-15 at 1.)

On February 11, 2021, ACHP notified the Forest Service that "further consultation in this case would be unproductive and therefore, we are hereby terminating consultations pursuant to 36 CFR § 800.7(a)(4)." (*San Carlos*, Doc. 109-3 at 2.)  ACHP reached this decision because "it [was] clear that the proposed undertaking would destroy significant historic properties, including the highly significant Oak Flat, and the measures in the PA [were] not sufficient to adequately resolve those adverse effects." (*Id.*)

On March 29, 2021, 45 days later, ACHP transmitted its comments to the Secretary of Agriculture.  (*San Carlos*, Doc. 109-5.)

On April 17, 2025, the Secretary of Agriculture responded to those comments in a five-page letter. (*San Carlos*, Doc. 82-15.) The Secretary addressed each of ACHP's comments individually and explained how those comments informed the ultimate decision to publish the FEIS and the DROD. (*Id.*) More specifically, in response to ACHP's comment that the Secretary "should work with the Administration and Congress to . . . amend or repeal [SALECA]," the Secretary explained that the USDA is prohibited by statute from engaging in lobbying activities. (*Id.* at 3.) As for ACHP's recommendation to "use further discussions with Tribes and other stakeholders to develop and evaluate alternatives and further modifications to the undertaking," the Secretary summarized the additional consultation efforts that took place following ACHP's comments in 2021 and explained that the USDA hadn't been able to identify better alternatives or permissible modifications under SALECA. (*Id.* at 3-4.) As for ACHP's recommendation to "commit to carrying out mitigation measures in the proposed PA" even though the PA was never fully executed, the Secretary responded that the USDA "remained committed" to carrying out those mitigation measures that remained in its power. (*Id.* at 4.) The remaining three comments from ACHP concerned systematic changes the USDA should implement in future consultation efforts not involving Oak Flat. (*Id.* at 4-6.) The Secretary explained, in response, how the USDA would address those concerns moving forward. (*Id.*)

The Tribe argues these consultation efforts were inadequate because "[t]he Forest Service has not substantively addressed the comments ACHP offered when it terminated consultation or that it presented by letter on March 29, 2021." (*San Carlos*, Doc. 105 at 23.) The Tribe also faults the Secretary for "defend[ing] the 2021 FEIS, a position contrary to the Forest Service's statements when it withdrew the 2021 FEIS." (*Id.* at 24.)

There is little caselaw on this subject. What appears to be the most on-point case comes from the Third Circuit in *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686 (3d Cir. 1999). There, the plaintiff challenged a decision by the Federal Highway Administration ("FHWA") to place a new bridge in a location that would send traffic through a nearby historic district. *Id.* at 690. As part of the challenge, the plaintiff argued

that FHWA failed to adequately defer to the ACHP's preferred alternative route.  *Id.* at 695-97.  The court rejected this argument, concluding that FHWA adequately considered ACHP's input because (1) ACHP was heavily involved in the planning process, (2) FHWA hired a consultant recommended by ACHP, and (3) FHWA's disagreement with ACHP was adequately justified and not arbitrary and capricious.  *Id.*  In short, the agency "demonstrate[d] that it ha[d] read and considered" ACHP's comments and "gave the ACHP's conclusion genuine attention." *Id.* at 696.  Here, too, the Secretary acknowledged ACHP's concerns and recommendations and provided detailed, reasoned responses to them.  ACHP was involved in the Forest Service's consultation efforts early on, and the Secretary provided adequate justifications for its decision to publish the FEIS, notwithstanding ACHP's comments.

As for the Tribe's assertion that the Secretary's response to ACHP's comments was inadequate because the Secretary "defended the 2021 FEIS"—it's not entirely clear what the Tribe is referring to.  It seems this argument concerns the Secretary's response to ACHP's second comment that "USDA should use further discussions with Tribes and other stakeholders to develop and evaluate alternatives and further modifications to the undertaking . . . ." (*San Carlos*, Doc. 82-15 at 3.)  In response, the Secretary stated that "USDA worked extensively with Tribes and other stakeholders to identify potential modifications and mitigations that might avoid adverse effects." (*Id.*)  The Secretary then stated that "[n]evertheless, in 2021, the Secretary of Agriculture ordered the re-initiation of consultation with Tribal nations after the [FEIS] was rescinded to redouble the agency's efforts . . . .  To date, additional consultations with the Tribes has not uncovered other potential mitigation or alternatives that would allow USDA to comply with the SALECA while avoiding adverse impacts to Tribal interests." (*Id.*)  Nothing in this passage is arbitrary or capricious—as discussed elsewhere in this order, the tribal consultation process was quite complicated due to the Tribe's vehement, if understandable, opposition to the very concept of the land exchange.

…

ii.    Programmatic Agreement

The Tribe also contends the Forest Service's consultation efforts with ACHP were inadequate because "[t]he Forest Service did not complete a Programmatic Agreement for treatment of historic and cultural properties in 2021 and still has not done so." (*San Carlos*, Doc. 105 at 23.)  But this argument misunderstands the nature of the PA.  The regulations provide that "the Advisory Council and the agency *may* negotiate a programmatic agreement." *Tohono O'odham Nation*, 138 F.4th at 1194 (cleaned up).  Although violating a *fully executed* PA might violate NHPA, *id.* at 1202-04, the PA in this case was never fully executed.  As explained above, if ACHP and the agency are unable to reach an agreement on the PA, ACHP can terminate consultations and transmit its comments to the agency within 45 days.  So long as the agency responds to those comments and takes them into account when making a final decision—which occurred here—nothing in NHPA or its governing regulations prevents the project from moving forward.

3.    Summary As To Consultation Claims

Although the Tribe will likely be able to overcome the jurisdictional and other threshold challenges that Defendants have raised to its consultation claims, the Tribe has not shown a likelihood of success on the merits of those claims or even serious questions going to the merits of those claims.

D.    **NFMA Claims**

1.    Threshold Issues

The parties' briefing regarding the jurisdictional and threshold issues raised by Defendants focuses almost exclusively on how those arguments apply to Plaintiffs' appraisal, NEPA, and consultation claims.  The one specific argument that Resolution Copper raises in relation to AMRC's NFMA claims is that they are "premature because the draft ROD is not a final agency action." (*AMRC*, Doc. 94 at 45-46.)

The Court agrees and thus finds it unnecessary to address how the remaining jurisdictional and threshold issues apply in this context.  As with all of the other claims at issue here, "agency decision-making under NFMA is governed by the judicial review

1  provisions of the APA because NFMA does not contain an express provision for judicial

2  review." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir.

3  2005). As a result, the "final agency action" requirement again applies.

4  AMRC's essential argument is that the Forest Service violated NFMA's

5  implementing regulations, which require any change to a forest plan to be preceded by a

6  formal notice-and-comment process, by including changes to the Forest Plan in the FEIS

7  and DROD without following such a process. But as discussed in relation to Plaintiffs'

8  NEPA claims, the proposed changes to the Forest Plan discussed in the FEID and DROD

9  are just that—proposed changes. No final decisions or changes have been made yet. It

10  follows that there has been no consummation of the agency's decision-making process, as

11  required to satisfy the first element of *Bennett*'s finality test.

12                                        2.     Merits

13  Although the analysis could end there, the Court will also address the merits.

14  According to AMRC, 36 C.F.R. Part 219 provides that any proposed amendment to a forest

15  plan must be preceded by a period of public review, comment, and notice. (*AMRC*, Doc.

16  87 at 27-29.) AMRC further contends that the FEIS "included, for the first time, a new

17  proposal to substantially amend the Tonto National Forest Plan." (*Id.*) It follows,

18  according to AMRC, that "the agency's decision to bypass public review and amend the

19  Forest Plan . . . violates the substantive and procedural requirements of the NFMA." (*Id.*)[25]

20  AMRC is unlikely to succeed on this claim. As background, NFMA provides the

21  statutory framework for management of National Forest lands. Under NFMA, the Forest

22  Service and Secretary of Agriculture must develop and maintain a forest plan for each unit

23  of the National Forest System. 16 U.S.C. § 1604(a). "[T]he Forest Service implements

24  each forest plan by approving or disapproving site-specific actions." *N. Cascades*

25  *Conservation Council v. United States Forest Serv.*, 2021 WL 8344155, *5 (W.D. Wash.

---

26  [25]     AMRC also makes a passing assertion that the Forest Service's challenged conduct

27  violates FLPMA and NEPA (*AMRC*, Doc. 87 at 29), but AMRC does not develop this
assertion in any depth or elaborate on this assertion in its reply brief. *Martinez-Serrano v.*

28  *INS*, 94 F.3d 1256, 1259 (9th Cir. 1996) ("Issues raised in a brief that are not supported by
argument are deemed abandoned.").

2021), *report and recommendation adopted*, 2022 WL 1043930 (W.D. Wash. 2022). *See also* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.").

The Secretary of Agriculture is also required to "promulgate regulations . . . that set out the process for the development and revision of the land management plans." 16 U.S.C. § 1604(g). The regulations create at least two possibilities for amending a forest plan. Under the first option, "the responsible official shall . . . [p]rovide opportunities for public participation as required in § 219.4 and public notification as required in § 219.16." 36 C.F.R. § 219.13(b)(2). Part 219.4, in turn, requires "[t]he responsible official" to "provide opportunities to the public for participating in the assessment process; developing a plan proposal; . . . [and] commenting on the proposal." 36 C.F.R. § 219.4(a). Part 219.16 requires "formal public notification" to "be provided . . . [t]o invite comments on a proposed plan, plan amendment, or plan revision, and associated environmental analysis" with the comment period lasting "at least 90 days" for a plan requiring a draft EIS. 36 C.F.R. § 219.16(a)(2).

Meanwhile, the second option applies "when a plan amendment is approved in a decision document approving a project or activity and the amendment applies only to the project or activity," in which case "the notification requirements of 36 CFR part 215 or part 218, subpart A, appl[y] instead." 36 C.F.R. § 219.16(b). *See also* 36 C.F.R. § 219.59(b) ("When a plan amendment is approved in a decision document approving a project or activity and the amendment applies only to the project or activity, the administrative review process of 36 CFR part 215 or part 218, subpart A, applies instead of the objection process established in this subpart."). Part 218 creates a modified "objection" process where public participation takes place contemporaneously with publication of a final EIS: "[T]he responsible official must promptly make available the final EIS . . . and a [DROD] to those who have requested the documents or are eligible to file an objection" and publish "legal notice of the opportunity to object" "in the applicable

1    newspaper of record."   36 C.F.R. § 218.7(b)-(c).   "Written objections, including any

2    attachments, must be filed with the reviewing officer within 45 days following the

3    publication date of the legal notice."  36 C.F.R. § 218.26(a).  "The responsible official may

4    not sign a ROD . . . until the reviewing officer has responded in writing to all pending

5    objections."  36 C.F.R. § 218.12(a).

6         Here, it fell within the "broad zone of reasonableness," *Seven County Infrastructure*

7    *Coalition*, 145 S. Ct. at 1513, for the Forest Service to conclude that the proposed

8    amendments to the Forest Plan set forth in the FEIS are project-specific—indeed, all of

9    those changes will flow from the land exchange and Resolution Copper's plan to begin

10   mining for copper.  And if the proposed changes are project-specific, this means that "the

11   notification requirements of 36 CFR part 215 or part 218, subpart A, appl[y] instead" of

12   the more formal requirements described elsewhere in Part 219.  36 C.F.R. § 219.16(b).

13   Consistent with the requirements set forth in Part 218,[26] the Forest Service published the

14   requisite legal notice in the *Arizona Capitol Times* on June 20, 2025.  *Copper Project &*

15   *Land Exchange and Project–Specific Forest Plan Amendment, Legal Notice*, Ariz. Capitol

16   Times, (June 20, 2025), https://www.resolutionmineeis.us/sites/default/files/feis/arizona-

17   capitol-times-resolution-feis-drod-20250620.pdf.   The *Arizona Capitol Times* is the

18   applicable "newspaper of record" as defined in 36 C.F.R. § 218.2.  *Newspapers Used for*

19   *Publication of Legal Notices in the Southwestern Region, Which Includes Arizona, New*

20   *Mexico, and Parts of Oklahoma and Texas*, 89 Fed. Reg. 92,888, 92,889 (Nov. 25, 2024)

21   ("Notices for Availability for Comments, Decisions, and Objections by Forest Supervisor,

22   Cave Creek Ranger District, and Mesa Ranger District are published in:—'Arizona Capitol

23   Times', in Phoenix, Arizona.").  Following this publication, the 45-day "objection" period

24   began, and there is no suggestion—let alone evidence—that concerned parties who met the

25   requirements of 36 C.F.R. § 218.5 were denied an opportunity to participate in that

26

27   _____

28   [26]     In 2014, the Forest Service repealed 36 C.F.R. Part 215.  *Notice, Comment, and*
     *Appeal Procedures for National Forest System Projects and Activities and Project-Level*
     *Predecisional Administrative Review Process*, 79 Fed. Reg. 44,291 (July 31, 2014).

process.[27]

AMRC also contends that the FEIS and proposed Forest Plan amendments fail to "explain the agency's dramatic departure from its policies and regulation from 2021 to 2025." (*AMRC*, Doc. 87 at 38.)  Charitably construed, this argument invokes the so-called "change-in-position doctrine." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 918 (2025).  This doctrine "asks two questions": *first*, "whether an agency changed existing policy"; and *second*, whether "the agency display[ed] awareness that it is changing position and offer[ed] good reasons for the new policy." *Id.* (internal quotation marks omitted).  There is "no basis in the [APA] or in our opinions for a requirement that all agency change be subjected to more searching review." *FCC v. Fox Television Stations*, 556 U.S. 502, 514 (2009).  Instead, the ordinary arbitrary-and-capricious standard applies, so long as the agency accounts for "factual findings that contradict those which underlay its prior policy" or "serious reliance interests" that "its prior policy has engendered." *Id.* at 515.

AMRC's argument appears twofold.  First, AMRC argues that proposing "numerous Plan Amendments" was "a complete reversal from the 2021 DROD, which specifically stated that: 'I find that the authorized uses do not require an amendment to the forest plan.'" (*AMRC*, Doc. 87 at 28.)  Second, AMRC appears to argue that the proposed amendments themselves are a "dramatic departure" from pre-existing agency policy because "the eliminated Plan requirements were enacted to protect valuable resources such as the recognized Traditional Cultural Property of Ga'an Canyon . . . as well as wildlife migration routes." (*Id.* at 28-29.)  This second argument is premature because the proposed Forest Plan amendments have not yet been adopted.  As for the first argument, it's unclear that the Forest Service was required to give any justification for its change in position because neither the 2021 FEIS nor the 2021 DROD represented official agency policy. *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1226 (9th Cir. 2015) ("Admittedly,

---

[27]     In fact, counsel for AMRC represented at oral argument that AMRC filed objections to the proposed Forest Plan amendments on Monday, August 4, 2025.

the BLM initially indicated that consultation might be required for the Wind Project.
However, the BLM's evolving analysis was not a change in a published regulation or
official policy.").[28]    Further, it's unclear that the proposal to amend the Forest Plan
represents a true change in position.  As the Forest Service points out, "[a]s early as March
2016 the Forest Service informed the public that a Forest Plan amendment could be
needed."  U.S. Dep't of Agric., *Request for Comments and Notice of Public Scoping on
Resolution     Copper     Project     and     Land     Exchange     EIS*     (Mar.     2016),
https://www.resolutionmineeis.us/documents/usfs-tonto-legal-notice-scoping-schedule-
201603 ("The Tonto National Forest (TNF) is preparing an environmental impact
statement (EIS) to evaluate and disclose the potential environmental effects from: . . .
amendments to the Tonto National Forest Land and Resource Management Plan.").  The
2021 EIS also reiterated that:

> An initial review of the consistency of the proposed GPO with the forest plan
> indicates that approval of the proposed GPO would result in conditions that
> are inconsistent with the forest plan for some alternatives.  If needed, an
> amendment to the forest plan would address the necessary changes to
> relevant standards and guidelines for managing visual quality and recreation
> opportunities, as determined by the project's record of decision.

(*AMRC*, Doc. 9-1 at 9.)  In this way, the proposal in the FEIS to amend the Forest Plan
appears consistent with the agency's pre-existing position that such amendments might be
needed.

Regardless, the Forest Service demonstrated awareness that it was changing position
by noting that "[t]he [Forest Plan] was revised and implemented in December 2023"
(*AMRC*, Doc. 87-2 at 59) and including an additional 36 pages of analysis in the FEIS
specifically devoted to discussion of the new proposed amendments (*id.* at 59-95).  *See*

---

[28]    The Supreme Court has likewise expressed doubt that the "change-in-position"
doctrine applies to informal and non-binding agency action, although it declined to decide
the issue definitively. *Food & Drug Admin.*, 145 S. Ct. at 918 n.5 ("We have traditionally
applied the change-in-position doctrine when an agency shifts from a position expressed
in a more formal setting.  True, we have on at least one occasion applied the doctrine when
an agency altered a position first stated in a policy statement.  But as we explained in that
case, the policy statement instituted 'a standardized review process' that 'effectively'
resembled adjudication.").

*also Sierra Club*, 786 F.3d at 1226 ("[T]he BLM's change of view regarding the need for consultation was adequately justified after further investigation demonstrated the feasibility of private access.  Thus, the BLM did not act arbitrarily or capriciously when it changed its unofficial position regarding consultation.") (citation omitted).

### 3.    Summary As To NFMA Claims

It is unlikely that AMRC will be able to establish final agency action in relation to its NFMA claims.  Furthermore, AMRC is unlikely to prevail on the merits.

## II.    The Second *Winter* Factor

The second *Winter* factor asks whether the movant is "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  The Tribe contends it will suffer several "textbook examples of irreparable harm" once the land exchange occurs, including that "the Tribe and its members would lose access to all but 50 of Oak Flat's 2,422 acres, and even the limited access that remains would be temporary and subject to Resolution's unilateral choice."  (*San Carlos*, Doc. 105 at 24-25.)  AMRC reiterates these arguments, emphasizing that "the immediate loss of access for cultural and spiritual purposes for [tribal members] is profound," and contends that "the Exchange will also immediately and permanantly [sic] eliminate the legal ability of members of the other Plaintiff groups to access and use these lands for hiking, rock climbing, appreciating and viewing of wildlife, plants, and waters on these lands, camping, and other recreational and aesthetic purposes."  (*AMRC*, Doc. 87 at 5.)

The Federal Defendants disagree, arguing that Plaintiffs cannot make the required showing because the exchange will not "cut off access to *all* the exchanged lands." (*AMRC*, Doc. 93 at 48, emphasis added.)  The Federal Defendants emphasize that, under SALECA, Resolution Copper is require to "provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable, consistent with health and safety requirements, until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper."  (*San Carlos*, Doc. 114 at 48, quoting 16 U.S.C. § 539p(i)(3).)

Meanwhile, Resolution Copper argues that Plaintiffs will still have access to all of the federal land being exchanged following the transfer, because Resolution Copper has "committed to maintaining current recreational access to the federal land for at least the next ten years"; that "there will be no impact at all to the surface of the federal land being conveyed to Resolution in the exchange until 2026"; and that any future "changes in the land's status are the ultimate result mandated by Congress." (*AMRC*, Doc. 94 at 47-49.)

Plaintiffs have the better of these arguments. SALECA itself only guarantees access—and even then, only temporary access that may be rescinded "for safety reasons, as determined by Resolution Copper," 16 U.S.C. § 539p(i)(3)—to the Oak Flat *Campground*, which is a small fraction of overall area to be exchanged. As for Resolution Copper's contention that it will provide recreational access to all of exchanged land for at least 10 years, although the Court accepts and has no reason to question the sincerity of this contention, it does not appear to be legally enforceable. (*San Carlos*, Doc. 116-9 ¶¶ 13-14 [declaration from Victoria Peacey, Resolution Copper's president and general manager: "[S]ubsidence of the ground surface is anticipated to occur beginning approximately 6 years after initiation of mining—or approximately 16 years. Access to Oak Flat will remain largely unchanged for this period of 16 years. . . . Until that time, existing access to the entire Oak Flat Parcel will remain largely unchanged. The Oak Flat campground will remain open to the public and available for tribal events and ceremonies."].) Thus, it appears that nothing would stop Resolution Copper from reconsidering this proposed grant of access following the land exchange. *See also Apache Stronghold v. United States*, 2025 WL 1360694, *6 (D. Ariz. 2025) ("Nothing about Resolution Copper's broad 'commitment' to public access is legally binding; furthermore, even their statutorily mandated duty to maintain access to the Oak Flat Campground is (1) contingent on their *discretionary* determination that access is 'practicable' and 'consistent with health and safety requirements,' and (2) fails to account for the fact that the Oak Flat Campground represents only a tiny portion of Oak Flat itself.") (citations omitted).

More important, it is undisputed that once the land exchange is completed,

1   Resolution Copper will begin changing Oak Flat in irreversible ways. Resolution Copper
2   plans to begin "construction of initial data-gathering tunnels through the resource and
3   beneath Oak Flat" following the land exchange. (*San Carlos*, Doc. 116-9 ¶ 13.) Although
4   this activity may not immediately cause any perceptible change to the surface of the land,
5   it is still an irreversible change. Furthermore, Resolution Copper will begin engaging in
6   surface disturbances of Oak Flat in 2026. (*San Carlos*, Doc. 116-9 ¶ 15 ["It will be
7   months—that is, not until 2026—before Resolution creates new surface disturbance of the
8   Oak Flat parcel. . . . This will be for the purpose of creation of four new drill pads (soil
9   clearings), two access roads (soil/gravel), equipment storage (soil clearing), and a medical
10  evacuation area (soil clearing)."].) Although Resolution Copper contends these activities
11  will only affect a small fraction of Oak Flat, they are still surface disturbances, and they
12  will begin before the case would otherwise reach a conclusion—there is no way this
13  complicated case, in which the administrative record is not yet even filed, would proceed
14  past summary judgment by the start of 2026.

15          It follows that absent injunctive relief, tribal members are at most guaranteed to
16  have access to some portion of Oak Flat for some period of time following the land
17  exchange. That access, moreover, will be to land that will immediately start being laced
18  with subterranean data-gathering tunnels and then, beginning in 2026, will start undergoing
19  surface disturbances. Continued access to such land is not meaningless, but to a tribal
20  member who sincerely "believe[s] the destruction of Oak Flat will close off a portal to the
21  Creator forever and will completely devastate the Western Apaches' spiritual lifeblood,"
22  *Apache Stronghold*, 145 S. Ct. at 1480-82 (Gorsuch, J., dissenting from the denial of
23  certiorari), it is easy to see why being given limited access to the post-land exchange
24  version of Oak Flat is no substitute for, and thus does not remediate the irreparable injury
25  flowing the lack of unlimited access to, Oak Flat in its current form.

26  III.    The Third And Fourth *Winter* Factors

27          When, as here, "a government agency is a party," "the final two injunction factors—
28  the balance of equities and the public interest—merge." *Assurance Wireless*, 100 F.4th at

1    1031.

2           There is no doubt that an array of equities and public-interest considerations favor

3    Plaintiffs, for the reasons discussed above in relation to the second *Winter* factor and for

4    the additional reasons that various judges have observed during the course of the *Apache*

5    *Stronghold* proceedings. *Apache Stronghold v. United States*, 2021 WL 12295173, *7 (9th

6    Cir. 2021) ("[A]ll citizens have a stake in upholding the Constitution. This is particularly

7    so where religious rights are at issue, because protecting religious liberty and conscience

8    is obviously in the public interest.") (Bumatay, J., dissenting) (cleaned up); *Apache*

9    *Stronghold v. United States*, 2025 WL 1360694, *5-9 (D. Ariz. 2025) (Logan, J., granting

10   stay pending resolution of Apache Stronghold's petition for certiorari).

11          However, there are also weighty equities and public-interest considerations on the

12   other side of the ledger. As discussed at the outset of this order, SALECA represents a

13   considered choice by the political branches to prioritize the significant potential benefits

14   that Resolution Copper's mining activity is expected to generate—not only boosting

15   Arizona's economy to the tune of over $1 billion per year but also promoting critical

16   national security interests—at the expense of potential devastation to the religious beliefs

17   and practices of the Tribe and to the environment. These are profound tradeoffs, and the

18   litigation in this case has made clear that many affected parties strongly disagree with the

19   choice that Congress made. Even so, the presence of a preliminary injunction request does

20   not give the Court license, under the guise of the evaluating the third and fourth *Winter*

21   factors, to second-guess the political branches' wisdom in deciding how to balance those

22   considerations. *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 497 ("[A] court sitting in

23   equity cannot ignore the judgment of Congress, deliberately expressed in legislation. . . .

24   Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a

25   statute.") (cleaned up).[29] It follows that there is a public interest in allowing the land

26   ─────────────────
     [29]    In a related vein, the Court is unpersuaded by Plaintiffs' attempts to downplay the
27   national security ramifications of securing a domestic supply of copper. (*San Carlos*, Doc.
     119 at 20; *AMRC*, Doc. 97 at 20.) Regardless of the location of the smelting facilities, the
     political branches have determined that it is "imperative for our national security that the
28   United States take immediate action to facilitate domestic mineral production to the
     maximum possible extent." Exec. Order No. 14241, § 1, 90 Fed. Reg. 13,673 (Mar. 20,

exchange to occur *even when* all of its profound tradeoffs, and the corresponding equities and public-interest considerations that favor Plaintiffs, are factored into the calculus.

AMRC also contends the third and fourth *Winter* factors cut in Plaintiffs' favor because they will suffer immediate, irreparable harm if the land exchange is not enjoined, whereas "a temporary injunction would not stop Resolution from mining a single ounce of copper should the transfer be upheld." (*AMRC*, Doc. 97 at 20, cleaned up.)  Although this line of reasoning might have more force in a different case, *see, e.g.*, *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) ("[T]he balance of equities tips toward the LOWD plaintiffs, because the harms they face are permanent, while the intervenors face temporary delay."), it ignores the unique features of SALECA.  First, as noted, Congress specified that it wished for the land exchange to occur within 60 days of the issuance of the FEIS and clarified that "[t]he purpose of this section is to authorize, direct, facilitate, *and expedite* the exchange of land between Resolution Copper and the United States."  16 U.S.C. § 539p(a) (emphasis added). It follows that there is a public interest in allowing the land exchange to proceed on the expedited timetable Congress contemplated, as opposed to delaying it for years pending the resolution of these lawsuits.  Second, given the indications by the political branches that securing access to a domestic supply of copper has significant national security ramifications—a determination this Court possesses neither the competence nor prerogative to second-guess—the Court is unwilling to conclude that a multi-year delay in pursuing that objective can be disregarded as insignificant.

Given these considerations, the third and fourth *Winter* factors do not tip sharply in Plaintiffs' favor.

IV.    Conclusion As To The *Winter* Factors

Because Plaintiffs have not established a likelihood of success or even serious questions going to the merits of any of their claims, their requests for a preliminary injunction must be denied.  *Critchfield*, 137 F.4th at 922 ("In the absence of serious

_____

2025).

questions going to the merits, the court need not consider the other factors.") (cleaned up).

Moreover, even if Plaintiffs had established serious questions going to the merits, a preliminary injunction could only "issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc.*, 709 F.3d at 1291. As discussed in Part III above, those requirements are not satisfied here.

V.    Request For Injunction Pending Appeal

During oral argument, Plaintiffs asked the Court to issue an injunction pending appeal if it denied their preliminary injunction requests.

It is understandable why Plaintiffs made this request. Plaintiffs intend to seek emergency injunctive relief from the Ninth Circuit should their motions be denied, and under Rule 8(a)(1)(C) of the Federal Rules of Appellate Procedure, "[a] party must ordinarily move first in the district court for . . . an order suspending, modifying, restoring, or granting an injunction while an appeal is pending." *Id.* Rule 62(d) of the Federal Rules of Civil Procedure, in turn, provides "*[w]hile an appeal is pending* from an interlocutory order or final judgment that . . . refuses . . . an injunction, the court may . . . grant an injunction on terms for bond or other terms that secure the opposing party's rights." *Id.* (emphasis added). As things currently stand, no "appeal is pending," so Plaintiffs' request appears to be premature.

Nevertheless, in an abundance of caution, the Court clarifies that it would deny a request for an injunction pending appeal even if such a request were properly before it.[30] Although "Rule 62(d) contemplates that there will be situations where district courts can grant injunctions pending appeal even after denying a preliminary injunction," "the fact that a court previously found that a preliminary injunction was not warranted should carry significant weight, so the circumstances must be of unusual magnitude to justify a district

---

[30] With that said, the Court notes that it previously issued an order—which remains in effect—that "[t]he federal defendants are enjoined from conveying the federal land described in § 3003 of NDAA until August 19, 2025." (*San Carlos*, Doc. 99 at 20.) Thus, as a practical matter, Plaintiffs will have a period of time following the issuance of this order to attempt to obtain emergency injunctive relief from the Ninth Circuit. The Court endeavored to finalize and issue this order by August 15, 2025, which was no small task, so that Plaintiffs would have that period of time.

court granting an injunction pending appeal after denying a preliminary injunction. Only when the legal question raised is particularly important and serious questions going to the merits have been raised should a district court consider such a course of action." *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1235-36 (N.D. Cal. 2025) (cleaned up). "This can occur when the trial court is charting a new and unexplored ground by ruling on an admittedly difficult legal question, and when the equities of the case suggest that the status quo should be maintained." *Id.* (cleaned up).

Although these cases are undoubtedly important, of an unusual magnitude, and raise an array of difficult and unsettled legal questions, those difficult and unsettled legal questions relate to the jurisdictional and threshold issues raised by Defendants. In contrast, the *merits* of Plaintiffs' claims do not, in the Court's view, present close or serious questions, especially in light of *Seven County Infrastructure Coalition*. The Court therefore cannot find, in good conscience, that the Rule 62(d) standard is satisfied.

This conclusion is also informed by two other considerations. First, it is notable that the Supreme Court recently denied certiorari in *Apache Stronghold* despite the presence of claims that, in the Court's view, present much closer and more serious merits questions than the substantive claims at issue here. Second, as discussed in Part III above, SALECA evinces a public interest in expediting the land exchange and allowing it to occur on the timetable that Congress contemplated.

Accordingly,

**IT IS ORDERED** that:

1.     San Carlos's motion for preliminary injunction (*San Carlos*, Doc. 105) is **denied**.

2.     AMRC's motion for preliminary injunction (*AMRC*, Doc. 87) is **denied**.

3.     Federal Defendants' motion to strike (*San Carlos*, Doc. 115) is **denied**.

Dated this 15th day of August, 2025.

Dominic W. Lanza
United States District Judge